UNITED STATES DISTRICT COURT **NIGHT BOX**
SOUTHERN DISTRICT OF FLORIDA **FILED**

CASE NO. 01-6215-CR-JORDAN(s)/BANDSTRA **OCT 3 1 2002**

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

WILLIAM P. TRAINOR,

        Defendant.

_____/

**UNITED STATES' RESPONSE TO
DEFENDANT'S CORRECTED MOTION TO DISMISS
COUNTS 1-10, 12-14, AND 16-21 OF THE SUPERSEDING INDICTMENT
AS BEING BARRED BY THE STATUTE OF LIMITATIONS**

COMES NOW the United States, through the undersigned attorneys, and respectfully submits this United States' Response to Defendant's Corrected Motion to Dismiss Counts 1-10, 12-14, and 16-21, of the Superseding Indictment as Being Barred by the Statute of Limitations.

The United States opposes Defendant's motion because it lacks legal basis and is premised upon an erroneous statement of the facts. Contrary to the contention of the defendant, the United States filed an *ex parte* application under 18 U.S.C. § 3292 on April 10, 2001, not April 6, 2001. The district court properly granted that application 30 days later on May 10, 2001, suspending the statute of limitations pursuant to § 3292 to permit the United States to obtain foreign evidence from the Central Authority of Switzerland. The majority of court decisions considering § 3292, although not cited and not addressed in the defendant's motion, support the correctness of the government's *ex parte* filing. Further, contrary to the contention of the defendant, the United States took reasonable measures to pursue the foreign evidence and the evidence sought was the type of

evidence contemplated by the statute and was absolutely material to the investigation.  For these reasons as further described below, the United States respectfully requests that the defendant's motion should be denied.

## STATEMENT OF THE FACTS

On October 17, 2000, the Office of International Affairs ("OIA"), Criminal Division, United States Department of Justice submitted by air mail an Official Request for Assistance to the Central Authority of Switzerland (henceforth "Switzerland") in the Prosecution of William TRAINOR, et al.[1] The Request for Assistance stated that it was submitted in connection with a civil action being prosecuted by the United States Securities and Exchange Commission ("SEC") and a criminal investigation being conducted by the United States Department of Justice, Criminal Division, Fraud Section.  The Request for Assistance described in detail the scheme perpetrated by defendant William P. Trainor and others to defraud investors through misrepresentations and sham transactions involving various entities controlled by defendant Trainor. One of the entities which played a crucial role in the scheme was known as New England Diagnostics ("NED").  The Request for Assistance, which noted that Andreas Schweitzer had been listed as the owner of NED, sought documents, as well as testimony, from Schweitzer, a Swiss citizen.

In January, February, March and April 2001, OIA followed up on the Request for Assistance with inquiries of Switzerland, and OIA and Switzerland exchanged correspondence  regarding the

---

[1] The transmittal letter of October 17, 2000 enclosed a memo styled: Request for Assistance in SEC v. Trainor, et al, signed (English version) on January 21, 2000 by Thomas G. Snow, Deputy Director, OIA.  The memo was then translated into German prior to submission to Switzerland.  Switzerland has indicated that the Request for Assistance was received at the Federal Office of Justice on October 23, 2000.

2

status of the Request.[2]

On April 10, 2001, the United States filed in the United States District Court for the Southern District of Florida in a matter styled *In Re Sealed Matter (Grand Jury 00-01)*, pursuant to 18 U.S.C. § 3292, a sealed *ex parte* application and proposed order for suspension of the statute of limitations for the offenses under investigation pending receipt of evidence from Switzerland.[3] On May 10, 2001, the district court, in a sealed *ex parte* order, granted the application of the United States suspending the statute of limitations as of October 17, 2000.[4]   In June 2001, Schweitzer's location was identified in Geneva. In August 2001, OIA again submitted a follow-up inquiry to Switzerland for an update on the Request for Assistance.

On September 20, 2001, the grand jury returned a 21-count indictment against defendant Trainor alleging eleven counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2, four counts of laundering monetary instruments in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2, and five counts of engaging in a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. §§ 1957 and 2. The indictment alleged that it was a purpose of the scheme and artifice that defendant Trainor, through fraudulent and misleading transactions about the business activities of certain named entities, including NED, acquired control of Novatek,

---

[2] One problem identified by Switzerland was in locating Schweitzer.

[3] A prior application styled differently and with a different proposed order was filed on April 6, 2001, but was not acted upon by the district court. The defendant incorrectly cites April 6th as the date the government filed the application that was later granted by the district court.

[4] The district court subsequently issued an order unsealing the grand jury record in this matter for the purpose of providing defendant Trainor with a copy of these documents. The grand jury record is for all other purposes still under seal.

fraudulently induced investors to buy Novatek securities, and fraudulently diverted money from Novatek. Indictment at ¶ 13.[5] The indictment also included allegations of sham license transactions and other misrepresentations involving NED and wire transfers of funds to NED. See Indictment at ¶ 20-23, 29.  Defendant Trainor also used NED in his scheme as a conduit to direct over $6 million from Novatek and converted millions of dollars to the use of himself and his family members.

In October 2001, and again in February 2002, OIA requested information regarding the Request for Assistance. On February 21, 2002, Switzerland advised OIA that Schweitzer had been interviewed by a Swiss magistrate. Switzerland sent the official statement of the interview to the undersigned prosecutor at the Fraud Section on March 2, 2002.

Subsequently, the United States continued to request that Switzerland seek additional information and evidence from Schweitzer and to request that prosecutors be permitted to interview Schweitzer. On October 29, 2002, Switzerland informed OIA that Schweitzer would be "ready to testify in Switzerland in November or December 2002" (but would not be willing to be recorded by visual means).  Switzerland informed OIA that defense counsel could be admitted to attend the testimony if such would make the matter admissible in accordance with United States law.

## ARGUMENT

### A.    Introduction.

18 U.S.C. § 3292 was part of the Comprehensive Crime Control Act of 1984.  Its stated purpose was to make foreign-kept business records more readily admissible into evidence in criminal

---

[5] On June 13, 2002, the grand jury returned a superseding indictment adding three tax evasion charges.

4

trials in the United States and to extend the statute of limitations and Speedy Trial Act deadlines when evidence located in foreign countries must be obtained. *See* H.R. Rep. No. 98-907, 98th Cong., 2d Sess at 2-3 (1984), reprinted in 1984 U.S. Code Cong. & Admin. News 3578-86. *See also United States v. Meador*, 138 F.3d 986, 994 (5th Cir.1998); *United States v. Bischel*, 61 F.3d 1429, 1433 (9th Cir.1995). The statute was prompted, in part, by concern for the difficulty and delay in obtaining evidence from other countries, which generally takes a considerable period of time to complete. *1984 U.S.C.C.A.N.* at 3578. Testimony taken before the House Subcommittee on Criminal Justice cited a particular instance involving the difficulty in obtaining records in Switzerland. *Id.* at 3578.

18 U.S.C. § 3292 provides in pertinent part:

(a)(1) Upon application of the United States, filed before an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

  (2) The court shall rule upon such application not later than thirty days after the filing of the application.

(b) Except as provided in subsection (c) of this section, a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request. . . .

(c) The total of all periods of suspension under this section with respect to an offense –

  (1) shall not exceed three years;

                                        * * *

(d) As used in this section, the term "official request" means a letter rogatory, * * * or any other request for evidence made by a court of the United States or an authority of the United States having criminal law enforcement responsibility, to a court or other authority of a foreign country.

The United States submits that the Request for Assistance to Switzerland was for a valid purpose as contemplated by the § 3292 and the procedure described in the statute was properly followed.

**B.    The district court properly exercised jurisdiction to suspend the running of the statute of limitations**.

The defendant wrongly contends that subsection (a)(2) is a jurisdictional time limitation, that the district court did not take action within 30 days after the filing of the application, and that the district court, therefore, was without jurisdiction to enter the suspension order. Defendant's Motion at 6.  The defendant's contention fails because he misstates the date of the application, wrongly contending that the application on which the order was based was filed on April 6, 2001.

The United States filed its application in the district court on April 10, 2001, and based upon that application, the district court issued an order on May 10, 2001, suspending the statute of limitations.  Hence, by standard counting rules, the district court ruled on the motion not later than 30 days after the filing of the application.[6]

The defendant's error concerning the date the application was filed makes it unnecessary to reach the issue of whether subsection (a)(2) establishes a finite jurisdictional time limitation as contended by the defendant.[7]

---

[6]  See Fed. R. App. P. 26(a) excluding the day of the act or event and including the last day of the period.

[7]  The United States has found no case on point regarding § 3292 that addresses whether the district court's jurisdiction to issue a tolling order terminates after the 30th day.  The United States contends that the thirty day time limit is not jurisdictional.

6

C.     **The *Ex Parte* application is proper within the plain language of the statute and is in accordance with prevailing case law.**

The United States submitted the application to the district court *ex parte* as is routinely done in matters involving grand jury investigations. Defendant Trainor, nevertheless, contends that these "secret proceedings," even though they conformed to standard grand jury practice, violated his Fifth Amendment right to due process. He asserts that because § 3292 establishes a preponderance of the evidence standard, an adversarial hearing in which the district court hears evidence from "each side" is mandated. Defendant's Motion at 7. In an attempt to support his argument, the defendant cites only one decision, *In Re Grand Jury Investigation*, 3 F. Supp.2d 82 (D. Mass. 1998), in which the district court declined to issue an order under § 3292 upon an *ex parte* application. That case, and the defendant's argument, has been soundly and correctly rebuffed by other courts.

Indeed, the defendant inexplicably fails to cite any of the subsequent decisions which expressly declined to follow the district court opinion cited by the defendant and which specifically approved *ex parte* applications. See *United States v. DeGeorge*, 219 F.3d 930, 937 (9th Cir.2000); *United States v. King*, 2000 WL 362026, at *20 (W.D.N.Y. Mar. 24, 2000). Further, the defendant fails to note other § 3292 cases in which *ex parte* applications were submitted and the courts upheld the tolling of the statute of limitations. *See United States v. Wilson*, 249 F.3d 366, 371 (5th Cir. 2001) ("*application to toll the statute of limitations under § 3292 is a preindictment ex parte proceeding*") (emphasis added); *United States v. Meador, 138 F.3d 986* (5th Cir.1998);[8] *United States v. Neill*, 940 F. Supp. 332 (D.D.C. 1996), *vacated on other grounds*, 953 F. Supp. 831

---

[8] The defendant noted the *Meador* case in his section regarding materiality of the evidence but did not mention that the case involved an *ex parte* application in that case.

(D.D.C.1996).  *See also United States v. Bischel*, 61 F.3d 1429 (9th Cir.1995).

Those cases approving an *ex parte* procedure did so for good reason. First, as pointed out in *DeGeorge*, the statute itself nowhere states that a grand jury target or any other person is entitled to notice or a hearing prior to the court's suspension of the statute of limitations. *DeGeorge*, 219 F.3d at 937. Nor does the legislative history in any way indicate that Congress intended the application process "would be on notice to anyone." *See King*, 2000 WL at *20.

The court in *DeGeorge* also specifically rejected a defense contention that the "preponderance of the evidence" language in the statute entitles the defendant to an adversarial hearing. *DeGeorge*, 291 F.3d at 937. As the court in *DeGeorge* noted, the preponderance of the evidence standard simply means that the United States has a burden to establish that the foreign evidence it seeks meets the requirements of § 3292. *Id.* at 937. If Congress had intended to require an adversarial hearing when it used the language "preponderance of the evidence," it clearly would have said so.

The defendant's argument never considers the secrecy requirements of grand jury proceedings, even though the statute is plainly addressed to grand jury investigations. As the Court in *DeGeorge* observed, an adversarial hearing would "ignore the traditionally non-adversarial and secret nature of grand jury investigations." *Id.* at 937. The Court in *King* also similarly observed that an "*ex parte* application to suspend a statute of limitations to facilitate a grand jury investigation is consistent with the long established principle that the grand jury proceedings are secret and non-adversarial in nature." *King,* 2000 WL at *20 . The *King* decision further pointed out that converting the § 3292 procedure into a mandatory adversarial hearing would frustrate the avoidance

8

of delay in completing the investigation that was a primary objective of the § 3292 legislation. *Id.* at *20.

In the present case, an adversarial hearing would have afforded the defendant detailed knowledge of the grand jury investigation – including information about persons allegedly involved in the scheme either as knowing participants or as witnesses – and an opportunity to frustrate the government's efforts to obtain both documentary and testimonial evidence. If the United States had been required to provide notice to the defendant and opportunity for an adversarial hearing, it would have afforded Trainor an additional opportunity to attempt to manipulate the evidence provided by Schweitzer and others – important evidence given that Schweitzer's fictional involvement in NED was central to the defendant's scheme to defraud.

In light of the plain language of the statute, its legislative history, a review of the relevant case law, and the circumstances of the present case, the district court's decision to permit an *ex parte* application was appropriate and should not be disturbed.

### D.    The United States exercised due diligence in pursuing the evidence in Switzerland.

The United States disagrees with the defendant's unsupported assertion that the United States did not exercise "due diligence" in obtaining the evidence from Switzerland.[9] See Defendant's Motion at 9-10. The official Request for Assistance was transmitted to Switzerland on October 17, 2000.[10] Thereafter, OIA made repeated inquiries to Switzerland regarding the status of the Request

---

[9] There is no written "due diligence" requirement in 18 U.S.C. § 3292. See *Bischel*, 61 F.3d at 1435 (noting that § 3292(c) provides a "built-in" three year time limit).

[10] The earliest date of any substantive charge alleged in the indictment is Count 14, which concerns a financial transaction that occurred in March 1996. Hence, the Request for

for Assistance. Those inquiries were made each month from January 2001 through April 2001, the date when the application was submitted to the district court.[11]   The United States continued to make urgent inquiries of Switzerland and press for evidence up through the time of the interview with Schweitzer. Further, the United States assisted in Switzerland's efforts to locate Schweitzer. Hence, the United States was diligent, making repeated and reasonable efforts to obtain the requested evidence.

### E.   The Request for Assistance sought evidence of the type contemplated in the statute.

The Defendant contends that the evidence sought by the United States must be not merely relevant, but also material to the offenses under investigation. Defendant's Motion at 11. Without describing the evidence sought in any detail whatsoever, the defendant characterizes the evidence as being "merely incidental" and "marginal" to the government's case. See Defendant's Motion at 11-12. Such characterization is ridiculous.[12] The defendant well knows the importance of evidence sought from Mr. Schweitzer. Specifically, the lies that the defendant told and caused others to tell concerning Schweitzer and NED were a significant part of his scheme to defraud.

The original indictment and the superseding indictment allege that it was a purpose of the

---

Assistance was submitted to Switzerland nearly four months before the running of the statute of limitations as to any count in the indictment.

[11] The defendant also asserts that the Swiss Central Authority did not respond in a timely manner. Defendant's Motion at 10. The purpose of the statute, as noted previously, is to compensate for the difficulty in obtaining evidence in foreign countries.

[12] The defendant appears to suggest, without directly stating, that the United States used the Request for Assistance as a ruse while seeking "more promising leads." See Defendant's Motion at 12. That allegation is without any basis in fact and is completely meritless.

10

scheme and artifice that through fraudulent and misleading transactions and representations about the business activity of entities, including Universal HealthWatch Inc. ("Universal") and New England Diagnostics ("NED"), the defendant acquired control of Novatek, fraudulently induced investors to buy Novatek securities, and fraudulently diverted money from Novatek to the defendant's personal use and for the use of his family members. Indictment at ¶ 13. The indictment describes how NED was used in sham license transactions by fraudulently flipping distribution licenses for medical devices between entities controlled by the defendant to artificially inflate the apparent value of the licenses and the entities. See Indictment at ¶ 20-22.

For example, the defendant represented and caused others to represent that in April 1995 NED provided $250,000 in cash and equipment and technology valued at about $7.8 million to Universal HealthWatch, Inc. ("Universal") in exchange for a license to distribute Universal's products in South America and other areas. In reality, NED was not the real source of the $250,000, NED provided no technology to Universal, and the "equipment" was a very small fraction of the value claimed and was never used by Universal. A short time later, NED flipped a license to Medical Products Inc., another company controlled by the defendant, in exchange for a $30 million note.[13] That exchange falsely pumped up the apparent value of the license held by Medical Products, Inc. A short time later, Medical Products, Inc. merged with Novatek, exchanging the license for millions of dollars in cash and Novatek stock. The cash went through a NED bank account to buy an expensive beach-front house for Trainor. In the process, defendant Trainor also acquired control

---

[13] NED "sold" to Medical Products, Inc. a license for only part of the geographical region covered in the original license, and retained the license for other regions. After the defendant gained control of Novatek, NED sold licenses to Novatek covering Mexico and Central America for still more millions of dollars.

of Novatek. A few months later, in May and June 1996, Novatek paid still more millions of dollars – all fraudulently obtained from investors – to NED for other licenses.

Money flowing to NED was secretly transferred to the benefit of the defendant and his family members to buy expensive houses and cars, among other things. Some of the money that fraudulently flowed to NED was secretly routed back to Novatek and Universal from a NED account in a fraudulent attempt to make it appear that revenue was coming in from contracts in foreign countries. *See e.g.,* Indictment at Counts 12-13 (money laundering).

To make it appear that NED was an independent third party entity which had acquired valuable licenses in arms-length transactions, the defendant concealed his control over NED and concealed that he was benefitting from the fraud. The defendant told investors and others associated with Novatek that Andreas Schweitzer was the owner of NED, and led them to believe that the defendant had no financial interest in NED.[14]

Therefore, it was important that the United States obtain evidence reasonably believed to be in Schweitzer's possession concerning NED, Universal and Novatek, and concerning the defendant and other persons associated with the scheme. The evidence sought was clearly material.

## CONCLUSION

For the reasons stated above, the district court should deny the defendant's motion to dismiss Counts 1-10, 12-14 and 16-21 of the Superseding Indictment. The United States followed the

---

[14] In his interview with the Swiss magistrate, Schweitzer did not mention the name "New England Diagnostics." He stated, however, that defendant Trainor asked him to hold a share certificate in trust for Trainor's company, Novatek, and that he believed that he was holding the certificate for Trainor. Schweitzer also stated that he was in no other way involved with Novatek except that he recalled attending Novatek's annual general meeting at Trainor's request.

procedures of 18 U.S.C. § 3292 in filing the application to suspend the statute of limitations. The

district court's decision to issue the tolling order was well-justified, well-considered and fully in

accordance with the law and intent of the statute.

Respectfully submitted,

MARCOS JIMENEZ
UNITED STATES ATTORNEY

By:

Jack B. Patrick
Senior Trial Attorney
Court ID # A5500596
United States Department of Justice
10th & Constitution Avenue, NW
Bond Building, Room 3114
Washington, D.C. 20530
E-Mail:  Jack.Patrick2@usdoj.gov
Tel: (202) 514-9842
Facsimile: (202) 514-0152

Jonathan R. Barr
Trial Attorney
United States Department of Justice
Court ID # A5500597
United States Department of Justice
10th & Constitution Avenue, NW
Bond Building, Room 3106
Washington, D.C. 20530
Telephone: (202) 353-7691
Facsimile: (202) 514-0152
E-Mail: Jonathan.R.Barr@usdoj.gov