SEALED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 01-6215-CR-JORDAN/BANDSTRA

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

WILLIAM P. TRAINOR,

    Unsealed 7/18/03

    Defendant.
_____/

## WILLIAM TRAINOR'S ~~SEALED~~ SUPPLEMENT TO REPLY TO GOVERNMENT'S RESPONSE TO CORRECTED MOTION TO DISMISS

William Trainor, through undersigned counsel, respectfully files the following documents under seal as a supplement to his Reply to the Government's Response to his Motion to Dismiss.

    Respectfully submitted,

    KATHLEEN M. WILLIAMS
    Federal Public Defender

By: *[signature]*
Michael Caruso
Assistant Federal Public Defender
Attorney for Defendant
Florida Bar No. 0051993
150 West Flagler Street, Suite 1700
Miami, Florida 33130-1555
Telephone: (305) 530-7000, ext. 135
Facsimile: (305) 536-4559

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing instrument was mailed the ____ day of December, 2002, to United States Attorney, 99 NE 4th Street, Miami, FL 33132-2111 and Jack B. Patrick, Senior Trial Attorney, Fraud Section, Criminal Division, United States Department of Justice, 10th & Constitution Avenue, N.W., Bond Building, Room 3114, Washington, DC 20005.

By: _____
Michael Caruso

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. 00-01

FILED by _____ D.C.
INTAKE
APR -6 2001
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. • FT. LAUD.

IN RE SEALED MATTER )
(Grand Jury Investigation of )
Novatek International, Inc. et al) )
_____ )

### SEALED MOTION FOR SUSPENSION OF STATUTE OF LIMITATIONS

The United States of America, by and through its undersigned counsel, hereby applies and moves this Court, ex parte and under seal, pursuant to 18 U.S.C. § 3292, for an order suspending the running of the statute of limitations for the offenses under investigation in the above-captioned matter, pending receipt of testimony and evidence from Switzerland. The offenses under investigation in the above-captioned matter concern the making of false statements, the concealment of material facts, and other acts of fraud or deception relating to Novatek International, Inc. and related entities, including Health Care Limited, Universal HealthWatch, Inc., Medical Products, Inc. and New England Diagnostics. Such offenses may include, but are not limited to, violations of 18 U.S.C. §§ 1341, 1343, 1956 and 1957.

The proposed order of suspension will cover the period beginning October 17, 2000, the date on which an official request for evidence in connection with the above-referenced investigation was submitted to Switzerland by the Criminal Division of the United States Department of Justice and ending on the date on which Switzerland takes final action on the request.

As this is an on-going grand jury matter that is subject to the general rule of secrecy contained in Rule 6(e) of the Federal Rules of Criminal Procedure, a separate motion requests filing under seal of this application and the Order until indictment of any defendant in this investigation or until further order of the Court.

This application is based on the attached Memorandum of Points and Authorities and attached exhibits.

Dated: March 29, 2001.

>Respectfully submitted,
>
>GUY A. LEWIS
>United States Attorney
>
>By: *Jack B Patrick*
>
>JACK B. PATRICK
>Senior Trial Attorney
>VA Bar No. 32645
>Fraud Section, Criminal Division
>U.S. Department of Justice
>1400 New York Avenue
>Washington, DC 20005
>Tel: (202) 514-9842
>Fax: (202) 514-0152
>E-MAIL: Jack.Patrick2@USDOJ.GOV

2

## MEMORANDUM OF POINTS AND AUTHORITIES

A.   Grand Jury Investigation.

A grand jury convened in the Southern District of Florida has been conducting an investigation concerning investments in Novatek International, Inc. and related entities. The investigation has focused on allegations that from in or about June 1994 through in or about December 1996 William P. Trainor and Vincent D. Celentano fraudulently induced investments in entities which they controlled and that they fraudulently gained control of Novatek International, Inc. ("Novatek"), a publicly-traded company, and, thereafter, used Novatek to engage in a pump and dump securities fraud scheme.

In or about 1994, William Trainor and Vincent Celentano began to create entities that purported to distribute medical diagnostic devices in countries outside of the United States. The first entity was Health Care Limited, organized in Russia. Health Care Limited, and subsequent entities controlled by Trainor and Celentano, obtained licenses to distribute the devices from Universal HealthWatch, Inc., which was another entity controlled by Trainor and Celentano and which was headquartered in Columbia, Maryland. Universal HealthWatch, Inc. was supposed to develop the devices or buy them from other companies. By selling the licenses between entities which they controlled, essentially "flipping" the licenses at increasing prices mostly paid for with promissory notes, Trainor and Celentano were able to create the illusion of value.

In or about January 1995, Trainor and Celentano began to sell stock in Health Care Limited, based on their false claims regarding Health Care Limited, including claims that they had a $216 million annual contract with a Russian government entity and claims that Celentano had put over $50 million into their company.

In or about November 1995, Trainor and Celentano began looking for a publicly-traded company which they could acquire and through which they could market medical diagnostic devices, reaching a broader range of investor-victims. In or about December 1995, they focused on Novatek.

Novatek was a manufacturer of steel, hurricane-proof buildings, headquartered in Boynton Beach, Florida. At that time, Novatek was not a very profitable operation. Novatek officials engaged in discussions with Celentano and with others on behalf of Trainor and Celentano concerning a possible merger between Novatek and Medical Products, Inc. ("MPI"), a company which Trainor and Celentano formed in November 1995. MPI was owned by the Pickeral Cove Trust and The Celentano Group, entities made up of the family members of Trainor and Celentano. The same entities owned Universal HealthWatch, Inc. The ownership structure allowed Trainor and Celentano to control both MPI and Universal HealthWatch, Inc.

MPI's sole asset was a license to distribute in South America and the Bahamas the medical diagnostic devices of Universal HealthWatch, Inc. MPI had acquired the license by an agreement, dated November 30, 1995, from an entity called New England Diagnostics, Inc. ("NED"), purportedly for $30 million, given by MPI as a promissory note. NED had purportedly acquired its license from Universal HealthWatch, Inc., covering many more countries, for $250,000 and certain other promises. Hence, the license flowed from Universal HealthWatch, Inc. to NED to MPI and the price purportedly paid for the license increased from $250,000 to $30 million in no more than a few months time.

2

Accountants who audited the financial statements of MPI and Novatek prior to the merger raised certain concerns during the merger negotiations, including whether or not the value being suggested for MPI in a proposed swap for Novatek stock was legitimate or falsely inflated and whether or not the license transactions being used to support MPI's value were between unrelated parties. Since the ownership of Universal HealthWatch, Inc. and MPI was essentially the same, the focus was on the ownership and control of NED.

Celentano made false representations and provided false documents to the accountants involved in the merger, creating the impression that the license held by MPI was valuable and that the license agreements were legitimate, arms-length transactions. Celentano represented that NED was not related to Universal HealthWatch, Inc. or MPI and that neither Celentano or Trainor controlled NED. Subsequently, Trainor and Celentano alleged that NED was owned by Andreas Schweitzer, a Swiss businessman. The grand jury investigation, however, has revealed that NED was operated out of the home of Trainor's daughter, Karen Losordo, in Hingham, Massachusetts and that Trainor and Celentano provided instructions to her as to NED's operations, including where to send money from NED. Losordo, who claims only to be the agent of NED, is identified in various documents as the president, sole director and authorized agent of NED.

Based on false and misleading representations made and caused to be made by Trainor and Celentano, Novatek officials agreed to the merger. In or about March 1996, Novatek merged with MPI, mistakenly believing that it was obtaining a license worth more than $55 million in the acquisition, the bump up from $30 million to $55 million being based on other license and

3

revenue figures. The $55 million value was then used in Novatek financial statements submitted to the SEC, resulting in Novatek appearing to have assets of about $55 million value.

As part of the merger, MPI acquired about 4 million shares of Novatek stock. NED also received about 3.4 million shares of Novatek and $1.3 million in cash as payment on the promissory note given to NED by MPI for the license. The $1.3 million ended up being used to buy a house on the Hillsboro mile for the Trainor family.

After the merger, Trainor and Celentano effectively controlled Novatek and caused Novatek to make additional multi-million dollar agreements with NED for licenses to distribute UHW medical diagnostic devices in Mexico and Central America. Trainor and Celentano also caused Novatek to issue press releases from March 1996 through September 1996 which falsely gave the appearance that Novatek had binding multi-million dollar contracts to distribute the medical diagnostic devices in South America and that Novatek was receiving revenue from the contracts. Novatek also submitted period reports to the SEC which repeated the false claims in the press releases and reflected Novatek's ownership of the $55 million license.

The false claims induced investors to buy Novatek stock and induced investors to pay about $7 million for Novatek convertible debentures. The efforts of Trainor and Celentano to fraudulently inflate the value of Novatek's stock price were successful. During the relevant period, Novatek's stock price more than doubled in value, rising from a mere $5 per share in March 1996 to over $13 per share in September 1996 before settling back to $9 per share. The stock price totally collapsed following suspension of trading in October 1996. Novatek subsequently went into bankruptcy. Trainor then fraudulently induced a Las Vegas businessman

4

to provide millions of dollars to continue the operations of Universal HealthWatch, Inc., with substantial amounts of that funding ending up in the hands of the Trainor family.

Tracing of the money paid to Novatek for the convertible debentures has revealed that about $7 million went from Novatek to NED, purportedly as payments on licenses sold by NED to Novatek and on loans made by NED to Novatek. Other money from the sale of stock also went through NED. After the money reached NED, Karen Losordo moved the money to other accounts or wired the money back to Florida and elsewhere to buy expensive homes and cars for the Trainor family. Over $1 million of the money was used to buy back stock from disgruntled family and friends who had bought stock based on Celentano's promise to repay them if their stock value did not increase. At least $250,000 went back to Novatek from NED to create the appearance that money was being received under a contract in South America as had been announced in a press release.

B. <u>Foreign Evidence and Treaty Requests</u>.

On October 17, 2000, a request for assistance in the prosecution of William Trainor, et al was submitted by the Central Authority of the United States to the government of Switzerland pursuant to the Treaty on Mutual Assistance in Criminal Matters entered into force on January 23, 1977, and to the Diplomatic Notes exchanged on November 3, 1993 in connection with a civil action by the United States Securities and Exchange Commission ("SEC") and a criminal investigation being conducted by the United States Department of Justice, Criminal Division, Fraud Section ("DOJ"). The request identified a civil lawsuit filed by the SEC and discussed the SEC interest. The request also stated that DOJ was investigating whether Trainor and other

5

persons and entities violated United States law by engaging in mail and wire fraud and money laundering in connection with misrepresentations made to investors. The request set forth the statutory offenses of 18 U.S.C. § 1341 (mail fraud), 1343 (wire fraud), 1956 (laundering of monetary instruments), and 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

The request sought was to obtain bank records and other documents in the possession of Andreas Schweitzer concerning Novatek, HealthCare Limited, Universal HealthWatch, Inc. and NED and concerning Trainor, Celentano and Losordo and to obtain business record certifications for the documents. The request also sought to have a Swiss magistrate arrange recorded testimony from Schweitzer and to have the Swiss magistrate invite Schweitzer to appear to testify before a grand jury (at that time identified as being in Washington, DC) and/or at trial.

The documents in the possession of Schweitzer are necessary to the grand jury investigation being conducted in the Southern District of Florida in order to determine Schweitzer's knowledge of and involvement in the license transactions and the transfer of money and to identify the true ownership and control of NED, the true purpose for NED's involvement in the license transactions, and the true value of the licenses.

The issue of the ownership and control of NED is of critical importance to the government's investigation of the aforementioned fraud and money laundering offenses. The purported $30 million license owned by MPI enabled Celentano and Trainor to gain control of Novatek. Moreover, the grossly inflated value of the MPI license shown on Novatek's financial statements after the Novatek/MPI merger, in part, induced people to invest million of dollars in

6

Novatek during the relevant period. If NED was owned or controlled by Trainor or Celentano (or their nominees), then it is clear that the license value was created through a series of related party transactions resembling classic land flips rather than through legitimate arms-length transactions as Celentano and Trainor represented to the auditors of MPI and Novatek. Thus, evidence related to the control or ownership of NED bears directly on whether Celentano, Trainor and others committed the fraud offenses outlined earlier. Because NED was the primary vehicle used to launder the proceeds of the fraud, evidence concerning the ownership and control of NED is equally important to the investigation of the money laundering offenses described above. Celentano, Trainor and Losordo have at various times claimed that NED was owned by Andreas Schweitzer. Accordingly, testimony and documentary evidence from Schweitzer concerning NED is critical to the government's fraud and money laundering investigation.

C. <u>Legal Authority for Suspension of the Statute of Limitations</u>

Title 18, United States Code, Section 3292, permits a court to suspend the running of the statute of limitations for a period of up to the three years when an official request has been made for evidence in a foreign country. Section 3292 provides in pertinent part as follows:

> (a) (1) Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.
> * * *
> (d) As used in this section, the term "official request" means a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the United States or an authority of the United States having

7

criminal law enforcement responsibility, to a court or other authority of a foreign country.

Upon receipt of an application that outlines the government's reasons to believe that evidence of an offense lies outside the jurisdiction of the United States, the Court must determine by a preponderance of the evidence (1) that "an official request" has been made and (2) that "it reasonably appears or reasonably appeared at the time the request was made, that such evidence is or was, in such foreign country. Exhibit A is the request for assistance by the United States Department of Justice. The issuance of the request satisfies the first prerequisite of the statute - - that an "official request" has been made to the foreign government by "an authority of the United States having criminal law enforcement responsibility."

The final prerequisite to stay the running of the statute of limitations is whether it reasonably appears that the evidence sought under the request for foreign assistance is, or was, in the foreign country. Documents obtained by the grand jury have identified Schweitzer as the holder of bearer stock of NED, as a Swiss resident, and have identified his business address as being in Switzerland. Agreements pertinent to NED and Schweitzer have identified Schweitzer's address in Switzerland. Witnesses interviewed by the Federal Bureau of Investigation have also stated that Trainor and Celentano represented to them that Schweitzer was the owner of NED and have identified Schweitzer as a Swiss resident.

The date for the tolling of the limitations period is the date of the official request for evidence, not the date that the § 3292 motion is made. United States v. Bischel, 61 F.3d 1429, 1434 (9th Cir.1995). Although the request was signed by Thomas Snow, Deputy Director, Office

8

of International Affairs, Criminal Division, on January 2, 2000, it was not submitted by the DOJ Criminal Division to the Central Authority of Switzerland until October 17, 2000. Accordingly, the United States takes the position for purposes of this motion only that the date of the request is October 17, 2000.

The statute is tolled until final action is taken by the Swiss Authorities. The Swiss authorities have requested additional information regarding Schweitzer, the matters being investigated, and the damages suffered by investors, and final action has not been taken by the Swiss authorities. See United States v. Bischel, 61 F.3d 1429, 1434 (9th Cir.1995)("final action" for purposes of § 3292 means a dispositive response by the foreign sovereign t both the request for records and for a certificate of authenticity of those records as identified in the official request).

D.  Conclusion.

For the foregoing reasons, the government respectfully requests that the court enter an order suspending the running of the statute of limitations herein as of October 17, 2000 until the appropriate authorities in Switzerland take final action on the official request.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. GJ-00-01

IN RE SEALED MATTER         )
(Grand Jury 00-01)          )
                            )
_____ )

### SEALED ORDER

Upon application ex parte and under seal of the United States of America, pursuant to 18 U.S.C. § 3292, the Court finds by a preponderance of the evidence that an official request was submitted to the appropriate Switzerland authorities on October 17, 2000 for evidence relating to the offenses of (1) mail fraud, 18 U.S.C. §§ 1341, (2) wire fraud, 18 U.S.C. § 1343, (3) laundering of monetary instruments, 18 U.S.C. § 1956, and (4) engaging in monetary transactions in property derived from specified unlawful activity, 18 U.S.C. § 1957, and that it reasonably appears that such evidence is in Switzerland.

Therefore, in view of the findings, it is hereby

ORDERED that the application of the United States is granted, and it is further

ORDERED that the running of the statute of limitations for the offenses set forth above and further described in the Motion of the United States for Suspension of the Statute of Limitations is hereby suspended beginning on October 17, 2000 until the date on which the authorities of Switzerland take final action on such request by delivering a complete response to

the United States, provided that this period of suspension may not exceed three years.

IT IS FURTHER ORDERED that, within ten (10) days of being advised that final action has been taken by Switzerland on the government's request, government counsel assigned to this investigation shall notify the Court of such final action.

Dated: This __10TH__ day of __May__, 2001.

_____
UNITED STATES DISTRICT JUDGE

```
                                                            [vdkttext]


                             Case Selection
Dkt type: cr   Case Number: 01-6215      Division: 0   FtLauderdale

Transaction: kseal doc -/-/- - -
                             History Record
Occurrence date:    12/03/02     Service date :             ID#  5489396
                             Document Record
Document number:       89    -1   Document type :doc        -
Date filed : 12/03/02             Date disposed :        Term # :
Date req :                        Time req :             Flag :
Requested Amt :
+------------------------------------------------------------+
 SEALED DOCUMENT as to William P. Trainor



+editing docket text----------------------------------------+


 Command mode (? for commands)
```