UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 01-6215-CR-JORDAN(s)/BANDSTRA

UNITED STATES OF AMERICA,                )
                                          )
            Plaintiff,                    )
                                          )
v.                                        )
                                          )
WILLIAM P. TRAINOR,                       )
                                          )
            Defendant.                    )
_____)

NIGHT BOX
FILED

MAR 05 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

**UNITED STATES' SUPPLEMENTAL MEMORANDUM OF LAW IN RESPONSE TO
DEFENDANT'S CORRECTED MOTION TO DISMISS COUNTS 1-10, 12-14, AND 16-21
OF THE SUPERSEDING INDICTMENT AS BEING BARRED
BY THE STATUTE OF LIMITATIONS**

COMES NOW the United States, through the undersigned attorney, and respectfully

submits this United States' Supplemental Memorandum of Law In Response to Defendant's

Corrected Motion to Dismiss Counts 1-10, 12-14, and 16-21 of the Superseding Indictment as

Being Barred by the Statute of Limitations.   Attached to the memoranda of law as Exhibit 1 is a

copy of the government's *ex parte* motion, date-stamped as being filed on April 10, 2001.

On February 25, 2003, the Court issued an Order directing the parties to file supplemental

memoranda of law, not exceeding ten pages, addressing the effect of the Eleventh Circuit's

recent decision in United States v. Torres, 318 F.3d 1058 (11th Cir. 2003), on the defendant's

corrected motion.[1]   This Court also directed the government to file the April 10, 2001 *ex parte*

_____

[1]  Previously cited as United States v. Torres, 2003 WL 132950 (11th Cir.  Jan. 17, 2003).

1

motion, which is attached as Exhibit 1 to this memorandum of law.

In the *ex parte* motion, the government provided a memorandum of points and authorities describing its investigation, the evidence being sought, and the legal authority for suspension of the statute of limitations, citing United States v. Bischel, 61 F.3d 1429 (9th Cir.1995), and included a copy of the October 17, 2000, Request for Assistance which identified the documents and testimony being sought from Andreas Schweitzer.  The *ex parte* motion also described the communications with Switzerland to that point, noting requests from Switzerland for more information about Schweitzer.   On May 10, 2001, Judge Gonzalez suspended the statute of limitations as of the date of the Request for Assistance.

As of September 20, 2001, the date of the  indictment, Switzerland had not provided any of the documents or testimony sought regarding Andreas Schweitzer.  Under the reasoning of the Torres decision, which strongly relied on Bischel, Switzerland had not provided a dispositive response to each of the items listed in the government's official request for information.  Thus, Switzerland had not taken any "final action" in response to the Request for Assistance that would conclude the period of tolling of the statute of limitations.  As the statute of limitations was properly suspended from October 17, 2000 to September 20, 2001, the charges in the indictment were timely.  Accordingly, the United States respectively submits that the defendant's corrected motion should be denied.

2

## MEMORANDUM OF LAW

**A.      Under _Torres_, "final action" occurs when a foreign court or authority provides a dispositive response to each of the items listed in the government's official request for information.**

A tolling order obtained under 18 U.S.C. § 3292 suspends the running of the statute of limitations until "final action" is taken on an official request made to a foreign government for evidence in a foreign country, subject to an exception that the total period of suspension shall not exceed three years.  18 U.S.C. §§ 3292 (b), (c).  In United States v. Torres, 318 F.3d 1058 (11th Cir.2003), the Court was presented with the issue of when "final action" occurs within the meaning of 18 U.S.C. § 3292.

In Torres, the government made a request for assistance on July 9, 1999 through the Department of Justice's Office of International Affairs (OIA) for international assistance in obtaining evidence located in the Isle of Man.  The government then obtained an order from the district court suspending the statute of limitations pursuant to Section 3292 "for the period beginning on July 9, 1999 and ending on the date the Isle of Mann [sic] takes final action on the request for evidence."  The Isle of Man first responded on November 12, 1999 with a cover sheet "Enclosed is the information you require," but which provided only some of the documents which had been requested by the United States.  On January 12, 2000, without requesting an extension of the tolling order, the United States submitted through OIA a supplemental request to the Isle of Man and asked for the documents that had been omitted.  Those items were provided by the Isle of Man on March 8, 2000, in a response that included a cover sheet stating "enclosed are documents that Barclays Bank PLC Isle of Man hold on the above investigation."  In June 2000, the United States obtained an indictment and a superseding indictment against Torres.

3

Defendant Torres sought to dismiss the indictments, contending that "final action" had been taken by the Isle of Man on November 12, 1999, the date of the initial response to the government's request for evidence.   Torres asserted that both indictments were untimely because they included acts outside of the statute.

The Torres Court noted that § 3292 does not define "final action" nor provide guidance as to when "final action" occurs and that the legislative history of § 3292 did not provide a clear determination of "final action." *Id.* at 1062.   Turning to cases in other circuits, the Court compared United States v. Bischel, 61 F.3d 1429 (9th Cir.1995) and United States v. Meador, 138 F.3d 986 (5th Cir.1998).  Bischel tied "final action" to a dispositive response by the foreign government to all of the items set forth in the official request.  61 F.3d at 1431, 1434.  Meador similarly tied "final action" to a dispositive response, but more narrowly found that "final action" occurs "when the foreign government believes it has completed its engagements [and fully complied with the request] and communicates that belief to our government." 138 F.3d at 992.

The Torres Court declined to follow the narrow Meador test, noting that it would be inconsistent with Congressional intent underlying § 3292 to adopt a bright line test that relied on and conditioned "final action" on the subjective determination by a foreign government that it had fully complied with the request.  318 F.3d at 1063.   Adopting the broader construction of "final action" in Bischel, the Torres Court held that "final action" for purposes of § 3292(b) occurs when a foreign court or authority provides a dispositive response to each of the items listed in the government's official request for information. *Id.* at 1065.  Recognizing that the foreign government may not be able to produce every item requested, the Court held that the response may be "dispositive" even if it simply communicates that the foreign government

4

cannot comply. *Id.* at n. 12.

As the Isle of Man's initial response on November 12, 1999 was incomplete, the Isle of Man did not take final action until March 8, 2000, when it provided a "clear, dispositive, and unambiguous response to each item in the government's original request." *Id.* at 1065. Therefore, under the district court's suspension order, the statute of limitations was tolled from July 9, 1999, the date of the order, to March 8, 2000, the date of the "final action." Finding the charges against Torres were timely in both indictments, the Court affirmed the district court's denial of the motion to dismiss. *Id.* at 1065.

**B.    Switzerland did not provide a dispositive response concerning the documents and testimony listed in the Request for Assistance prior to the September 20, 2001 indictment of Defendant Trainor.**

It is undisputed that Switzerland did not provide any of the documents or testimony sought concerning Andreas Schweitzer between the date of the October 17, 2000, Request for Assistance and the September 20, 2001 indictment. During that time, Switzerland never asserted that it could not comply with the Request for Assistance; rather, Switzerland indicated that it was attempting to locate Andreas Schweitzer and comply with the request.

On October 17, 2000, the Justice Department's OIA submitted by air mail an Official Request for Assistance ("Request") to the Central Authority of Switzerland in the <u>Prosecution of William TRAINOR, et al</u>, Exhibit 1, *Ex Parte* Motion, Cover Letter, Request for Assistance. The Request for Assistance stated that it was submitted in connection with a criminal investigation being conducted by the United States Department of Justice, Criminal Division, Fraud Section and a civil action being prosecuted by the United States Securities and Exchange Commission ("SEC"). *Id.* at 1, 2. The Request described in detail the scheme perpetrated by

5

defendant Trainor and others to defraud investors through misrepresentations and sham

transactions involving various entities controlled by Trainor. *Id.* at 2 - 6.   The Request

specifically asked that all documents and other materials in the possession of Andreas Schweitzer

be provided concerning the following:

> (1)   Novatek International, Inc.;
> (2)   Novatek International Holding, Inc.;
> (3)   HealthCare, Ltd.;
> (4)   Universal HealthWatch, Inc.;
> (5)   New England Diagnostics, Inc.;
> (6)   William P. Trainor;
> (7)   Vincent D. Celentano; and
> (8)   Karen Losordo.

*Id.* at 11.   Further, it requested the testimony of Schweitzer "concerning his involvement with the

above-mentioned persons and entities and his knowledge of all matters pertaining to the subject

of this request for assistance," and that representatives of DOJ, the FBI and the defendant be

present.   *Id.* at 11.   It also requested that the testimony be recorded verbatim by sound and visual

means and that Schweitzer sign the verbatim transcript or other record.   *Id.* at 12.

In January, February, March and April 2001, OIA followed up with inquiries of

Switzerland, and OIA and Switzerland exchanged correspondence regarding the status of the

Request for Assistance.   In those communications, the Swiss sought additional information

regarding Schweitzer and the investigation.   For example, on March 30, 2001, the Swiss Ministry

of Justice advised OIA by facsimile, which is attached as Exhibit 2 to this memorandum of law,

that it had been unable to locate Andreas Schweitzer and sought more information regarding

Schweitzer, "so as not to ask the incorrect authorities to execute the request."   The language of

the Swiss facsimile plainly demonstrates that it was not intended as a dispositive response or

"final action" to the government's request; rather, it asked for additional information in order to

6

comply with the Request.   OIA provided additional information on April 2, 2001 (and

Schweitzer was later located in a different region of Switzerland).

On April 10, 2001, the government filed in the U.S. District Court for the Southern

District of Florida in a matter styled *In Re Sealed Matter (Grand Jury 00-01)*, pursuant to 18

U.S.C. § 3292, a sealed *ex parte* application and proposed order for suspension of the statute of

limitations for the offenses under investigation pending receipt of evidence from Switzerland.

Exhibit 1, *Ex Parte* Motion.  The motion noted that

> "the Swiss authorities have requested additional information regarding Schweitzer, the
> matters being investigated, and the damages suffered by investors, and final action has
> not been taken by the Swiss authorities."

Exhibit 1, *Ex Parte* Motion, Memorandum of Points and Authorities at 8.[2]   Unlike <u>Torres</u>, the

government in this case informed the court in the <u>ex parte</u> motion that additional information had

been sought by Switzerland after the Request.

On May 10, 2001, the district court, in a sealed *ex parte* order, granted the application of

the United States suspending the statute of limitations as of October 17, 2000.  In June 2001, the

Swiss identified Schweitzer's location in Geneva.  In August 2001, OIA submitted a follow-up

inquiry to Switzerland for an update on the Request for Assistance.

On September 20, 2001, the grand jury returned a 21-count indictment against defendant

Trainor alleging eleven counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2, four counts

of laundering monetary instruments in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2, and five

counts of engaging in a monetary transaction in property derived from specified unlawful activity

---

[2]  The *ex parte* motion referenced <u>United States Bischel</u>, 61 F.3d 1429, 1434 (9th
Cir.1995), regarding "final action." Exhibit 1, *Ex Parte* Motion, Memorandum of Points and
Authorities at 8.

in violation of 18 U.S.C. §§ 1957 and 2.  At the time of the indictment, the Swiss had not

provided any documents or testimony of Andreas Schweitzer or any response which could be

characterized as dispositive of the Request for Assistance.[3]

On October 1, 2001, OIA requested an update on the Request for Assistance.  Switzerland

responded on October 3, 2001, that the Request was being handled by a prosecutor in Geneva.

On February 5, 2002, OIA again requested information regarding the Request.  On February 21,

2002, Switzerland advised that Schweitzer had been interviewed by a Swiss magistrate.[4]

Switzerland sent the official statement of the interview to the undersigned prosecutor at the Fraud

Section on March 2, 2002.

Subsequently, the United States continued to request that Switzerland seek additional

information and evidence from Schweitzer and to request that prosecutors be permitted to

interview Schweitzer.  On October 29, 2002, Switzerland informed OIA that Schweitzer would

be "ready to testify in Switzerland in November or December 2002," but would not be willing to

be recorded by visual means.

**C.     Switzerland did not take "final action" concerning the Request for
         Assistance prior to the September 20, 2001 indictment.**

From the date of the October 17, 2001, Request for Assistance to the September 20, 2001

indictment, Switzerland did not provide any of the items requested by the government, i.e.

documents and testimony of Andreas Schweitzer.  "Final action" was not taken before the

---

[3]  The defendant was indicted on June 13, 2002 on a superseding indictment which added
three counts alleging income tax evasion.  Those counts were timely without reference to the
tolling order.

[4]  The interview took place without representatives of the SEC, DOJ, FBI, or the
defendant present, contrary to the procedures sought in the Request for Assistance.

8

indictment, and, pursuant to Judge Gonzalez' Order, the statute of limitations was suspended for the entire period between October 17, 2001 to the date of the indictment.

Although Switzerland's March 30, 2001 facsimile stated that it had not yet located Schweitzer, the facsimile did not indicate in any manner that the Swiss had completed their effort to provide the documents and testimony sought in the Request.  The Swiss simply asked for additional information in order to comply with the Request, and, on April 2, 2001, the government provided the information Switzerland requested.  Recognizing that there would be some additional delay by the Swiss in complying with the Request, the government then sought the tolling order.  Unlike the Torres case, the government apprised Judge Gonzalez that additional information had been sought by the foreign government.

Between the time of Judge Gonzalez' Order and the September 20, 2001 indictment, the Swiss located Schweitzer but did not provide any of the documents and testimony requested.  Nor did Switzerland indicate during that time that it would not comply or would not be able to comply with the Request.[5]  As such, "final action" did not occur before the indictment and the statute of limitations was properly suspended between the October 17, 2001, Request for Assistance and the September 20, 2001 indictment.  Excluding the period in which the statute of limitations was properly suspended, all of the charges were timely brought.

---

[5] Switzerland has not yet arranged for a interview in the presence of representatives of the DOJ, FBI and defendant as sought in the Request, nor has it finally stated that it will not or cannot arrange an interview using the procedures sought in the Request.  The government is attempting to arrange a deposition of Schweitzer in accordance with the Court's Order of March 25, 2002.

## CONCLUSION

For the reasons stated above, the district court should deny the defendant's motion to dismiss Counts 1-10, 12-14 and 16-21 of the Superseding Indictment. The statute of limitations was properly tolled between the date of the Request for Assistance and the indictment because "final action" under Torres had not occurred.

Respectfully submitted,

MARCOS JIMENEZ
UNITED STATES ATTORNEY

By: _____
Jack B. Patrick
Senior Trial Attorney
Court ID # A5500596
Fraud Section, Criminal Division
United States Department of Justice
10th & Constitution Avenue, NW
Bond Building, Room 3114
Washington, D.C. 20530
Tel: (202) 514-9842
Facsimile: (202) 514-0152
E-Mail: Jack.Patrick2@usdoj.gov

10

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the undersigned caused a true and correct copy of the foregoing <u>United States' Supplemental Memorandum of Law In Response to Defendant's Corrected Motion to Dismiss Counts 1-10, 12-14, and 16-21 of the Superseding Indictment as Being Barred by the Statute of Limitations</u> to be sent by facsimile and by prepaid United States mail this 5th day of March 2003 to the following address:

Michael Caruso
Assistant Federal Public Defender
Southern District of Florida
150 W. Flagler Street #1700
Miami, Florida 33130
Fax: (305) 536-4559

Jack B. Patrick
Senior Trial Attorney
Court ID # A5500596
Fraud Section, Criminal Division
United States Department of Justice
10th & Constitution Avenue, NW
Criminal Division, Fraud Section
Bond Building, Room 3114
Washington, D.C. 20530
Tel: (202) 514-9842
Facsimile: (202) 514-0152
E-Mail: Jack.Patrick2@usdoj.gov

11

**United States v. William P. Trainor**
**Case No. 01-6215-CR-JORDAN(s)/BANDSTRA**

**SERVICE LIST**

Counsel for Defendant William P. Trainor:

      Michael Caruso
      Assistant Federal Public Defender
      Southern District of Florida
      150 W. Flagler Street #1700
      Miami, Florida 33130-1556
      Tel: (305) 530-7000, Ext. 135
      Fax: (305) 536-4559

Counsel for the United States:

      Jack B. Patrick
      Senior Trial Attorney
      Court ID # A5500596
      Fraud Section, Criminal Division
      United States Department of Justice
      10th & Constitution Avenue, NW
      Criminal Division, Fraud Section
      Bond Building, Room 3114
      Washington, D.C. 20530
      Tel: (202) 514-9842
      Facsimile: (202) 514-0152
      E-Mail: Jack.Patrick2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. _____

IN RE SEALED MATTER          )
(Grand Jury 00-01)           )
                             )
_____ )

FILED BY _____ B.B.
INTAKE

APR 1 0 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. • FT. LAUD.

## MOTION FOR SUSPENSION OF STATUTE OF LIMITATIONS

The United States of America, by and through its undersigned counsel, hereby applies and

moves this Court, ex parte and under seal, pursuant to 18 U.S.C. § 3292, for an order suspending

the running of the statute of limitations for the offenses under investigation in the above-

captioned matter, pending receipt of testimony and evidence from Switzerland. The offenses

under investigation in the above-captioned matter concern the making of false statements, the

concealment of material facts, and other acts of fraud or deception relating to Novatek

International, Inc. and related entities, including Health Care Limited, Universal HealthWatch,

Inc., Medical Products, Inc. and New England Diagnostics. Such offenses may include, but are

not limited to, violations of 18 U.S.C. §§ 1341, 1343, 1956 and 1957.

The proposed order of suspension will cover the period beginning October 17, 2000, the

date on which an official request for evidence in connection with the above-referenced

investigation was submitted to Switzerland by the Criminal Division of the United States

Department of Justice and ending on the date on which Switzerland takes final action on the

request.

As this is an on-going grand jury matter that is subject to the general rule of secrecy contained in Rule 6(e) of the Federal Rules of Criminal Procedure, a separate motion requests filing under seal of this application and the Order until indictment of any defendant in this investigation or until further order of the Court.

This application is based on the attached Memorandum of Points and Authorities and attached exhibits.

Dated: April __9__, 2001.

> Respectfully submitted,
>
> GUY A. LEWIS
> United States Attorney
>
> By: _Jack B Patrick_
> JACK B. PATRICK
> VA Bar No. 32645
> Senior Trial Attorney
> Fraud Section, Criminal Division
> U.S. Department of Justice
> 1400 New York Avenue
> Washington, DC 20005
> Tel: (202) 514-9842
> Fax: (202) 514-0152
> E-MAIL: Jack.Patrick2@USDOJ.GOV

## MEMORANDUM OF POINTS AND AUTHORITIES

A.    Grand Jury Investigation.

A grand jury convened in the Southern District of Florida has been conducting an

investigation concerning investments in Novatek International, Inc. and related entities.  The

investigation has focused on allegations that from in or about June 1994 through in or about

December 1996 William P. Trainor and Vincent D. Celentano fraudulently induced investments

in entities which they controlled and that they fraudulently gained control of Novatek

International, Inc. ("Novatek"), a publicly-traded company, and, thereafter, used Novatek to

engage in a pump and dump securities fraud scheme.

In or about 1994, William Trainor and Vincent Celentano began to create entities that

purported to distribute medical diagnostic devices in countries outside of the United States.   The

first entity was Health Care Limited, organized in Russia.  Health Care Limited, and subsequent

entities controlled by Trainor and Celentano, obtained licenses to distribute the devices from

Universal HealthWatch, Inc., which was another entity controlled by Trainor and Celentano and

which was headquartered in Columbia, Maryland.   Universal HealthWatch, Inc. was supposed to

develop the devices or buy them from other companies.   By selling the licenses between entities

which they controlled, essentially "flipping" the licenses at increasing prices mostly paid for with

promissory notes, Trainor and Celentano were able to create the illusion of value.

In or about January 1995, Trainor and Celentano began to sell stock in Health Care

Limited, based on their false claims regarding Health Care Limited, including claims that they

had a $216 million annual contract with a Russian government entity and claims that Celentano

had put over $50 million into their company.

In or about November 1995, Trainor and Celentano began looking for a publicly-traded

company which they could acquire and through which they could market medical diagnostic

devices, reaching a broader range of investor-victims.  In or about December 1995, they focused

on Novatek.

Novatek was a manufacturer of steel, hurricane-proof buildings, headquartered in

Boynton Beach, Florida.  At that time, Novatek was not a very profitable operation.  Novatek

officials engaged in discussions with Celentano and with others on behalf of Trainor and

Celentano concerning a possible merger between Novatek and Medical Products, Inc. ("MPI"), a

company which Trainor and Celentano formed in November 1995.  MPI was owned by the

Pickeral Cove Trust and The Celentano Group, entities made up of the family members of

Trainor and Celentano.  The same entities owned Universal HealthWatch, Inc.  The ownership

structure allowed Trainor and Celentano to control both MPI and Universal HealthWatch, Inc.

MPI's sole asset was a license to distribute in South America and the Bahamas the

medical diagnostic devices of Universal HealthWatch, Inc.  MPI had acquired the license by an

agreement, dated November 30, 1995, from an entity called New England Diagnostics, Inc.

("NED"), purportedly for $30 million, given by MPI as a promissory note.  NED had purportedly

acquired its license from Universal HealthWatch, Inc.,  covering many more countries, for

$250,000 and certain other promises.  Hence, the license flowed from Universal HealthWatch,

Inc. to NED to MPI and the price purportedly paid for the license increased from $250,000 to $30

million in no more than a few months time.

Accountants who audited the financial statements of MPI and Novatek prior to the merger

raised certain concerns during the merger negotiations, including whether or not the value being

suggested for MPI in a proposed swap for Novatek stock was legitimate or falsely inflated and

2

whether or not the license transactions being used to support MPI's value were between unrelated parties. Since the ownership of Universal HealthWatch, Inc. and MPI was essentially the same, the focus was on the ownership and control of NED.

Celentano made false representations and provided false documents to the accountants involved in the merger, creating the impression that the license held by MPI was valuable and that the license agreements were legitimate, arms-length transactions. Celentano represented that NED was not related to Universal HealthWatch, Inc. or MPI and that neither Celentano or Trainor controlled NED. Subsequently, Trainor and Celentano alleged that NED was owned by Andreas Schweitzer, a Swiss businessman. The grand jury investigation, however, has revealed that NED was operated out of the home of Trainor's daughter, Karen Losordo, in Hingham, Massachusetts and that Trainor and Celentano provided instructions to her as to NED's operations, including where to send money from NED. Losordo, who claims only to be the agent of NED, is identified in various documents as the president, sole director and authorized agent of NED.

Based on false and misleading representations made and caused to be made by Trainor and Celentano, Novatek officials agreed to the merger. In or about March 1996, Novatek merged with MPI, mistakenly believing that it was obtaining a license worth more than $55 million in the acquisition, the bump up from $30 million to $55 million being based on other license and revenue figures. The $55 million value was then used in Novatek financial statements submitted to the SEC, resulting in Novatek appearing to have assets of about $55 million value.

As part of the merger, MPI acquired about 4 million shares of Novatek stock. NED also received about 3.4 million shares of Novatek and $1.3 million in cash as payment on the

3

promissory note given to NED by MPI for the license.  The $1.3 million ended up being used to buy a house on the Hillsboro mile for the Trainor family.

After the merger, Trainor and Celentano effectively controlled Novatek and caused Novatek to make additional multi-million dollar agreements with NED for licenses to distribute UHW medical diagnostic devices in Mexico and Central America.  Trainor and Celentano also caused Novatek to issue press releases from March 1996 through September 1996 which falsely gave the appearance that Novatek had binding multi-million dollar contracts to distribute the medical diagnostic devices in South America and that Novatek was receiving revenue from the contracts.  Novatek also submitted period reports to the SEC which repeated the false claims in the press releases and reflected Novatek's ownership of the $55 million license.

The false claims induced investors to buy Novatek stock and induced investors to pay about $7 million for Novatek convertible debentures.  The efforts of Trainor and Celentano to fraudulently inflate the value of Novatek's stock price were successful.  During the relevant period, Novatek's stock price more than doubled in value, rising from a mere $5 per share in March 1996 to over $13 per share in September 1996 before settling back to $9 per share.  The stock price totally collapsed following suspension of trading in October 1996.  Novatek subsequently went into bankruptcy.  Trainor then fraudulently induced a Las Vegas businessman to provide millions of dollars to continue the operations of Universal HealthWatch, Inc., with substantial amounts of that funding ending up in the hands of the Trainor family.

Tracing of the money paid to Novatek for the convertible debentures has revealed that about $7 million went from Novatek to NED, purportedly as payments on licenses sold by NED to Novatek and on loans made by NED to Novatek.  Other money from the sale of stock also

4

went through NED.  After the money reached NED, Karen Losordo moved the money to other

accounts or wired the money back to Florida and elsewhere to buy expensive homes and cars for

the Trainor family.  Over $1 million of the money was used to buy back stock from disgruntled

family and friends who had bought stock based on Celentano's promise to repay them if their

stock value did not increase.   At least $250,000 went back to Novatek from NED to create the

appearance that money was being received under a contract in South America as had been

announced in a press release.

>        **B.**     Foreign Evidence and Treaty Requests.

On October 17, 2000, a request for assistance in the prosecution of William Trainor, et al

was submitted by the Central Authority of the United States to the government of Switzerland

pursuant to the Treaty on Mutual Assistance in Criminal Matters entered into force on January

23, 1977, and to the Diplomatic Notes exchanged on November 3, 1993 in connection with a

civil action by the United States Securities and Exchange Commission ("SEC") and a criminal

investigation being conducted by the United States Department of Justice, Criminal Division,

Fraud Section ("DOJ").   The request identified a civil lawsuit filed by the SEC and discussed the

SEC interest.  The request also stated that DOJ was investigating whether Trainor and other

persons and entities violated United States law by engaging in mail and wire fraud and money

laundering in connection with misrepresentations made to investors.  The request set forth the

statutory offenses of 18 U.S.C. § 1341 (mail fraud), 1343 (wire fraud), 1956 (laundering of

monetary instruments), and 1957 (engaging in monetary transactions in property derived from

specified unlawful activity).

The request sought was to obtain bank records and other documents in the possession of

Andreas Schweitzer concerning Novatek, HealthCare Limited, Universal HealthWatch, Inc. and

NED and concerning Trainor, Celentano and Losordo and to obtain business record certifications

for the documents. The request also sought to have a Swiss magistrate arrange recorded

testimony from Schweitzer and to have the Swiss magistrate invite Schweitzer to appear to

testify before a grand jury (at that time identified as being in Washington, DC) and/or at trial.

The documents in the possession of Schweitzer are necessary to the grand jury

investigation being conducted in the Southern District of Florida in order to determine

Schweitzer's knowledge of and involvement in the license transactions and the transfer of money

and to identify the true ownership and control of NED, the true purpose for NED's involvement

in the license transactions, and the true value of the licenses.

The issue of the ownership and control of NED is of critical importance to the

government's investigation of the aforementioned fraud and money laundering offenses. The

purported $30 million license owned by MPI enabled Celentano and Trainor to gain control of

Novatek. Moreover, the grossly inflated value of the MPI license shown on Novatek's financial

statements after the Novatek/MPI merger, in part, induced people to invest million of dollars in

Novatek during the relevant period. If NED was owned or controlled by Trainor or Celentano (or

their nominees), then it is clear that the license value was created through a series of related party

transactions resembling classic land flips rather than through legitimate arms-length transactions

as Celentano and Trainor represented to the auditors of MPI and Novatek. Thus, evidence

related to the control or ownership of NED bears directly on whether Celentano, Trainor and

others committed the fraud offenses outlined earlier. Because NED was the primary vehicle

used to launder the proceeds of the fraud, evidence concerning the ownership and control of NED

6

is equally important to the investigation of the money laundering offenses described above.

Celentano, Trainor and Losordo have at various times claimed that NED was owned by Andreas

Schweitzer. Accordingly, testimony and documentary evidence from Schweitzer concerning

NED is critical to the government's fraud and money laundering investigation.

C.    Legal Authority for Suspension of the Statute of Limitations

Title 18, United States Code, Section 3292, permits a court to suspend the running of the

statute of limitations for a period of up to the three years when an official request has been mde

for evidence in a foreign country. Section 3292 provides in pertinent part as follows:

> (a) (1)   Upon application of the United States, filed before return of an
> indictment, indicating that evidence of an offense is in a foreign country, the
> district court before which a grand jury is impaneled to investigate the offense
> shall suspend the running of the statute of limitations for the offense if the court
> finds by a preponderance of the evidence that an official request has been made
> for such evidence and that it reasonably appears, or reasonably appeared at the
> time the request was made, that such evidence is, or was, in such foreign country.
> 
>                              *    *    *
> 
> (d)    As used in this section, the term "official request" means a letter
> rogatory, a request under a treaty or convention, or any other request for evidence
> made by a court of the United States or an authority of the United States having
> criminal law enforcement responsibility, to a court or other authority of a foreign
> country.

Upon receipt of an application that outlines the government's reasons to believe that

evidence of an offense lies outside the jurisdiction of the United States, the Court must determine

by a preponderance of the evidence  (1) that "an official request" has been made and (2)  that "it

reasonably appears or reasonably appeared at the time the request was made, that such evidence

is or was, in such foreign country. Exhibit A is the request for assistance by the United States

Department of Justice. The issuance of the request satisfies the first prerequisite of the statute - -

that an "official request" has been made to the foreign government by "an authority of the United

7

States having criminal law enforcement responsibility."

The final prerequisite to stay the running of the statute of limitations is whether it reasonably appears that the evidence sought under the request for foreign assistance is, or was, in the foreign country. Documents obtained by the grand jury have identified Schweitzer as the holder of bearer stock of NED, as a Swiss resident, and have identified his business address as being in Switzerland. Agreements pertinent to NED and Schweitzer have identified Schweitzer's address in Switzerland. Witnesses interviewed by the Federal Bureau of Investigation have also stated that Trainor and Celentano represented to them that Schweitzer was the owner of NED and have identified Schweitzer as a Swiss resident.

The date for the tolling of the limitations period is the date of the official request for evidence, not the date that the § 3292 motion is made. United States v. Bischel, 61 F.3d 1429, 1434 (9th Cir.1995). Although the request was signed by Thomas Snow, Deputy Director, Office of International Affairs, Criminal Division, on January 2, 2000, it was not submitted by the DOJ Criminal Division to the Central Authority of Switzerland until October 17, 2000. Accordingly, the United States takes the position for purposes of this motion only that the date of the request is October 17, 2000.

The statute is tolled until final action is taken by the Swiss Authorities. The Swiss authorities have requested additional information regarding Schweitzer, the matters being investigated, and the damages suffered by investors, and final action has not been taken by the Swiss authorities. See United States v. Bischel, 61 F.3d 1429, 1434 (9th Cir.1995)("final action" for purposes of § 3292 means a dispositive response by the foreign sovereign t both the request for records and for a certificate of authenticity of those records as identified in the official

8

request).

    D.    <u>Conclusion</u>.

For the foregoing reasons, the government respectfully requests that the court enter an order suspending the running of the statute of limitations herein as of October 17, 2000 until the appropriate authorities in Switzerland take final action on the official request.

Dated: April ___9___, 2001

                            Respectfully submitted,

                            GUY A. LEWIS
                            United States Attorney

By:                             
                            JACK B. PATRICK
                            VA Bar No. 32645
                            Senior Trial Attorney
                            Fraud Section, Criminal Division
                            U.S. Department of Justice
                            1400 New York Avenue
                            Washington, DC 20005
                            Tel: (202) 514-9842
                            Fax: (202) 514-0152
                            E-MAIL: Jack.Patrick2@USDOJ.GOV

Exhibit A

U.S. Department of Justice

*Criminal Division*

JEH:RT:JF:JTjt
182-6767 (please repeat when responding)

Washington, DC 20530

OCT 1 7 2000

BY AIRMAIL

Giorgio Bomio, Esquire
Central Authority for U.S. Requests
Division of International Legal Assistance
Federal Office of Justice
Bundesrain 20
3003 Bern
Switzerland

Dear Mr. Bomio:

> Re:  Request to Switzerland for Assistance in the
> Prosecution of William TRAINOR, et al.

Enclosed is a request for assistance on behalf of the U.S. Securities and Exchange Commission pursuant to the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters (entered into force January 23, 1977). A German translation of the request is also provided. In addition, we apologize for the delay in the transmittal of this request.

If you have any questions concerning this matter, please contact me at (202) 514-0951 or Julie Thirolf, the paralegal assigned, at (202) 616-0549. Thank you for your assistance in this matter.

Sincerely,

John E. Harris, III
Acting Director
Office of International Affairs
Criminal Division

By:

Judith Friedman
Senior Trial Attorney
P.O. Box 27330
Washington, D.C. 20038-7330

Enclosures
Records
Chron
File
Attorney

cc w/ enclosures:

Elizabeth Jacobs
United States Securities and Exchange Commission
Office of International Affairs
450 Fifth Street, NW
Washington, D.C.  20549-1104

2

**U.S. Department of Justice**

Criminal Division

Washington, D.C.   20530

TO:   The Central Authority Of Switzerland

SUBJECT:   Request For Assistance in <u>SEC v. Trainor, et al.</u>


The Central Authority of the United States requests the
assistance of the appropriate authorities in Switzerland pursuant
to the Treaty on Mutual Assistance in Criminal Matters entered
into force on January 23, 1977, and to the Diplomatic Notes
exchanged on November 3, 1993, which replace the Diplomatic Notes
of November 10, 1987, in connection with a civil action being
prosecuted by the United States Securities and Exchange
Commission ("SEC"), and a criminal investigation being conducted
by the United States Department of Justice, Criminal Division,
Fraud Section ("DOJ").

On August 18, 1998, the SEC filed a civil lawsuit in the
United States District Court for the District of Columbia
against, William P. Trainor, Trainor's daughter, Karen Losordo,
Vincent D. Celentano, Novatek International, Inc. ("Novatek"),
New England Diagnostics, Inc. ("NED"), a private company
controlled by Trainor and Celentano, and several other Trainor
and Celentano family members.  The SEC is investigating whether
these persons and entities violated U.S. federal securities laws
by making false and misleading public statements in press

releases and reports filed with the SEC in connection with the
offer and sale of securities to the U.S. public.  DOJ is
investigating whether Trainor and other persons and entities have
violated United States law by engaging in mail and wire fraud and
money laundering in connection with misrepresentations made to
investors.

The SEC needs bank records and other documents, as well as
testimony, from  Andreas Schweitzer, a Swiss citizen who was
listed as NED's owner, to determine what information Schweitzer
has relating to the allegations contained in the SEC's complaint.
This information will be shared with DOJ in connection with its
investigation.

## FACTS

During the period from early 1995, through the end of 1996,
Novatek, a small Columbia, Maryland-based company, claimed to
have an exclusive license to distribute ("Distribution License")
rapid medical diagnostic test kits  in South America, Latin
America, and the Bahamas, which were designed to detect
infectious diseases such as HIV and cholera.  The devices were
purportedly manufactured by Universal HealthWatch, Inc.
("Universal"), a private company controlled by Trainor (who
served time in prison on a fraud conviction), and Celentano.
Novatek acquired the Distribution License through a series of
sham transactions among several entities either owned or
controlled by Trainor and/or Celentano, including Medical
Products, Inc. ("MPI"), a shell company formed for the sole

2

purpose of transferring the Distribution License.  Various
documents identify Andreas Schweitzer as NED's owner at the time
of these transactions.

The fraudulent activities involved in this matter began in
1995, when Celentano, a Florida-based businessman, Losordo, and
NED offered securities in a company named HealthCare, Ltd.
("HealthCare") to the U.S. public.  HealthCare was purportedly a
Russian public company that sold medical devices similar to those
allegedly sold by Novatek.  HealthCare investors were told, among
other things, that the company's securities were traded on a
Russian stock exchange and that the company had entered into
agreements to supply medical diagnostic devices to Russian
entities.  There is no evidence, however, that either of these
assertions was true.  The HealthCare stock offered and sold was,
in fact, owned by NED.

On March 3, 1996, Novatek and MPI entered into a Plan of
Merger Agreement whereby Novatek would acquire MPI for $72
million worth of Novatek securities. Shortly after the merger,
Novatek began filing a series of reports with the SEC that
contained misrepresentations relating to Novatek's financial
status and business contacts.  For example, on April 2, 1996,
Novatek filed a Form 8-K/A, a report that companies are required
to file when there is a material change in its operations.  This
report included pro forma financial information reflecting
Novatek's acquisition of MPI and ownership of the Distribution
License.  The financial statements included in this filing listed
Novatek's assets in excess of $57 million.  In reality, however,

3

Novatek's assets were only approximately $2 million.  The $55
million difference resulted from a false valuation of the
Distribution License.

At about this same time, in early 1996, Celentano offered
HealthCare investors the option of converting their  shares of
HealthCare into Novatek.  Prior to its merger with MPI, Novatek
had been a Florida-based construction firm whose securities
traded on the National Association of Securities Dealers'
("NASD") SmallCap Market.  Subsequent to the merger, Novatek's
securities continued to trade on the SmallCap Market until
trading was suspended by the SEC and the NASD in October 1996.
In the course of offering investors this opportunity, Celentano
made false and misleading representations concerning the
existence of multi-million dollar contracts with Brazilian and
Mexican entities, and the value of Novatek's assets.  Further, at
no time were Celentano, Losordo, or NED registered as brokers or
dealers, or associated with a broker or dealer, as required by
the U.S. securities laws.

On April 11, 1996, Novatek issued the first in a series of
false and misleading press releases.  This press release
announced a purported five-year agreement between Novatek and
Importadora y Exportadora Accmed., Ltd., ("Importadora"), based
in Santiago, Chile, for the sale of cholera tests.  According to
the press release, the agreement called for the "guaranteed
purchase (by Importadora) of five million dollars ($5,000,000) of
QUIX (™) Rapid Cholera Strip Tests per year for five (5) years
totaling twenty-five million dollars ($25,000,000 U.S.)."  In

4

fact, the Importadora contract, as stated in the press release, did not exist, and no devices were ever shipped to Chile.

On May 20, 1996, Novatek filed with the SEC a Form 10-QSB, a required periodic report setting forth, among other things, a company's financial condition, for the quarter that ended March 31, 1996. This filing repeated the false information contained in the earlier April 2 filing and reported Novatek's assets at $57 million, with the Distribution License accounting for $52 million. Further, in the Management Discussion and Analysis ("MD&A") section of the filing, Novatek falsely stated that it was acting as a co-broker in an agreement to ship HIV test devices to Mexico, and that the first shipment had been made on May 14, 1996. In fact, no shipment was ever made pursuant to any agreement.

On June 14, 1996, NASD advised Novatek that its previously filed application for listing on the National Market System (which lists companies with assets of at least $4 million) was being denied. Not only did NASD deny Novatek's application, but it advised Novatek that its accounting for the March merger was incorrect. As a result, Novatek was advised that it would have to submit a new application for continued listing on the SmallCap Market and that failure to do so might lead to delisting of Novatek's securities.

On August 13, 1996, Novatek filed a Form 10-QSB with the SEC for the period that ended June 30, 1999. This report also contained false financial statements, listing Novatek's assets at $59 million and shareholders' equity at $55 million. Without the improper $54 million valuation of the Distribution License, the

shareholders' equity would have been approximately $1.3 million.
Novatek also failed to disclose the circumstances giving rise to
NASD's possible delisting of its stock and falsely stated in the
MD&A section of this report that Novatek had executed an
agreement in Chile worth more than $15 million.

On August 16, 1996, Novatek issued a press release claiming
that Novatek and the Oswaldo Cruz Foundation had entered into a
ten year joint agreement to manufacture and distribute medical
diagnostic kits throughout Brazil. The press release projected
that revenues from the purported agreement would exceed $35
million in the first year and expand thereafter. These
representations were false.

A short time later, Novatek issued the first of two press
releases concerning health ministries in Argentina. On August
26, 1996, Novatek issued a press release concerning a purported
contract with the Ministry of Health of the Province of
Corrientes that would garner revenues of $3 million per year.
Less than two weeks later, on September 5, Novatek issued a press
release announcing an agreement worth $15 million with the
Ministry of Health of the Province of Mendoza. In fact, neither
of these contracts existed.

On August 12, 1996, the SEC filed its First Amended
Complaint in this matter, alleging that Novatek and the other
defendants violated U.S. securities laws by 1) disseminating a
series of false and misleading press releases, 2) making false
and misleading statements concerning Novatek's financial status
in financial statements included in reports filed with the SEC,
and 3) acting as unlicensed brokers or dealers.

## THE OFFENSES

15 U.S.C. §§77e and 77q(a). Fraudulent interstate
transactions

    (a) It shall be unlawful for any person in the
offer or sale of any securities . . .
(1) to employ any device, scheme or artifice to defraud
or
(2) to obtain money or property by means of any untrue
statement of a material fact or any omission to state a
material fact necessary in order to make the statements
made, in the light of the circumstances under which
they were made, not misleading. . . .

15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5.
Regulation of the use of manipulative and deceptive devices

    It shall be unlawful for any person, directly or
indirectly, by use of . . . the mails, or any facility
of any national securities exchange . . .
(b) To use or employ, in connection with the purchase
or sale of any security registered on a national
securities exchange . . . any manipulative or
deceptive device or contrivance in contravention of
such rules and regulations as the commission may
prescribe as necessary or appropriate in the public
interest for the protection of investors.

15 U.S.C. §§77e (a) & (c). Prohibitions relating to
interstate commerce and the mails

    (a) Unless a registration statement is in effect
as to a security, it shall be unlawful for any person,
directly or indirectly,
(1) to make use of any means or instruments of
transportation or communication . . . to sell such
security  through the use or medium of any prospectus
or otherwise; or . . .
    (c) . . . to offer to sell or offer to through the
use or medium of any prospectus or otherwise any
security, unless a registration statement has been
filed as to such security. . . .

15 U.S.C. §78ff(a). Penalties

    (a) Any person who willfully violates any
provision . . . or any rule or regulation . . . the
violation of which is made unlawful or the observance
of which is required under the terms of this title, or
any  person who willfully and knowingly makes, or
causes to be made, any statement in any application,
report, or document required to be filed under this
title . . . shall . . . be fined not more than
$1,000,000, or imprisoned not more than 10 years, or
both. . . .

7

18 U.S.C. §1341. Frauds and swindles

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do . . . [uses the mails] shall be fined not more than [$250,000] or imprisoned for not more than five years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. §1343. Fraud by wire, radio or television

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises by means of wire, radio or television communication .  . . . for the purpose of executing such scheme or artifice, shall be fined not more than [$250,000] or imprisoned not more than five years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. §1956. Laundering of monetary instruments

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of specified unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of the specified unlawful activity--
> (A)(i) with the intent to promote the carrying on of specified unlawful  activity .  .  . shall be fined not more than $500,000 or twice the value of the property (or monetary instrument or funds) involved in the transaction, whichever is greater, or imprisoned for not more than 20 years, or both.

18 U.S.C. §1957. Engaging in monetary transactions in property derived from specified unlawful activity

> (a) Whoever, .  .  . knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished by [a fine of not more than $250,000, or imprisoned for not more than ten years, or both].

8

## PERSONS AND ENTITIES INVOLVED

1.  WILLIAM P. TRAINOR

     Date of Birth:                        November 30, 1936

     Place of Birth:                       United States

     Citizenship:                         United States

     Race:                               Caucasian

     Sex:                                Male

     Height:                           Unknown

     Weight:                           Unknown

     Eye Color:                       Unknown

     Hair Color:                     Unknown

     Passport Number:                   (U.S.) 200822511

     Social Security Number:           Unknown

2.  VINCENT D. CELENTANO

     Date of Birth:                        Unknown

     Place of Birth:                       Unknown

     Citizenship:                         United States

     Race:                               Caucasian

     Sex:                                Male

     Height:                           Unknown

     Weight:                           Unknown

     Eye Color:                       Unknown

     Hair Color:                     Unknown

     Passport Number:                   Unknown

     Social Security Number:           Unknown

3.  KAREN P. LOSORDO

     Date of Birth:                        January 13, 1959

     Place of Birth:                       United States

| | |
|---|---|
| Citizenship: | United States |
| Race: | Caucasian |
| Sex: | Female |
| Height: | Unknown |
| Weight: | Unknown |
| Eye Color: | Unknown |
| Hair Color: | Unknown |
| Passport Number: | (U.S.) 100461696 |
| Social Security Number: | Unknown |

4. NOVATEK INTERNATIONAL, INC.
   (now known as Medical Diagnostic Products, Inc.)

| | |
|---|---|
| Place of Incorporation: | Colorado, U.S.A. |
| Address: | 8990-H<br>Route 108<br>Columbia, Maryland |

5. NEW ENGLAND DIAGNOSTICS, INC.

| | |
|---|---|
| Place of Incorporation: | Cayman Islands |
| Address: | 4 Butternut Lane<br>Hingham,<br>Massachusetts |

## PERSON AFFECTED

ANDREAS SCHWEITZER

| | |
|---|---|
| Date of Birth | Unknown |
| Place of Birth: | Unknown |
| Citizenship: | Believed to be Swiss |
| Race: | Caucasian |
| Sex: | Male |
| Social Security Number: | Unknown |
| Address: | Seestrosso No. 1<br>Cham 6330<br>Switzerland |

10

## NEED FOR ASSISTANCE

### DOCUMENTS NEEDED

Please provide all documents or other materials in the possession of Andreas Schweitzer concerning:

1) Novatek International, Inc.;

2) Novatek International Holding, Inc.;

3) HealthCare, Ltd.;

4) Universal HealthWatch, Inc.;

5) New England Diagnostics, Inc.;

6) William P. Trainor;

7) Vincent D. Celentano; and

8) Karen Losordo.

### TESTIMONY NEEDED

Please take the sworn testimony of Andreas Schweitzer, with the participation of attorneys from the SEC, attorneys from DOJ, agents from the Federal Bureau of Investigation, and attorneys representing the defendants, concerning his involvement with the above-mentioned persons and entities and his knowledge of all matters pertaining to the subject of this request for assistance. The SEC and DOJ are prepared to provide questions that they would like posed to Schweitzer in advance of the testimony.

### PROCEDURES TO BE FOLLOWED

Please ask the cantonal magistrate to do the following:

1.   arrange for Schweitzer's interview to take place no less than a week after the requested documents have been produced to the SEC, with representatives of DOJ, FBI and the defendants present, and provide a proces-verbal pursuant to articles 1(4)(b), 10 and 12;

11

2.    arrange to have Schweitzer's testimony recorded verbatim by sound and visual means, have Schweitzer sign the verbatim transcript or other record of responses to the questions, and provide the verbatim transcript or other record to all counsel who request copies;

3.    require production of original or true copies of the requested documents pursuant to articles 1(4)(c) and 18(1);

4.    attach to the documents a Certificate of Authenticity of Business Records completed and signed by Andreas Schweitzer pursuant to articles 1(4)(e) and 18(2);

5.    affix his or her seal (or stamp) upon the certificate pursuant to article 18(3) if satisfied that, under the procedure followed, a false statement on the certificate would subject the person who completed and signed it to criminal penalty under Swiss law; and

6.    invite Andreas Schweitzer to appear at some future date in Washington, D.C., at the expense of the United States Government, to testify before a grand jury and/or at trial pursuant to article 23(2).

_____
Date

_____
Thomas G. Snow
Deputy Director
Office of International Affairs
Criminal Division

12

US-Justizministerium [U.S. Department of Justice]
Kriminalabteilung [Criminal Division]

Washington, DC 20530, USA

An: Die Zentralbehörde der Schweiz

REF: Ersuchen um Unterstützung im Fall <u>SEC gegen Trainor, u.a.</u>

Die Zentralbehörde der Vereinigten Staaten ersucht um die Unterstützung durch die entsprechenden Behörden in der Schweiz gemäß dem Abkommen zur gegenseitigen Unterstützung bei strafrechtlichen Verfahren vom 23. Januar 1977 und gemäß der am 3. November 1993 ausgetauschten diplomatischen Mitteilungen, die die diplomatischen Mitteilungen vom 10. November 1987 ersetzen, im Zusammenhang mit einem von der US-Börsenaufsichtsbehörde [United States Securities and Exchange Commission – „SEC"] angestrengten Zivilprozess und einer Untersuchung in einem Strafverfahren durch das US-Justizministerium [U.S. Department of Justice], Kriminalabteilung [Criminal Division], Abteilung Betrug [Fraud Section] („DOJ").

Am 18 . August 1998 reichte die SEC beim US-Bezirksgericht [United States District Court] für den District of Columbia eine Zivilklage gegen William P. Trainor, Trainors Tochter, Karen Losordo, Vincent D. Celentano, Novatek International, Inc. („Novatek"), New England Diagnostics, Inc. („NED"), ein Privatunternehmen unter dem beherrschenden Einfluss von Trainor und Celentano, und weitere Mitglieder der Familien Trainor und Celentano ein. Die SEC untersucht, ob diese Personen und Unternehmen durch Bekanntgabe falscher und irreführender Veröffentlichungen in Pressemitteilungen und in bei der SEC eingereichten Berichten gegen US-Wertpapiergesetze verstoßen haben. Diese Veröffentlichungen und Berichte erfolgten im Zusammenhang mit dem Angebot und Verkauf von Wertpapieren an die US-amerikanische Öffentlichkeit. DOJ untersucht, ob Trainor und andere Personen und Unternehmen durch Begehen von Betrug unter Zuhilfenahme des Post- und Telegrafendienstes und Geldwäscherei im Zusammenhang mit irreführenden Darstellungen gegenüber Anlegern gegen die Gesetze der USA verstoßen haben.

Die SEC benötigt Schweizer Bankunterlagen und andere Dokumente sowie die Zeugenaussage von Herrn Andreas Schweitzer, einem Schweizer Bürger, der als Eigentümer von NED registriert war, um festzustellen, welche Informationen Herr Schweitzer in Bezug auf die Behauptungen in der Klageschrift der SEC hat. Diese Informationen werden im Rahmen seiner Untersuchung an das DOJ weitergeleitet.

## <u>DIE TATBESTÄNDE</u>

In der Zeit von Anfang 1995 bis Ende 1996 behauptete Novatek, ein kleines Unternehmen mit Sitz in Columbia im US-Bundesstaat Maryland, in Besitz einer Exklusivlizenz zum Vertrieb („Vertriebslizenz") von schnell wirkenden medizinischen Diagnosetestsätzen in Südamerika, Lateinamerika und auf den Bahamas zu sein, mit denen Infektionskrankheiten, wie zum Beispiel HIV und Cholera, erkannt werden können. Angeblich wurden die Testsätze von Universal Healthwatch, Inc. („Universal") hergestellt, einem Privatunternehmen unter dem beherrschenden Einfluss von Trainor, der eine Gefängnisstrafe wegen Betrugs absaß, und Celentano. Novatek erwarb die Vertriebslizenz mittels einer Reihe von betrügerischen Transaktionen zwischen verschiedenen Unternehmen, die entweder unter dem beherrschenden Einfluss von Trainor und/oder Celentano standen, einschließlich Medical Products, Inc. („MPI"), einem Firmenmantel, der für den alleinigen Zweck der Übertragung der Vertriebslizenz gegründet wurde. Verschiedene Dokumente nennen Andreas Schweitzer als Eigentümer von NED zum Zeitpunkt dieser Transaktionen.

Die betrügerischen Aktivitäten in dieser Angelegenheit begannen 1995, als Celentano, ein in Florida ansässiger Geschäftsmann, Losordo und NED der US-amerikanischen Öffentlichkeit Aktien eines Unternehmens mit dem Namen HealthCare, Ltd. („HealthCare") anboten. HealthCare war angeblich ein russisches, an der Börse gehandeltes Unternehmen, das ähnliche medizinische Geräte, wie angeblich von Novatek verkauft, verkaufte. Den Anlegern von HealthCare wurde mitgeteilt, dass die Aktien des Unternehmens an einer russischen Börse gehandelt wurden und dass das Unternehmen Verträge zum Verkauf von medizinischen Diagnosegeräten an russische Unternehmen eingegangen war. Allerdings liegen keine Beweise vor, dass eine dieser Behauptungen wahr ist. Vielmehr befanden sich die angebotenen und verkauften HealthCare Aktien im Besitz von NED.

Am 3. März 1996 gingen Novatek und MPI einen Vertrag zur Planung einer Fusion ein, wonach Novatek MPI für Aktien im Wert von 72 Millionen Novatek Aktien erwerben würde. Kurz nach der Fusion begann Novatek, eine Reihe von Berichten bei der SEC einzureichen, die irreführende Darstellungen hinsichtlich Novateks finanzieller Lage und Geschäftsverträgen enthielt. Zum Beispiel reichte Novatek am 2. April 1996 ein Formular 8-K/A ein. Diesen Bericht müssen Unternehmen einreichen, wenn eine wesentliche Änderungen ihres Geschäftsbetriebs vorliegt. Dieser Bericht enthielt Proforma-Finanzinformationen hinsichtlich Novateks Übernahme von MPI und Eigentum an der Vertriebslizenz. Die Finanzausweise bei dieser Einreichung gaben Novateks Vermögenswerte mit einer Höhe von 57 Millionen US-Dollar an. In Wahrheit jedoch betrug der Wert von Novateks Vermögenswerten nur ca. 2 Millionen US-Dollar. Die Differenz in Höhe von 55 Millionen US-Dollar war ein Ergebnis der falschen Bewertung der Vertriebslizenz.

Ungefähr zum gleichen Zeitpunkt zu Beginn des Jahres 1996 bot Celentano HealthCare Anlegern die Option, ihre Aktien von HealthCare in Novatek Aktien umzuwandeln. Vor seiner Fusion mit MPI war Novatek eine Baufirma mit Sitz in Florida, deren Aktien auf dem SmallCap-Markt der National Association of Securities Dealers („NASDAQ") gehandelt wurden. Bei dem

Angebot dieser Gelegenheit an die Anleger machte Celentano falsche und irreführende Angaben hinsichtlich des Bestehens eines mehrere Millionen Dollar umfassenden Vertrages mit brasilianischen und mexikanischen Unternehmen und des Werts der Vermögenswerte von Novatek. Gleichzeitig waren weder Celentano, Losordo noch NED zu keinem Zeitpunkt als Broker oder Wertpapierhändler registriert bzw. arbeiteten mit einem Broker oder Wertpapierhändler zusammen, wie dies laut US-Wertpapiergesetzen vorgesehen ist.

Am 11. April 1996 veröffentliche Novatek die erste Pressemitteilung einer Reihe von falschen und irreführenden Pressemitteilungen. In dieser Pressemitteilung wurde ein angeblicher fünf Jahre laufender Vertrag zwischen Novatek und Importadora y Exportadora Accmed., Inc. („Importadora") mit Sitz in Santiago, Chile, über den Verkauf von Cholera-Tests angekündigt. Laut Pressemitteilung sah der Vertrag den „garantierten Kauf [durch Importadora] in Höhe von fünf Millionen Dollar (5.000.000 US-Dollar) von QUIX™ Rapid Cholera Strip Tests über fünf (5) Jahre für insgesamt fünfundzwanzigmillionen Dollar (25.000.000 US-Dollar)" vor. Tatsächlich jedoch gab es den in der Pressemitteilung beschriebenen Importadora Vertrag überhaupt nicht, und es wurden niemals irgendwelche Vorrichtungen nach Chile versandt.

Am 20. Mai 1996 reichte Novatek bei der SEC ein Formular 10-QSB bei. Dieser erforderliche in regelmäßigen Abständen eingereichte Bericht beschreibt u.a. die finanzielle Lage des Unternehmens in dem Quartal, das am 31. März 1996 endete. In diesem Bericht wurden die falschen Informationen in dem früheren Bericht vom 2. April wiederholt und Novateks Vermögenswerte wurden mit einem Wert von 57 Millionen US-Dollar angegeben, wobei die Vertriebslizenz mit 52 Millionen US-Dollar veranschlagt wurde. Außerdem gab Novatek in dem Abschnitt „Management Discussion und Analysis" („MD&A") des Berichts fälschlicherweise an, dass es als Co-Broker mit einem Vertrag zum Versand von HIV-Testvorrichtungen nach Mexiko auftrat und dass der erste Versand am 14. Mai 1996 erfolgte. Tatsächlich erfolgte jedoch zu keinem Zeitpunkt ein Versand aufgrund irgendeines Vertrages.

Im Juni 1994 teilte NASDAQ Novatek mit, dass sein zuvor eingereichter Antrag zur Zulassung beim National Market System ( das Unternehmen mit Vermögenswerten in Höhe von mindestens 4 Millionen US-Dollar aufführt) abgelehnt wurde. NASDAQ lehnte nicht nur den Antrag von Novatek ab, sondern wies Novatek darauf hin, dass seine Rechnungslegung für die Fusion im März unrichtig war. Dies führte dazu, dass Novatek darauf hingewiesen wurde, dass es für die weitere Zulassung auf dem SmallCap-Markt einen neuen Antrag stellen müsste. Ohne diesen neuen Antrag würden unter Umständen die Aktien von Novatek nicht länger zulassen werden.

Am 13. August 1996 reichte Novatek für den Zeitraum bis zum 30. Juni 1999 ein Formular 10-QSB bei der SEC ein. Dieser Bericht enthielt ebenfalls falsche Finanzausweise und gab Novateks Vermögenswerte mit 59 Millionen US-Dollar und ein Eigenkapital in Höhe von 55 Millionen US-Dollar an. Ohne die falsche Bewertung der Vertriebslizenz mit 54 Millionen US-Dollar hätte das Eigenkapital ca. 1,3 Millionen betragen. Außerdem versäumte es Novatek, die

Umstände offenzulegen, die möglicherweise zur Nichtzulassung seiner Aktien führen könnten, und es gab fälschlicherweise im MD&A-Abschnitt dieses Berichts an, dass Novatek in Chile einen Vertrag eingegangen ist, der über 15 Millionen US-Dollar wert war.

Am 16. August 1996 gab Novatek eine Pressemitteilung heraus, in der behauptet wurde, dass Novatek und die Oswaldo Cruz Foundation gemeinsam einen über 10 Jahre laufenden Vertrag zur Herstellung und zum Vertrieb von medizinischen Diagnosesätzen in ganz Brasilien eingegangen sind. Der Pressebericht prognostizierte, dass die Erlöse aus dem angeblichen Vertrag im ersten Jahr 35 Millionen US-Dollar übersteigen und dann noch höher sein würden. Diese Darstellungen waren falsch.

Kurz darauf veröffentlichte Novatek die erste von zwei Pressemitteilungen in Bezug auf die Gesundheitsministerien in Argentinien. Am 26. August 1996 gab Novatek eine Pressemitteilung in Bezug auf einen angeblichen Vertrag mit dem Gesundheitsministerium der Provinz von Corrientes in einem Umfang von jährlich 3 Millionen US-Dollar heraus. Weniger als zwei Wochen später am 3. September später veröffentlichte Novatek eine Pressemitteilung, um einen Vertrag im Wert von 15 Millionen US-Dollar mit dem Gesundheitsministerium der Provinz von Mendoza bekanntzugeben. Tatsächlich jedoch existierte keiner dieser Verträge.

Am 12. August 1998 reichte die SEC ihre erste abgeänderte Klage [First Amended Complaint] in dieser Angelegenheit ein, in der dargelegt wurde, dass Novatek und die anderen Beklagten folgendermaßen gegen die US-Wertpapiergesetze verstoßen hätten: 1) durch Verbreitung einer Reihe von falschen und irreführenden Pressemitteilungen, 2) durch falsche und irreführende Angaben in Bezug auf die finanzielle Lage von Novatek in den Finanzausweisen, die den bei der SEC eingereichten Berichten beigelegt wurden und 3) durch Auftreten als nicht zugelassene Broker oder Wertpapierhändler.

## DIE STRAFTATEN

15 U.S.C. §§77 e und 77 q (a). Betrügerische Transaktionen zwischen Bundesstaaten

> (a) Keiner Person ist es erlaubt, beim Verkauf oder Kauf von Wertpapieren ...
> (1) Methoden, Machenschaften oder Täuschungsmanöver für betrügerische Zwecke einzusetzen.
> (2) Geld oder Vermögensgegenstände durch unwahre Angaben zu einer wesentlichen Tatsache oder durch Nichtangabe einer wesentlichen Tatsache an sich zu bringen, die notwendig ist, um sicherstellen, dass die Angaben unter den Umständen, unter denen sie gemacht wurden, nicht irreführend sind.

15 U.S.C. §§78 j (b) und 17 C.F.R. § 240.10b-5  Vorschriften gegen den Einsatz von manipulativen und täuschenden Methoden

Es ist keiner Person erlaubt, sich direkt oder indirekt mit Hilfe ... der Postdienste oder einer Einrichtung einer nationalen Börse ...

(b) im Zusammenhang mit dem Kauf oder Verkauf von Wertpapieren, die an einer nationalen Börse registriert sind, manipulativer oder täuschender Mittel oder Vorrichtungen in Zuwiderhandlung in Bezug auf solche Regeln und Vorschriften zu bedienen, die die SEC als erforderlich oder angemessen betrachtet und im Interesse der Öffentlichkeit oder zum Schutz der Anleger vorschreibt.

15 U.S.C. §§77 e (a) & (c ) Verbote in Bezug auf den zwischenstaatlichen Handel und Postdienste

(a) Es sei denn, eine Anlage zum Antrag auf Börsenzulassung von Wertpapieren bei der SEC ist für das Wertpapier wirksam, ist es keiner Person erlaubt, direkt oder indirekt

(1) Transport- oder Kommunikationsmittel bzw. −instrumente einzusetzen ..., um solche Wertpapiere mittels Emissionsprospekt etc. zu verkaufen oder

(c) ... mittels Emissionsprospekt etc. ein Wertpapier nur dann anzubieten oder zu verkaufen, wenn eine Anlage zum Antrag auf Börsenzulassung von Wertpapieren bei der SEC wurde für das Wertpapier eingereicht wurde.

15 U.S.C. § 78 ff (a) Strafen

(a) Jede Person, die vorsätzlich gegen irgendeine Vorschrift oder eine Vorschrift oder Regel, deren Verletzung ungesetzlich ist oder deren Beachtung gemäß den Bedingungen dieses Titels erforderlich ist, oder jede Person, die vorsätzlich und wissentlich Angaben in einem Antrag, Bericht oder Dokument macht oder veranlasst, der gemäß diesem Titel veröffentlicht werden muss, verstößt, ...wird bei Verurteilung mit einer Geldstrafe von bis zu 1.000.000 US-Dollar oder mit einer Gefängnisstrafe von bis zu 10 Jahren oder beidem bestraft.

18 U.S.C. §1341 Betrug und Schwindel

Jede Person, die sich Machenschaften oder Täuschungsmanöver für einen Betrug oder zum Erhalt von Geldern oder Eigentum mit Hilfe irreführender oder betrügerischen Vorgaben, Darstellungen oder Versprechen mittels telegrafischer, Funk- oder TV-Kommunikation ausdenkt oder beabsichtigt oder die diese plant oder verspricht, ... zum Zweck der Durchführung solcher Machenschaften oder Täuschungsmanöver, .... bzw. dieses versucht, wird mit einer Geldstrafe

von bis zu 250.000 US-Dollar oder Gefängnisstrafe von bis zu 5 Jahren oder beidem bestraft. Wenn der Verstoß ein Finanzinstitut betrifft, wird eine solche Person mit einer Geldstrafe von bis zu 1.000.000 US-Dollar oder mit einer Gefängnisstrafe von bis zu 30 Jahren oder beidem bestraft.

## 18 U.S.C. §1956 Geldwäsche

(a) (1) Jede Person, die weiß, dass die in einer finanziellen Transaktion verwendeten Vermögensgegenstände die Erlöse aus einer bestimmten unerlaubten Handlung sind, und die eine finanzielle Transaktion durchführt oder versucht durchzuführen, bei der die Erlöse aus der unerlaubten Tätigkeit verwendet werden ...

(A) (i) mit der Absicht, die bestimmte unerlaubte Handlung weiterhin ausführen zu können, wird mit einer Geldstrafe von bis zu 500.000 US-Dollar bzw. dem doppelten Wert des Vermögensgegenstandes (oder der Geldinstrumente oder Gelder), die bei der Transaktion eingesetzt wurden, wobei der jeweils höhere Betrag gilt, oder einer Gefängnisstrafe von bis zu 20 Jahren oder beidem bestraft.

18 U.S.C. §1957 Beteiligung an Geldtransaktionen mit Vermögensgegenständen, die aus einer bestimmten unerlaubten Handlung stammen

(a) Jede Person, die sich wissentlich an Geldtransaktionen beteiligt oder dieses versucht. die mit Vermögensgegenständen durchgeführt werden, die aus kriminellen Handlungen stammen, die einen Wert von 10.000 US-Dollar übersteigen und aus einer bestimmten unerlaubten Handlung stammen, wird mit [einer Geldstrafe von bis zu 250.000 US-Dollar bzw. einer Gefängnisstrafe von bis zu 10 Jahren oder beidem bestraft].

## BETEILIGTE PERSONEN UND UNTERNEHMEN

### 1. WILLIAM P. TRAINOR

| | |
|---|---|
| Geburtsdatum: | 30. November 1936 |
| Geburtsort: | USA |
| Staatsbürgerschaft: | USA |
| Rasse: | Kaukasisch |
| Geschlecht: | Männlich |
| Körpergröße: | Unbekannt |
| Gewicht: | Unbekannt |

| Augenfarbe: | Unbekannt |
| Haarfarbe: | Unbekannt |
| Passnummer: | (U.S.) 200822511 |
| US-Sozialversicherungsnummer: | Unbekannt |

## 2. VINCENT D. CELENTANO

| Geburtsdatum: | Unbekannt |
| Geburtsort: | Unbekannt |
| Staatsbürgerschaft: | USA |
| Rasse: | Kaukasisch |
| Geschlecht: | Männlich |
| Körpergröße: | Unbekannt |
| Gewicht: | Unbekannt |
| Augenfarbe: | Unbekannt |
| Haarfarbe: | Unbekannt |
| Passnummer: | Unbekannt |
| US-Sozialversicherungsnummer: | Unbekannt |

## 3. KAREN P. LOSORDO

| Geburtsdatum: | 13. Januar 1959 |
| Geburtsort: | USA |
| Staatsbürgerschaft: | USA |
| Rasse: | Kaukasisch |
| Geschlecht: | Weiblich |
| Körpergröße: | Unbekannt |
| Gewicht: | Unbekannt |
| Augenfarbe: | Unbekannt |
| Haarfarbe: | Unbekannt |
| Passnummer: | (U.S.) 100461696 |
| US-Sozialversicherungsnummer: | Unbekannt |

## 4. NOVATEK INTERNATIONAL, INC.
(läuft jetzt unter dem Namen Medical Diagnostics Products, Inc.)

| Eingetragener Geschäftssitz: | Colorado, USA |
| Adresse: | 8990-H |
| | Route 108 |
| | Columbia, Maryland, USA |

## 5. NEW ENGLAND DIAGNOSTICS, INC.

| Eingetragener Geschäftssitz: | Cayman-Inseln |
| Adresse: | 4 Butternut Lane |

Hingham
Massachussetts, USA

BETROFFENE PERSON

ANDREAS SCHWEITZER

| | |
|---|---|
| Geburtsdatum: | Unbekannt |
| Geburtsort: | Unbekannt |
| Staatsbürgerschaft: | Anscheinend Schweiz |
| Rasse: | Kaukasisch |
| Geschlecht: | Männlich |
| Sozialversicherungsnummer: | Unbekannt |
| Adresse: | Seestrosso No. 1 |
| | Cham 6330 |
| | Schweiz |

## ERFORDERLICHE UNTERSTÜTZUNG
### Erforderliche Dokumente

Bitte stellen Sie alle Unterlagen oder andere Materialien im Besitz von Herrn Andreas Schweitzer hinsichtlich folgender Unternehmen und Personen zur Verfügung:

1) Novatek International, Inc.,
2) Novatek International Holding, Inc.,
3) HealthCare, Ltd.,
4) Universal Health Watch, Inc.,
5) New England Diagnostics, Inc.,
6) William P. Trainor,
7) Vincent D. Celentano und
.8) Karen Losordo.

## ERFORDERLICHE ZEUGENAUSSAGEN

Bitte nehmen Sie die Zeugenaussage des vereidigten Zeugen Andreas Schweitzer unter Beteiligung der SEC-Rechtsanwälte, der DOJ-Rechtsanwälte, der Vertreter des Federal Bureaus of Investigation und Rechtsanwälte der Beklagten hinsichtlich seiner Beziehungen zu den oben genannten Personen und Unternehmen und seines Wissens in allen Angelegenheiten, die sich auf die Angelegenheit dieses Unterstützungsgesuchs beziehen. Die SEC und DOJ haben Fragen vorbereitet, die sie Herrn Schweitzer vor der Zeugenaussage stellen möchten.

## ZU BEACHTENDE VERFAHRENSWEISEN

Bitte bitten Sie den Kantonalrichter um Folgendes:

1. Dafür zu sorgen, dass das Interview mit Herrn Schweitzer innerhalb einer Woche nach Vorlage der erforderlichen Dokumente bei der SEC, wobei Vertreter des DOJ, FBI und der Beklagten anwesend sein müssen, durchgeführt wird und Vorlage eines Protokolls gemäß Artikel 1(4) (b), 10 und 12.

2. Dafür zu sorgen, dass Herrn Schweitzers Zeugenaussage wortwörtlich in Ton und Bild aufgezeichnet wird, dass Herrn Schweitzer das wortwörtliche Protokoll oder andere Medien, die zur Aufzeichnung der Antworten auf die Fragen verwendet wurden, unterzeichnet, und dass das wortwörtliche Protokoll oder die anderen Aufzeichnungen allen Rechtsanwälten zur Verfügung gestellt werden, die dies wünschen.

3. Anforderungen von Originaldokumenten oder gleichlautenden Abschriften der Dokumente von der Bank gemäß Artikel 1(4) (c) und 18(1),

4. Das Ergänzen der Dokumente um eine Echtheitsbescheinigung der Geschäftsunterlagen ausgefüllt und unterschrieben von der Person, die diese Dokumente vorlegt, gemäß Artikel 1(4) (e) und 18(2) und

5. Das Versehen der Bescheinigung mit ihrem oder seinem Siegel (oder Stempel) gemäß Artikel 18(3), wenn gewährleistet wird, das eine Falschaussage auf der Bescheinigung die Person, die diese ausfüllte und unterschrieb, der Strafverfolgung nach Schweizer Recht aussetzt.

6. Einladung an Herrn Schweitzer zum Erscheinen in Washington D.C. zur Zeugenaussage vor dem Geschworenengericht und/oder im Rahmen der Gerichtsverhandlung gemäß Artikel 23 (2) zu einem zukünftigen Zeitpunkt auf Kosten der Regierung der Vereinigten Staaten.

21. Januar 2000     {Unterschrift}
Datum              Thomas G. Snow
                       Stellvertretender Direktor
                       Büro für Internationale Angelegenheiten
                       [Office of International Affairs]
                       Kriminalabteilung [Criminal Division]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. _____

IN RE SEALED MATTER            )
(Grand Jury 00-01)             )
                               )
_____ )

## SEALED ORDER

Upon application ex parte and under seal of the United States of America, pursuant to 18

U.S.C. § 3292, the Court finds by a preponderance of the evidence that an official request was

submitted to the appropriate Switzerland authorities on October 17, 2000 for evidence relating to

the offenses of (1) mail fraud, 18 U.S.C. §§ 1341, (2) wire fraud, 18 U.S.C. § 1343, (3)

laundering of monetary instruments, 18 U.S.C. § 1956, and (4) engaging in monetary transactions

in property derived from specified unlawful activity, 18 U.S.C. § 1957, and that it reasonably

appears that such evidence is in Switzerland.

Therefore, in view of the findings, it is hereby

ORDERED that the application of the United States is granted, and it is further

ORDERED that the running of the statute of limitations for the offenses set forth above

and further described in the Motion of the United States for Suspension of the Statute of

Limitations is hereby suspended beginning on October 17, 2000 until the date on which the

authorities of Switzerland take final action on such request by delivering a complete response to

the United States, provided that this period of suspension may not exceed three years.

IT IS FURTHER ORDERED that, within ten (10) days of being advised that final action has been taken by Switzerland on the government's request, government counsel assigned to this investigation shall notify the Court of such final action.

Dated: This _____ day of _____, 2001.


_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. _____

IN RE SEALED MATTER                    )
(Grand Jury 00-01)                     )
                                       )
_____      )

## MOTION TO SEAL

The United States of America, by and through its undersigned counsel, hereby applies and

moves this Court, for an Order sealing the Motion for Suspension of the Statute of Limitations in

the above-captioned matter, sealing the Order granting that motion, and sealing this Motion to

Seal, until such time as the indictment of any of the defendants in this investigation or until

further Order of the Court.

In furtherance of this motion, the United States submits that the matters contained in the

motion and Order are of a sensitive nature pertaining to an on-going grand jury investigation

involving a number of victims and subject to the general rule of secrecy contained in Rule 6(e) .

WHEREFORE, pursuant to Rule 6(e)(6) of the Federal Rules of Criminal Procedure, the

United States respectfully requests that the Motion for Suspension of the Statute of Limitations,

the Order granting that motion, and this Motion to Seal, be **SEALED** until such time as the

indictment of any defendant in this investigation or until further Order of the Court.

Dated: April ___9___, 2001.

Respectfully submitted,

GUY A. LEWIS
United States Attorney

By: _Jack B Patrick_____

JACK B. PATRICK
VA Bar No. 32645
Senior Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue
Washington, DC 20005
Tel: (202) 514-9842
Fax: (202) 514-0152
E-MAIL: Jack.Patrick2@USDOJ.GOV

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. _____

IN RE SEALED MATTER          )
(Grand Jury 00-01)           )
                             )
_____ )

## ORDER TO SEAL

Upon Motion of the United States, this Court having been apprised in the premises, for

good cause shown, does hereby enter an ORDER sealing the Motion for Suspension of the

Statute of Limitations, the Order granting the Motion for Suspension of the Statute of

Limitations, the Motion to Seal, and this Order, until such time as the indictment of any of the

defendants in the above-styled matter or until further Order of the Court.

Dated: This _____ day of _____, 2001.


_____
UNITED STATES DISTRICT JUDGE



**U.S. Department of Justice**

*Criminal Division*

Washington, D.C. 20530

March 30, 2001

**TELEFAX** transmittal sheet

TO:                    Mr. Jack Patrick, Esquire
                       Fraud Section
                       Fax: 4-0152

FROM:                  John E. Harris
                       Acting Director
                       OFFICE OF INTERNATIONAL AFFAIRS
                       CRIMINAL DIVISION
                       UNITED STATES DEPARTMENT OF JUSTICE

                       By *Juliana Thirolf*

                       Juliana Thirolf
                       Paralegal Specialist
                       (For: Judith Friedman)

SUBJECT:               Request to Switzerland in the Matter of
                       William P. TRAINOR/ "SEC vs. Trainor"

MESSAGE:

Attached please find a copy of a fax from the Swiss Ministry of
Justice regarding the above-captioned matter.  A translation
follows:

Per your facsimile dated March 27, 2001, we must unfortunately
inform you, that we have not been able to locate the desired
person at the address provided in the fax.  In addition, we were
unable to find the Firm Kenk & Schweitzer.  Therefore, we ask
that you please provide us with additional information regarding
Andreas Schweitzer (DOB, possible languages that he speaks) so as
not to ask the incorrect authorities to execute the request.

If you have any questions, please contact Judith Friedman at
(202) 514-0951 or me at (202) 616-0549.  Thank you for your
assistance.  Regards!

Number of pages (including this one) 2        Sent by: JT

Our telefax number: 202-514-0080
Voice: 202-514-0041; 202-616-0549 (direct)
E-mail: Juliana.Thirolf@usdoj.gov

# FAX



**Bundesamt für Justiz · Office fédéral de la justice · Ufficio federale di giustizia · Federal Office of Justice**
Eidg. Justiz- und Polizeidepartement · Département fédéral de justice et police · Dipartimento federale di giustizia e polizia · Federal Department of Justice and Police

**Internationale Rechtshilfe - Entraide judiciaire internationale - International Legal Assistance**
CH -3003 Bern (Schweiz)

| | | | | |
|---|---|---|---|---|
| Telefon | 031 322 83 74 | | Seiten (inkl. Titelseite):<br>Total pages (including cover sheet): | |
| Telefax | 031 322 53 80 | **30. März 2001** | Total pages (couverture inclue): | **1** |

| An:<br>To:<br>A: | OIA Washington | Fax:<br>Fax No.:<br>Fax: | **MEMO** |
|---|---|---|---|
| Ihre Referenz:<br>your reference:<br>votre réf.: | **182 -6767 William Trainor** | Unsere Ref.:<br>our reference:<br>notre réf.: | **B 96 673 HUT** |
| Betrifft:<br>Subject:<br>concerne: | **Ihr Rechtshilfeersuchen in der Sache William Trainor-**<br><br>**Ihr Telefax vom 27. März 2001** | | |

Sehr geehrte Damen und Herren

In Bezug auf Ihr Fax vom 27. März 2001 müssen wir Ihnen leider mitteilen, dass wir die gewünschte Person an die von Ihnen angegebene Adresse nicht gefunden haben. Weiterhin teilen wir Ihnen mit, dass es uns unmöglich war, die Firma Kenk & Schweitzer zu finden. Deshalb bitten wir Ihnen, uns weitere Angaben über Andreas Schweitzer zu geben (Geburtsdatum, ev. Sprache usw.). Dies um zu vermeiden, dass mit dem Rechtshilfeersuchen die falsche Behörde beauftragt wird.

Mit freundlichen Grüssen

**ABTEILUNG INTERNATIONALE RECHTSHILFE**
Sektion Rechtshilfe

Catherine Hutter

182-6767