~~SEALED~~

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 01-6215-CR-JORDAN(s)/BANDSTRA

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )          Unsealed  7/18/03
                                )
v.                              )
                                )
WILLIAM P. TRAINOR,             )
                                )
          Defendant.            )
_____)

**SEALED UNITED STATES' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
DEFENDANT'S CORRECTED MOTION TO DISMISS**

COMES NOW the United States, through the undersigned attorneys, and respectfully submits

this Supplemental Memorandum in Opposition to Defendant's Corrected Motion to Dismiss. For the

reasons set forth below, the United States respectfully requests that this Court deny defendant's motion.

On April 16, 2003, this Court held a hearing on defendant's corrected motion to dismiss counts

1-10, 12-14 and 16-21 of the superseding indictment. At the hearing, in addition to advancing other

arguments previously addressed by the United States, defendant claimed that counts of the superseding

indictment should be dismissed as time barred because (1) Judge Gonzalez did not grant the United

States' request to issue an order suspending the running of the statute of limitations pursuant to 18

U.S.C. § 3292 within thirty days after the filing of the application, as required by the statute; (2) the

requirement that the district court rule on an application for a tolling order within thirty days of its filing is

1

jurisdictional, such that a judge's failure to rule within that period deprives the court of jurisdiction to later grant the government's application; and (3) Judge Gonzalez could not properly have found by a preponderance of the evidence that it reasonably appears or it reasonably appeared at the time the official request was made that such evidence is or was in such foreign country, because the United States did not submit an affidavit of an agent in support of its application for the tolling order. Defendant also argued at the hearing that Judge Gonzalez, in making his findings, could not properly rely upon the representations contained in the application or the Official Request submitted by the United States because the application and request were hearsay. During the hearing, this Court granted the United States additional time to submit a Memorandum of Law addressing defendant's claims.

As explained more fully below, all of defendant's arguments attacking the legality of Judge Gonzalez's order suspending the running of the statute of limitations are misplaced because they are contrary to law, contrary to the facts, or at odds with the plain meaning and purpose of the Suspension of Limitations Statute, 18 U.S.C. § 3292. Judge Gonzalez exercised valid jurisdiction on May 10, 2001, when he granted the United States' April 10, 2001 application for a tolling order. Judge Gonzalez signed the order within the thirty day period set forth in the statute. The application that the United States submitted on April 6, 2001, did not meet the requirements of the Clerk's Office, was not acted upon by the Court, and absent evidence that the Court considered it, did not start the clock running on the thirty day period contained in the statute. However, even assuming arguendo that Judge Gonzalez granted the government's request for a tolling order 34 days after the application was filed by the government, that order is valid because it is clear from the statute's purpose and plain language that the time limit set forth in § 3292 is not jurisdictional. This conclusion is supported by the holdings of

2

several courts of appeals that have addressed the issue of whether a similar thirty-day time limit for judicial action contained in the Antiterrorism and Effective Death Penalty Act of 1996 at 28 U.S.C. § 2244(b)(3)(D) is jurisdictional.  The Courts consistently ruled that the thirty-day time limitation is not jurisdictional.

In addition, Judge Gonzalez made correct preponderance of evidence findings when he granted the tolling order on May 10, 2002.  Contrary to defendant's claim, there is no requirement in § 3292 that the government submit an affidavit to support its application to the district court.  Judge Gonzalez followed the procedure anticipated by the plain language of 18 U.S.C. § 3292 in making his preponderance findings.  Furthermore, the Federal Rules of Evidence do not apply in miscellaneous proceedings such as proceedings to obtain a tolling order.   The application that the United States submitted in this case, which included a copy of the Official Request transmitted to Switzerland and proffers by government counsel,  was sufficient to meet the statutory requirements.

## STATEMENT OF THE FACTS

On October 17, 2000, the Office of International Affairs ("OIA"), Criminal Division, United States Department of Justice submitted by air mail an Official Request for Assistance (henceforth "Request for Assistance" or "Request") to the Central Authority of Switzerland (henceforth "Switzerland") in the Prosecution of William TRAINOR, et al.[1]  The Request for Assistance stated that

---

[1]  The transmittal letter of October 17, 2000, enclosed a memo styled: Request for Assistance in SEC v. Trainor, et al, signed (English version) on January 21, 2000, by Thomas G. Snow, Deputy Director, OIA.  The memo was translated into German prior to submission to Switzerland.  The Request for Assistance was received at the Federal Office of Justice in Switzerland on October 23, 2000.

it was submitted in connection with a civil action being prosecuted by the U.S. Securities and Exchange Commission ("SEC") and a criminal investigation being conducted by the U.S. Department of Justice, Criminal Division, Fraud Section. The Request described in detail the scheme perpetrated by defendant William P. Trainor and others to defraud investors through misrepresentations and sham transactions involving various entities controlled by Trainor. One of the entities which played a crucial role in the scheme was New England Diagnostics ("NED"). The Request for Assistance, which noted that Andreas Schweitzer had been listed as the owner of NED, sought documents as well as testimony from Schweitzer, a Swiss citizen.[2]

In January, February, March and April 2001, OIA followed up on the Request for Assistance with inquiries of Switzerland, and OIA and Switzerland exchanged correspondence  regarding the status of the Request. The correspondence included a March 30, 2001, fax from the Swiss Authority notifying the United States that it could not find Andreas Schweitzer at the address provided and requesting additional information so that it could continue to follow up on the United States' Official Request for assistance. The United States searched for additional information, and provided the Swiss Authority with another possible address for Andreas Schweitzer on April 2, 2001.[3]

---

[2]The United States learned through interviews conducted by FBI Special Agent Swanson during the period 1999 through October 2000 and from documents obtained in the investigation that Andreas Schweitzer was a resident and citizen of Switzerland. See Declaration of Special Agent David Swanson attached as Exhibit A. The Swiss Magistrate confirmed the information that Special Agent Swanson obtained concerning Schweitzer's citizenship and residence when she interviewed Schweitzer on February 18, 2002, pursuant to the Request for Assistance.

[3]The Swiss Magistrate eventually confirmed that Schweitzer resided at the address the United States provided the Swiss on April 2, 2001.

4

On April 6, 2001, concerned that it would take a long time to obtain the requested evidence from Switzerland, the United States attempted to file in the U.S. District Court for the Southern District of Florida–Fort Lauderdale Division a sealed *ex parte* application for a tolling order pursuant to 18 U.S.C. § 3292. The *ex parte* application included a proposed order with a signature line for a United States Magistrate Judge. The application and proposed order were each captioned: "IN RE SEALED MATTER (Grand Jury Investigation of Novatek International, Inc., et al)." See Declaration of Jack Patrick attached as Exhibit B. Shortly thereafter, an employee of the Clerk's Office in Ft. Lauderdale informed Fraud Section Senior Trial Attorney Jack Patrick that the captions on the *ex parte* application and proposed order submitted on April 6, 2001, were improper because the captions listed the name of an entity and this was not permitted in pleadings in a Grand Jury matter. In addition, Mr. Patrick was advised that the proposed order would have to be changed because it was required to be executed by a United States District Judge rather than a United States Magistrate Judge. The employee of the Clerk's Office informed Mr. Patrick that a new application would need to be filed. Mr. Patrick understood from this conversation that the April 6, 2001 application would not be acted upon due to the defects in the caption and signature line. See Declaration of Jack Patrick.

On April 10, 2001, the United States filed a new *ex parte* application for a tolling order. This application and proposed order were captioned "IN RE SEALED MATTER (Grand Jury 00-01)," and the proposed order contained a signature line for a United States District Judge. On May 10, 2001, thirty days after the United States' filed the April 10 application for a tolling order, United States

5

District Judge Gonzalez signed the government's proposed order, granting the application of the United States to suspend the statute of limitations in this matter as of October 17, 2000.[4]

The order Judge Gonzalez signed was captioned "IN RE SEALED MATTER (Grand Jury 00-01)" and was assigned Miscellaneous No. GJ-00-01. The caption and signature line in this order plainly establish that Judge Gonzalez acted upon the April 10, 2001 application filed by the United States, rather than the application the United States attempted to file on April 6, 2001. Notably, Judge Gonzalez in his May 10, 2001 order specifically found "by a preponderance of the evidence that an official request was submitted to the appropriate Switzerland authorities on October 17, 2000 for evidence related to the offenses of (1) mail fraud, 18 U.S.C. § 1341, (2) wire fraud, 18 U.S.C. § 1343, (3) laundering of monetary instruments, 18 U.S.C. § 1956, and (4) engaging in monetary transactions in property derived from specified unlawful activity, 18 U.S.C. § 1957, and that it reasonably appears that such evidence is in Switzerland."

In June 2001, the Swiss police through Interpol verified that Andreas Schweitzer resided in Geneva, Switzerland at the address provided by the United States on April 2, 2001. In August 2001, OIA again submitted a follow-up inquiry to Switzerland for an update on the Request for Assistance.

On September 20, 2001, the grand jury returned a 21-count indictment against defendant Trainor, alleging eleven counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2, four counts of laundering monetary instruments in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2, and five counts of

_____

[4] The district court subsequently issued an order unsealing the grand jury record in this matter for the purpose of providing defendant Trainor with a copy of these documents. The grand jury record for all other purposes is still under seal.

engaging in a monetary transaction in property derived from specified unlawful activity in violation of 18

U.S.C. §§ 1957 and 2.  The indictment alleged that it was a purpose of the scheme and artifice that

defendant Trainor, through fraudulent and misleading transactions about the business activities of certain

named entities, including NED, acquired control of Novatek, fraudulently induced investors to buy

Novatek securities, and fraudulently diverted money from Novatek.  Indictment at ¶ 13.[5]  The

indictment also included allegations of sham license transactions and other misrepresentations involving

NED and wire transfers of funds to NED.  See Indictment at ¶ 20-23, 29.  Defendant Trainor also

used NED in his scheme as a conduit to direct over $6 million from Novatek and converted millions of

dollars to his own use and that of his family members.  See Indictment at ¶ 13 and 19.

In October 2001, and again in February 2002, OIA requested information regarding the

Request for Assistance.  On February 21, 2002, Switzerland advised OIA that Schweitzer had been

interviewed by a Swiss magistrate.  Switzerland sent the official statement of the interview to the

undersigned prosecutors at the Fraud Section on March 2, 2002.  In addition to other information, the

Official Statement of Interview confirmed that Andreas Schweitzer resided at the Geneva address the

United States provided to the Swiss Authority in April 2001, and that Schweitzer was a Swiss citizen.

Subsequently, the United States continued to request that Switzerland seek additional

information and evidence from Schweitzer and to request that prosecutors be permitted to interview

Schweitzer.  On October 29, 2002, Switzerland informed OIA that Schweitzer would be ready to

testify in Switzerland in November or December 2002 but would not be willing to be recorded by

---

[5] On June 13, 2002, the grand jury returned a superseding indictment adding three tax evasion charges.

visual means.   Switzerland informed OIA that defense counsel could attend the testimony if such would

make the matter admissible in accordance with United States law.  The United States unsuccessfully

attempted to schedule a Rule 15 deposition with Schweitzer prior to the scheduled April 21, 2003 trial

date in this matter.

## ARGUMENT

**JUDGE GONZALEZ EXERCISED VALID JURISDICTION AND MADE PROPER PREPONDERENCE OF THE EVIDENCE FINDINGS WHEN HE SIGNED THE TOLLING ORDER SUSPENDING THE STATUTE OF LIMITATIONS.**

    **A.    JUDGE GONZALEZ EXERCISED VALID JURISDICTION WHEN HE GRANTED THE TOLLING ORDER ON MAY 10, 2002.**

        **1.    Judge Gonzalez Properly Granted the Government's April 10, 2001 Application Within Thirty Days of its Submission.**

The record in this case demonstrates that Judge Gonzalez granted the United States'

application for a tolling order not later than thirty days after it was filed as required by 18 U.S.C. §

3292.  The order Judge Gonzalez signed is identical to the proposed order the United States submitted

on April 10, 2001, and very different from the proposed order submitted to the Clerk's Office four

days earlier on April 6, 2001.  Further, the Clerk's Office advised the United States that the April 6

application was defective, and informed counsel for the United States that the government would have

to file a new application.  As a result of this discussion, Senior Trial Attorney Jack Patrick believed the

filing had been rejected, and he filed a new application as instructed.  These facts suggest that the April

6 application was not forwarded to Judge Gonzalez for consideration.  Moreover, that Judge Gonzalez

granted the tolling order exactly thirty days after it was submitted on April 10, 2001,  provides strong

circumstantial evidence that Judge Gonzalez was well aware of the thirty day requirement contained in

the statute, and that he had before him only the April 10 application for the suspension of the statute of

limitations in this matter.  This is reinforced by the fact that no judicial action or recognition was ever

made by Judge Gonzalez of the defective April 6 application.  The April 6 application for a tolling order

is simply a red herring being used by the defendant in an attempt to undermine the important suspension

of limitations remedy Congress enacted into law as part of the Comprehensive Crime Control Act of

1984.  Based upon the record in this case, this Court should properly find that Judge Gonzalez's May

10, 2001 tolling order is valid without reaching the issue of whether the thirty day time limit set forth in

18 U.S.C. § 3292 is jurisdictional.

> **2.      The Plain Language and Purpose of 18 U.S.C. § 3292 Demonstrate that the Thirty Day Time Limit for Judicial Action Set Forth in the Statute is not Jurisdictional.**

Even if this Court assumes *arguendo* that Judge Gonzalez granted the United States'

application for suspension of the statute of limitations thirty-four days after the United States filed its

application, the May 10, 2001 tolling order is valid because the thirty day time limit set forth in 18

U.S.C. § 3292 is not jurisdictional.  A reasoned examination of the plain language and clear purpose of

18 U.S.C. § 3292 reveals that Congress could not have intended the thirty day time limit set forth in the

statute to be jurisdictional.  As more fully discussed below, this conclusion is supported by the holdings

of several courts of appeals that have addressed the issue of whether a similar thirty-day time limit for

judicial action contained in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") at

28 U.S.C. § 2244(b)(3)(D) is jurisdictional; the courts have ruled in each of these cases that an

appellate court can validly grant a motion for authorization to file a successive habeas corpus petition

after the thirty-day time period has run.  See, e.g., Browning v. United States, 241 F.3d 1262, 1263-

1264 (10th Cir. 2001) (court "convinced" that it continues to have jurisdiction over motion

notwithstanding the expiration of the thirty-day period). The thirty-day limit for judicial action in 28

U.S.C. § 2244(b)(3)(D), which requires a court of appeals to grant or deny a motion for authorization

to file a second or successive application for a writ of habeas corpus "not later than 30 days after the

filing of the motion" is directly analogous to identical time limit contained in 18 U.S.C. § 3292(a). In

contrast, as will be explained below, the seven day limitation in Fed. R. Crim. P. 35(a) on a district

court's ability to change the sentence that is part of a final judgment in a criminal case is not analogous

to the thirty day provision in § 3292(a)(2). The plain language and purpose of 18 U.S.C. § 3292, and

the appellate decisions that uniformly hold that the thirty day limit for judicial action in § 2244(b)(3)(D)

is not jurisdictional, demonstrate that defendant's contention that the time limit in 18 U.S.C. § 3292 is

jurisdictional is wholly without merit.

It is well a settled principle of statutory interpretation that courts must interpret statutes so as "to

effectuate and not destroy the spirit and force of the law and not to render it absurd." United States v.

Torres, 318 F.3d 1058, 1062 (11th Cir. 2003) ("In looking to the legislative history, we consider the

purpose, the subject matter and the condition of affairs which led to its enactment, and so construe it as

to effectuate and not destroy. . . "); DeGeorge v. United States District Court for the Central District of

California, 219 F.3d 930, 936 (9th Cir. 2000) ("[t]he plain meaning of the statute controls and courts

will look no further, unless its application leads to unreasonable or impracticable results.") The plain

language of 18 U.S.C. § 3292 and its legislative history establish that Congress' purpose in enacting the

statute was to facilitate the prosecution of criminal offenses by providing the United States with effective

relief from the statutes of limitation in cases where some of the evidence relating to those offenses was

10

located in foreign countries.[6] United States v. Torres, 318 F.3d at 1062; H.R. Rep. No. 98-907, at

2-4 reprinted in 1984 U.S.C.A.N. 3578, 3578-3580.   Congress recognized that because procedures

to obtain evidence in foreign jurisdictions "generally take a considerable amount of time to complete,"

efforts to recover evidence located in foreign countries during criminal investigations often resulted in

statute of limitations problems that interfered with the effective prosecution of federal crimes.  Torres,

318 F.3d at 1062; H.R. Rep. No. 98-907 at 2-3, reprinted in 1984 U.S.C.A.N. 3578, 3578-3579.

"Thus, in enacting § 3292, Congress sought to facilitate the prosecution of these criminal acts by

affording prosecutors enough time to obtain evidence located in foreign countries." Torres, 318 F.3d at

1062; H.R. Rep. No. 98-907 at 4, reprinted in 1984 U.S.C.A.N. 3579 (recognizing that "[t]he bill also

---

[6]18 U.S.C. § 3292 provides in pertinent part:

(a)(1) Upon application of the United States, filed before an indictment, indicating that evidence
of an offense is in a foreign country, the district court before which a grand jury is impaneled to
investigate the offense shall suspend the running of the statute of limitations for the offense if the
court finds by a preponderance of the evidence that an official request has been made for such
evidence and that it reasonably appears, or reasonably appeared at the time the request was
made, that such evidence is, or was, in such foreign country.
     (2)  The court shall rule upon such application not later than thirty days after the filing of the
application.
(b) Except as provided in subsection (c) of this section, a period of suspension under this
section shall begin on the date on which the official request is made and end on the date on
which the foreign court or authority takes final action on the request.
(c) The total of all periods of suspension under this section with respect to an offense –
     (1) shall not exceed three years; and
     (2) shall not extend a period within which a criminal case must be initiated for more than six
months if all foreign authorities take final action before such period would expire without regard
to this section.
(d) As used in this section, the term "official request" means a letter rogatory, * * * or any other
request for evidence made by a court of the United States or an authority of the United States
having criminal law enforcement responsibility, to a court or other authority of a foreign country.

. . . permits a Federal court, upon application of the prosecutor, to suspend the running of the statute of limitation for such time as is necessary (up to 3 years) to obtain evidence from a foreign country.")

When the provision in 18 U.S.C. § 3292(a)(2) that "the court shall rule upon such application not later than thirty days after the filing of the application" is considered along with the clear purpose of the statute, it is plain that the thirty day time limitation is not jurisdictional. Given the Congressional desire to provide prosecutors effective relief from statutes of limitation in cases where evidence related to those offenses is located in foreign countries, the obvious purpose of the thirty day time limit is to prompt courts to act quickly and thus provide prosecutors with a meaningful remedy that will permit them to bring cases that otherwise would be time barred. This purpose is clear because where prosecutors are determining whether they must seek indictment of offenses before important evidence in a foreign country is obtained because the statute of limitations is expiring, it is critical that their applications for a suspension of the statutes of limitation deadline be acted upon quickly. If the district court had unlimited time to rule on the government's application, § 3292 would not provide prosecutors with an effective remedy for the problem Congress intended to correct and would lead to a result that defeated the statute's purpose. The thirty day time limit assures that prosecutors who are awaiting the receipt of important foreign evidence – and also facing an approaching statutory deadline – will be able to effectively time the filing of an application for suspension with the court, so that if the application is rejected they will still have the option of presenting an indictment to the grand jury notwithstanding that the foreign evidence was not received. The thirty day time limit also provides prosecutors with the important remedy of seeking a writ of mandamus from the court of appeals in cases where a district court fails to rule within thirty days on the government's application as required by the statute.

Therefore, the clear purpose of the thirty day limit is to provide prosecutors with a mechanism to require district courts to act promptly on their applications for an order suspending the statute of limitation; its purpose is not to divest the district court of jurisdiction at the end of the thirty day period.[7]

To interpret the thirty day requirement in § 3292(a)(2) as a jurisdictional provision would turn the statute on its head and lead to the absurd result of making the prosecutor's ability to utilize the significant remedy that Congress enacted dependent upon the vagaries of crowded district court dockets and a district court's ability or willingness to rule rapidly on the government's application. Such a tortured interpretation of the § 3292(a)(2) would severely limit its effectiveness and permit the district court to deny the application simply by inaction. Moreover, if the thirty day requirement is jurisdictional, the government would have no remedy to correct a district court's refusal to act; if the government sought a writ of mandamus in such circumstances, the court of appeals could not order the district court to act because the thirty day period already would have run. The defendant's proposed interpretation of § 3292(a)(2) would have the perverse effect of turning the process of obtaining an order to suspend the statute of limitations into a game the government would lose if the district court failed for arbitrary reasons to act quickly. Thus, to hold that the thirty-day requirement is jurisdictional

---

[7]There is no basis to believe that the time limitation contained in § 3292 is designed to protect the sense of repose defendants usually receive from statutes of limitation. Congress protected "repose" with § 3292(c), which requires that "the total of all periods of suspension under this section with respect to an offense–(1) shall not exceed three years; and (2) shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section." Congress could not have intended to protect "repose" by making its remedy dependent upon the district court following the law and ruling with in thirty days. Such an interpretation is neither rational nor consistent with Congress' demonstrated willingness in the statute to allow the statute of limitations to be suspended for three years.

would "destroy the spirit and force of the law," because the undisputed purpose of the statute was to facilitate the cumbersome process of obtaining evidence from foreign governments.

Defendant's argument that the § 3292 time limit is jurisdictional because it is analogous to the seven-day jurisdictional limitation in Fed. R. Crim. P. 35(a) is misplaced. Rule 35(a)'s seven day requirement is dissimilar to the thirty day provision in § 3292(a)(2). Rule 35(a) governs the circumstance where the district court has made a final judgment in a criminal case by pronouncing sentence on the defendant, and, in particular, defines the period within which the court can change the sentence set forth in the final judgment to correct "arithmetical, technical or other clear error." After a district court enters final judgment in a criminal matter, the defendant has the right to appeal the court's judgment and must file a notice of appeal within a particular time period to effect that appeal. As noted in the advisory committee notes to Rule 35, one of the specific reasons for the jurisdictional seven-day time limit set forth in Rule 35(a) "is so that the appellate process (if a timely appeal is taken) may proceed without delay and without jurisdictional confusion." Advisory Committee Notes to the 1991 Amendments to Fed. R. Crim. P. 35. Public policy issues concerning the need for finality in court judgments dictate that such a jurisdictional time period be specified after which the district cannot be permitted to change its judgment.

The circumstances under which the § 3292 thirty-day requirement for judicial action becomes applicable are entirely distinguishable from those of Rule 35(a). Unlike the Rule 35(a) context, the thirty-day requirement in § 3292 does not mandate that the district court take action concerning a valid judgment it has previously entered which is subject to appeal and which will result in the court eventually losing jurisdiction over the criminal matter. In the § 3292 context, the court has not yet

14

issued any order, entered any judgment or taken any action that will result in its losing jurisdiction over the case as part of the natural course of events. Rather, the court has merely received an application from the government requesting an order to suspend the statute of limitations to permit the United States to obtain foreign evidence. No matter how the court rules on the government's application, it will continue to have jurisdiction over the grand jury investigation which prompted the application. The court's jurisdiction over the investigation will continue until the grand jury votes on an indictment or until the investigation otherwise is concluded. Unlike Rule 35(a), the purpose of the time requirement contained in § 3292(a)(2) is not to clarify jurisdiction over the prosecutor's application for an order suspending the statute of limitations, but rather to require the district court to act promptly on the application, as contemplated by the tolling statute.

That the thirty-day time limit in § 3292(a)(2) is not jurisdictional is supported by the holdings of several circuit courts that have addressed the issue of whether a similar thirty-day time limit for judicial action contained in 28 U.S.C. § 2244(b)(3)(D) is jurisdictional. Those courts have consistently ruled that an appellate court can validly grant a motion for authorization to file a successive habeas corpus petition after the 30-day time limit has run. Browning v. United States, 241 F.3d at 1263-1264 (court is "convinced" that it continues to have jurisdiction over motion notwithstanding the expiration of the 30-day period); Gray-bey v. United States, 201 F.3d 866, 867 (7th Cir. 2000) (court has power to extend the 30-day period for ruling upon motion for authorization to file a successive habeas corpus petition); Rodriguez v. Superintendant, 139 F.3d 270, 272 (1st Cir. 1998)(time limit in § 2444(b)(3)(D) is "hortatory or advisory rather than mandatory"), abrogation on other grounds recognized by, Simpson v. Matesanz, 175 F.3d 200 (1st Cir.1999); In Re Siggens, 132 F.3d 333,

15

336 (6th Cir. 1997) (failure to comply with the 30-day provision does not deprive court of power to grant or deny motion under § 2244), abrogated on other grounds, Bousley v. United States, 523 U.S. 614 (1998); Galtieri v. United States, 128 F.3d 33, 36-37 (2d Cir. 1997) (ruling that 2244(b)(3) must be applied with flexibility); In Re Vial, 115 F.3d 1192, 1194 n.3 (4th Cir. 1997) (noting that court exceeded 30-day time limit but concluding that the importance of the issue justified the delay); but see Tyler v. Cain, 533 U.S. 656, 663 (2001) (although not addressing issue of whether 30-day period was jurisdictional, noting "stringent time requirement" contained in § 2244(b)(3)(D)); Guenther v. Holt, 173 F.3d 1328, 1330 (11th Cir. 1999) (not addressing the issue of whether the time limit was jurisdictional, but noting requirement that court grant or deny motion within 30 days).   The 30 day time limit for judicial action in 28 U.S.C. § 2244(b)(3)(D), which requires the court of appeals to grant or deny a motion for authorization to file a second or successive application for a writ of habeas corpus "not later than 30 days after the filing of the motion" is directly analogous to same time limit contained in 18 U.S.C. § 3292(a)(2).  Accordingly, this Court should follow the sound reasoning of circuit courts that have interpreted 28 U.S.C. § 2244(b)(3)(D), and similarly rule that the thirty-day time limit in § 3292(a)(2) is not jurisdictional and deny defendant's challenge to Judge Gonzalez's order suspending the statute of limitations in this case.

However, in the event the Court determines that the time limit in § 3292 is jurisdictional, despite the plain language of the statute and appellate precedent concerning a similar period, then this Court should find that the April 6, 2001 application was not a validly filed application accepted by the Court, and thus removing the defective filing from the calculus of whether Judge Gonzalez timely acted on the United States' application.

16

**B.  JUDGE GONZALEZ MADE PROPER PREPONDERANCE OF THE EVIDENCE FINDINGS WHEN HE GRANTED THE TOLLING ORDER ON MAY 10, 2002.**

It is clear from the face of the order signed by Judge Gonazlez that as required by 18 U.S.C. § 3292(a)(1), he found by a preponderance of the evidence that "an official request has been made for such evidence and that it reasonably appears or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country." 18 U.S.C. § 3292(a)(1). The order in pertinent part reads as follows:

> Upon application *ex parte*. . .of the United States of America, pursuant to 18 U.S.C. § 3292, the Court finds **by a preponderance of the evidence** that an official request was submitted to the appropriate Switzerland authorities on October 17, 2000 for evidence relating to . . . offenses and that **it reasonably appears that such evidence is in Switzerland.** (emphasis supplied)

Defendant attacks the propriety of Judge Gonzalez's preponderance findings arguing that they are deficient, not because they are incorrect, but because the government only provided Judge Gonazlez with (i) an application signed by the prosecutor and (ii) a copy of the Official Request and the cover letter transmitting the request to Switzerland on October 17, 2000. Defendant argues that Judge Gonzalez's findings were deficient because the United States did not submit an affidavit such as it would have been required to do if it were obtaining judicial authorization to install and use a wiretap. Defendant further argues that it was impossible for Judge Gonzalez to make proper preponderance of the evidence findings because the application contained hearsay proffers of fact and hearsay evidence in the form of the Official Request.[8] Defendant apparently contends that a district judge can never make

---

[8]Defendant Trainor does not explain how his suggested procedure of filing an affidavit would overcome the evidentiary and hearsay objections he has made to the United States' application. Any

preponderance of the evidence findings based upon a government proffer or hearsay evidence.  Finally,

defendant claims that Judge Gonzalez's findings were based on "stale" information and that the court

was not informed that the Swiss had indicated they could not locate Andreas Schweitzer at the address

the United States had provided in its Request.

Defendant's attacks on Judge Gonzalez's preponderance findings are meritless.  Unlike the

wiretap statute, 18 U.S.C. § 2518, which requires that each application be made under oath and that

each application contain very specific information, the plain language of 18 U.S.C. § 3292 merely

requires the United States to make an application to the court.  Section 3292 does not impose a

specific requirement regarding the content or form of the application for a tolling order.  Similarly, there

is no requirement in 18 U.S.C. § 3292 that the district court's findings be based upon newly received

evidence.  The nature and purpose of the statute certainly suggest otherwise.  Further, the Federal

Rules of Evidence did not govern Judge Gonzalez's consideration of the United States' application for

an order suspending the running of the statute of limitations in this case.  As such, in making the required

preponderance findings, it was permissible for Judge Gonzalez to rely upon hearsay evidence and the

proffer of facts by a government attorney, just as federal judges do every day in detention hearings,

revocation of supervised release and probation  hearings, and sentencings.

Finally, the fact that the Swiss notified the United States in March 2001 that they could not

locate Andreas Schweitzer at the address provided, and that they requested additional information

---

affidavit filed with an application would obviously be inadmissible hearsay or would contain inadmissible
hearsay statements under Fed.R.Evid. 801(c) unless, as the United States contends, the Federal Rules
of Evidence did not apply to the Judge's determination of the application under 18 U.S.C. § 3292.

about Schweitzer to locate him, does not undercut Judge Gonzalez's findings.  Prior to submitting its

application to Judge Gonzalez, the United States provided the Swiss with a current address for

Schweitzer in Geneva, Switzerland that it obtained from a search of Internet databases on April 2,

2001.  See Declaration of Special Agent David Swanson.  Significantly, the Swiss eventually located

Schweitzer at that same address.  That the Swiss requested additional information to locate Schweitzer

in no way invalidates the preponderance of the evidence findings made by Judge Gonzalez.[9]  Similarly,

none of defendant's other objections undermine Judge Gonzalez's valid evidentiary findings.

> **1.      The United States Fully Complied with the Requirements of 18 U.S.C. §
> 3292 by Submitting to the Court an Application with a Copy of the
> Official Request that had been Sent to Switzerland.**

The determination of what information the United States is required to submit to a district court

to obtain an order suspending the running of the statute of limitations pursuant to 18 U.S.C. § 3292

begins with an examination of the language of the statute.  United States v. Torres, 318 F.3d at 1061-

1062.

> To determine the plain meaning of a particular statutory provision, and thus
> congressional intent, the court looks to the entire statutory scheme.  If the statute uses a
> term which it does not define, the court gives that term its ordinary meaning.  The plain
> meaning of the statute controls, and courts will look no further, unless its application
> leads to unreasonable or impracticable results.  If the statute is ambiguous–and only
> then–courts may look to its legislative history for evidence of congressional intent.
> DeGeorge, 219 F.3d at 936.

---

[9]The United States informed Judge Gonzalez in its application that "the Swiss authorities [had]
requested additional information regarding Schweitzer".  Clearly, the disclosure of the need for
additional information about Schweitzer implies that the Swiss had not been able to locate him.  Judge
Gonzalez was not denied any information that would undermine the validity of his preponderance of the
evidence findings, particularly since Andreas Schweitzer was found in Switzerland as represented in the
United States' application.

In the case of 18 U.S.C. § 3292, the language of the statute only requires the United States to submit an application to the court; the form of the application is not prescribed in the statute.  In other statutes, where Congress intended for the United States to support an application with a sworn affidavit, such as the wiretap statute, 18 U.S.C. § 2518, the language of the statute specifically requires the United States to submit such a sworn writing to the court.  The pertinent language of the wiretap statute, which defendant relies upon in arguing that the government should have submitted a sworn affidavit to the court, is instructive:

> Each application for an order . . . shall be made in writing under oath or affirmation to a judge or competent jurisdiction and shall state the applicant's authority to make such an application.  Each application shall include the following information. . .

The wiretap statute then goes on to require an exhaustive list of information to be provided in the sworn application, and notes that the "judge may require the applicant to furnish additional testimony or documentary evidence in support of the application."  18 U.S.C. § 2518(2).  Section 3292 contains no language imposing similar requirements for the application.  Rather, the statute merely requires the court to make preponderance findings and issue a tolling order based "upon application of the United States."  The legislative history of the statute confirms that it "permits a federal court, **upon application of the prosecutor** to suspend the running of the statutes of limitation for such time as is necessary (up to 3 years) to obtain evidence from a foreign country." (emphasis added).  H.R. Rep. No. 98-907 at 4, reprinted in 1984 U.S.C.A.N. at 3580; United States v. Torres, 318 F.3d at 1062.  Defendant's contention that Judge Gonzalez was required to review an affidavit before making preponderance of the evidence findings and granting the United States' request for an order suspending the running of the statute of limitations is incorrect.  In this case, the district court properly followed the procedure set

20

forth in the statute – namely reviewing the application of the United States – before issuing an order

under § 3292.[10]

United States v. Wilson, 249 F.3d 366, 371 (5th Cir. 2001), appears to confirm that the

district court can make the preponderance findings required by § 3292 based upon the submission of

an application signed by a government attorney that contains pertinent representations, along with a

copy of the Official Request submitted to the foreign authority.  In this regard, the Fifth Circuit noted in

Wilson:

> In its application for tolling, the United States presented the district court with a copy of
> a letter addressed to the Attorney General of the Bahamas and signed by the Director
> of the Criminal Division of the Department of Justice's Office of International Affairs.
> This letter requested authenticated copies of records. . . .The United States represented
> to the court that this letter was delivered to the Bahamian government for evidence
> located in the Bahamas.  In light of the evidence the Government presented, the district
> court did not clearly err in finding that the United States made this request for evidence
> and correctly tolled the statute of limitations.  Id.

The court of appeals held, however, that where the defendant later challenged the district court's

findings with evidence that the Official Request had not actually been sent, the district court should have

held a hearing to determine the factual issue of whether the Request was sent.  Id. at 372-373.  On

remand, the district court held a hearing, and determined by a preponderance of the evidence that the

Official Request had been sent.  United States v. Wilson, 322 F.3d 353, 361 (5th Cir. 2003)

(hereinafter cited as Wilson II).  On appeal after remand, the Fifth Circuit ruled that the district court

erred in finding by a preponderance of the evidence that the government had sent the Official Request

---

[10]The plain language of 18 U.S.C. § 3292 does not require the court to hold an evidentiary
hearing when acting upon the prosecutor's application for a suspension order.

to the foreign authority because the government failed to submit sufficient proof in response to defendant's evidence that the letter had never been sent. Id. at 361-364.

The facts of Wilson II are distinguishable from the case at bar. Although defendant challenges the procedure followed by Judge Gonzalez in making his preponderance of the evidence findings, unlike the defendant in Wilson II, Trainor cannot argue that the court's findings that the Official Request was sent to Switzerland and that it reasonably appeared the evidence was in Switzerland were not correct. Communications the United States has received from the Swiss Magistrate in response to its October 17, 2000, request - including a facsimile received from Switzerland on March 30, 2001, which is attached to the United States' previous motion response - establish beyond any dispute that the Official Request was sent by the United States and received by the Swiss Authority. Similarly, communications by the Swiss Magistrate concerning her first interview of Andreas Schweitzer, and her attempts to set up a hearing attended by the United States and defendant wherein Schweitzer could be questioned, establish that some of the evidence the United States requested was and still is located in Switzerland.[11] Although it now appears from the Swiss Magistrate's interview of Andreas Schweitzer in February 2002, that he may no longer possesses the documentary evidence he acknowledges he once had, it is

---

[11]Defendant earlier argued that 18 U.S.C. § 3292 only allows the court to suspend the running of the statute of limitations where the government seeks documentary evidence and it reasonably appears that such documentary evidence is located in the foreign jurisdiction. The Ninth Circuit considered and rejected the identical claim. United States v. DeGeorge, 219 F.3d at 937-938. The Ninth Circuit examined the plain language of the statute and held that Congress used the term "evidence" in section 3292, which has an ordinary meaning that is very broad, including testimony, documents and tangible objects, when it could have used the term "documents" or "foreign records" if it intended to restrict the application of the statute to documents or foreign records. Id. Accordingly, the court held the plain language of the statute must be read to include testimonial as well as documentary evidence. Id. at 938.

clear that both at the time the Official Request was submitted on October 17, 2000, and when Judge

Gonzalez signed the order on May 10, 2001, it reasonably appeared that documentary evidence was

located in Switzerland.  See Declaration of Special Agent David Swanson.  Accordingly, there is no

basis to disturb Judge Gonzalez's findings.

> **2.    Judge Gonzalez Properly Relied upon the Application of the United
> States and Attached Official Request to make Preponderance of the
> Evidence Findings because the Federal Rules of Evidence were
> Inapplicable.**

Fed. R. Evid. 1101 governs the applicability of the Federal Rules of Evidence and provides in

pertinent part that the rules shall apply generally to criminal cases and proceedings, but that the rules

(other than with respect to privileges) do not apply in the following situations:  preliminary questions of

fact, proceedings before grand juries and in miscellaneous proceedings.  Under Rule 1101(d)(3),

miscellaneous proceedings include:

> Proceedings for extradition or rendition; preliminary examinations in criminal cases;
> sentencing, or granting or revoking probation; issuance of warrants for arrest, criminal
> summonses, and search warrants; and proceedings with respect to release on bail or
> otherwise.

Several courts have held, however, that the list of proceedings specified in Rule 1101(d)(3) is

not a complete list of the situations in which the Federal Rules of Evidence are inapplicable.  See 31

Charles Alan Wright & Victor James Gold, 31 Fed. Prac. & Proc. § 8077 (2000).  Numerous courts

have ruled that other proceedings analogous to proceedings listed in Rule 1101(d)(3) are also

miscellaneous proceedings to which the Federal Rules of Evidence do not apply.  See, United States v.

Armstrong, 187 F.3d 392, 394 (4th Cir. 1999) (revocation of supervised release hearings); United

States v. Government of Virgin Islands, 34 F.3d 153, 161-162 (3rd Cir. 1994) (delinquency transfer

23

hearings); United States v. Frazier, 26 F.3d 110, 112-114 (11th Cir. 1994) (revocation of supervised

release hearings); United States v. Portalla, 985 F.2d 621, 625 (1st Cir. 1993) (same); United States v.

Palesky, 855 F.2d 34, 36 (1st Cir. 1988) (hearings to determine whether release of insanity acquittee

from commitment would create substantial risk of bodily injury to others); United States v. Whitehurst,

116 F.R.D. 511, 513 (D. Minn. 1987) (Rule 40 transfer hearing).

Judge Gonzalez's consideration of the United States' application for a tolling order is closely

analogous to the miscellaneous proceedings set forth in Rule 1101(d)(3) and to those proceedings for

which courts have determined that the Federal Rules of Evidence are inapplicable. As in the context of

search warrants, delinquency transfer proceedings, and Rule 40 transfer proceedings, Judge Gonzalez's

consideration of the tolling order application was a preliminary matter far removed from the

determination of guilt or innocence, and was in no way comparable to a criminal trial or proceeding of

the type that is usually governed by the Federal Rules of Evidence. See, United States v. Government

of the Virgin Islands, 34 F.3d at 161 (in determining that Rule 1101(d)(3) applied to delinquency

transfer hearings, court considered  that proceeding was of a preliminary nature not comparable to a

civil or criminal trial); United States v. Whitehurst, 116 F.R.D. at 513 (Fed. R. Evid. not applicable to

Rule 40 transfer hearings); United States v. E.K., 471 F. Supp. 924, 929 (D. Or. 1979) (motion to

transfer in delinquency proceedings is an intermediary step when viewed in context of final resolution of

matter). The United States' application did not require that the court make any finding or determination

relating to the guilt or innocence of the defendant, any evidentiary ruling concerning the admissibility of

evidence, any ruling on pre-trial discovery issues, or any ruling relating to issues ordinarily addressed in

pre-trial criminal proceedings. Rather, as in the search warrant arena, the application for a tolling order

was more closely related to the effective gathering of evidence than the determination of guilt which occurs in criminal trials. In addition, the plain language of 18 U.S.C. § 3292, which requires the district court to make preponderance findings solely "upon application of the United States," reflects that the § 3292 procedure was not meant to be governed by the Federal Rules of Evidence.

Because the Federal Rules of Evidence do not govern the district court's consideration of the application filed by the United States, it was proper for Judge Gonzalez to make his preponderance of the evidence findings based upon the application signed by the prosecutor,[12] which contained the government's proffer of the facts, and the Official Request sent to Switzerland which was attached to the application. In proceedings where the Federal Rules of Evidence are inapplicable, such as detention hearings, it is well settled that district courts can rely on proffers from the government and hearsay evidence to make preponderance of the evidence findings. United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (upholding district court's decision to allow the government to proceed by proffer in bail hearing); United States v. Gaviria, 828 F.2d 667, 669 (11th Cir. 1987) (government may proceed in detention hearing by proffering evidence subject to the discretion of the judge). In detention hearings and in a district court's consideration of a § 3292 application, where expeditious rulings are statutorily required, it is particularly appropriate for the district court to rely upon proffers of evidence and hearsay evidence. Accordingly, Judge Gonzalez's preponderance of the evidence findings were proper, and there is no basis to reverse them.

---

[12]Government attorneys who signed pleadings act as officers of the court and are bound by the requirements of Fed. R. Civ. P. 11. United States v. Stevens, 510 F.2d 1101, 1106 n.5 (5th Cir. 1975). See United States v. Orozco, 160 F.3d 1309, 1310 (11th Cir. 1998), cert. denied, 528 U.S. 1082 (2000).

## CONCLUSION

For the reasons stated above, the district court should deny the defendant's motion to dismiss Counts 1-10, 12-14 and 16-21 of the Superseding Indictment.  The United States followed the procedures contained in 18 U.S.C. § 3292 in filing the application to suspend the statute of limitations. The district court's decision to issue the tolling order was well-justified, well-considered and fully in accordance with the law and intent of the statute.

Respectfully submitted,

MARCOS JIMENEZ
UNITED STATES ATTORNEY

By: _____
Jack B. Patrick
Senior Trial Attorney
Court ID # A5500596
United States Department of Justice
10th & Constitution Avenue, NW
Bond Building, Room 3114
Washington, D.C. 20530
E-Mail: Jack.Patrick2@usdoj.gov
Tel: (202) 514-9842
Facsimile: (202) 514-0152

By: _____
Jonathan R. Barr
Special Assistant United States Attorney
Court ID # A5500597
99 N.E. 4th Street, Fourth Floor
Miami, FL  33132
Telephone: (202) 514-9620
Facsimile:  (305) 536-5321
E-Mail: Jonathan.R.Barr@usdoj.gov

26

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the undersigned caused a true and correct copy of the foregoing Sealed United States' Supplemental Memorandum in Opposition to Defendant's Corrected Motion to Dismiss and accompanying exhibits to be sent by prepaid United States mail this 21st day of April 2003 to the following address:

Michael Caruso
Assistant Federal Public Defender
Southern District of Florida
150 W. Flagler Street #1700
Miami, Florida 33130
Fax: (305) 536-4559

By:

Jonathan R. Barr
Special Assistant United States Attorney
Court ID # A5500597
99 N.E. 4th Street, Fourth Floor
Miami, FL 33132
Telephone: (202) 514-9620
Facsimile: (305) 536-5321
E-Mail: Jonathan.R.Barr@usdoj.gov

**United States v. William P. Trainor**
**Case No. 01-6215-CR-JORDAN(s)/BANDSTRA**

**SERVICE LIST**

Counsel for Defendant William P. Trainor:

      Michael Caruso
      Assistant Federal Public Defender
      Southern District of Florida
      150 W. Flagler Street #1700
      Miami, Florida 33130-1556
      Tel: (305) 530-7000, Ext. 135
      Fax: (305) 536-4559

Counsel for the United States:

      Jack B. Patrick
      Senior Trial Attorney
      Court ID # A5500596
      United States Department of Justice
      10th & Constitution Avenue, NW
      Criminal Division, Fraud Section
      Bond Building, Room 3114
      Washington, D.C. 20530
      Tel: (202) 514-9842
      Facsimile: (202) 514-0152
      E-Mail: Jack.Patrick2@usdoj.gov

      Jonathan R. Barr
      Special Assistant United States Attorney
      Court ID # A5500597
      99 N.E. 4th Street, Fourth Floor
      Miami, FL  33132
      Telephone: (202) 514-9620
      Facsimile: (305) 536-5321
      E-Mail: Jonathan.R.Barr@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 01-6215-CR-JORDAN(s)/BANDSTRA

UNITED STATES OF AMERICA,       )
                                )
               Plaintiff,       )
                                )
v.                              )
                                )
WILLIAM P. TRAINOR,             )
                                )
               Defendant.       )
_____)

## DECLARATION OF DAVID SWANSON

I, David Swanson, do hereby declare that I am a Special Agent with the Federal

Bureau of Investigation and have been so employed for sixteen years. As a Special Agent, I am vested

with the authority to investigate violations of federal laws. I have received training related to the

investigation of a variety of federal criminal offenses, including 18 U.S.C. Sections 1343, 1956 and

1957. I have more than twelve years experience investigating complex white collar crimes. I have

participated in more than fifty investigations of white collar crimes and have participated in the execution

of search warrants in white collar criminal investigations.

I am the case agent assigned to an investigation of defendant William P. Trainor. Since August

1999, I have been investigating the activities of defendant Trainor in connection with entities known as

Novatek International, Inc., Universal HealthWatch, Inc., Health Care Limited, and New England

1

EXH. A

Diagnostics. During my investigation, I reviewed many documents concerning Trainor's activities and interviewed numerous witnesses having knowledge of those activities. Many of these witnesses informed me of statements that Trainor made to them.

In the Fall of 1999, employees of the Securities and Exchange Commission advised me that Trainor had claimed that the principal and owner of New England Diagnostics was a person identified by Trainor as Andreas Schweitzer, a citizen and resident of Switzerland. I also reviewed documents indicating that Schweitzer resided in Switzerland. Subsequently during the investigation, the following persons related information concerning Schweitzer:

1.　　On November 2, 1999, Robert Jones advised another FBI agent that Trainor had told Jones that Karen Losordo and Andreas Schweitzer were directors of New England Diagnostics and that they (Losordo and Schweitzer) controlled New England Diagnostics. This information was related to me in an FBI Form 302 Report of Interview. Mr. Jones also provided to me memoranda sent from Trainor to Jones between 1997 and May 1999, which contain references to Andreas Schweitzer and New England Diagnostics.

2.　　On November 18, 1999, Sharon Riccardi, a former employee of Vincent Celentano, advised me that Celentano had stated to her that New England Diagnostics was an offshore company controlled by Andreas Schweitzer.

3.　　On March 2, 2000, William Childs, an officer and employee of Universal HealthWatch, Inc., advised me that Trainor had alluded to Childs that Andreas Schweitzer owned New England Diagnostics.

4.　　On August 4, 2000, Gaston Oxman, a former officer of Novatek International, Inc.,

2

told me that Trainor had introduced Andreas Schweitzer to Oxman as an investor from Switzerland.

5.　　On October 18, 2000, Frank Jaumot, an accountant who performed professional accounting services for Novatek International, Inc., told me that Trainor told him that Andreas Schweitzer was the principal of New England Diagnostics and that Schweitzer owned New England Diagnostics.　During my investigation, I also reviewed testimony taken on October 18, 1996, by the Securities and Exchange Commission of Mr. Jaumot in hearings styled In the Matter of Novatek International, Inc. Mr. Jaumot testified under oath that Vincent Celentano had told Jaumot in late August or early September 1996 that New England Diagnostics was an independent company owned by a Swiss investor, Andreas Schweitzer.

During the investigation, I also reviewed documents which contained references to Andreas Schweitzer and New England Diagnostics, including the following:

1.　　A document titled "Notice of Annual Meeting of Shareholders To Be Held on September 30, 1996." This document included an "Information Statement" which stated that New England Diagnostics, Ltd. "is owned and controlled by Andreas Schweitzer, a citizen and resident of Switzerland."

2.　　A Form 14A filed by Novatek with the Securities and Exchange Commission on September 11, 1996. This document contained the Information Statement noted above and also stated that New England Diagnostics, Ltd. "is owned and controlled by Andreas Schweitzer, a citizen and resident of Switzerland."

I learned from the prosecutors assigned to this case that on April 2, 2001 a search of internet databases was conducted which led to the discovery of a current address in Geneve, Switzerland for

3

Andreas Schweitzer. A copy of the results of that internet search are attached hereto. This address was forwarded to the Swiss Authorities for use in acting upon the Department of Justice's Official Request.

Based on my training and experience investigating white collar crime for over twelve years, I know that it is customary for individuals who own or control companies to keep business records in the form of documents, computer files, calendars, and other writings in their home and in their offices. Based on that knowledge, documents that I reviewed, and the information provided to me by the individuals identified above, I believed that Andreas Schweitzer was located in Switzerland and that documents material to the investigation were in his possession and were located in Switzerland on October 17, 2000, the date of the Request to Switzerland for Assistance, and on May 10, 2001, the date of the order suspending the running of the statute of limitations.

DAVID SWANSON

I declare under penalty of perjury, pursuant to 28 U.S.C. Section 1746, that the foregoing is true and correct. Executed on 4/21/03 .

DAVID SWANSON

4

tel.search.ch   Das kostenlo...   Telefonbuch der Schw...   http://www.tel.search.ch/result.de   ...l?n...=Andreas&misc=&strasse=&ort=&kanton=&tel

# [ tel.search.ch ]

### das elektronische Telefonbuch



**Home**
**Telefonbuch**
Suchresultat

_francais_

_Neu!_ map.search.ch
Die Interaktive
Schweizer Karte



## Telefonbucheinträge zu Schweizer, Andreas

**1 Eintrag**                                    [ Neue Suche ]

Sie sehen alle passenden Einträge: Privatpersonen und Firmen und Behörden

**Schweitzer Andreas**
av. de Champel 61
1206 Genève/GE *022 789 54 21
* Wünscht keine Werbung

**1 Eintrag**                                [ 1 ] [ Neue Suche ]

**Web-Suche nach Stichwort:**

[                              ]  Suchen

**Aktuell:** News, Wetter
**Anzeigen:** Immobiliensuche, Stellensuche, Fahrzeugsuche, Kontakte
**Nützlich:** Vergleichsdienste, Gratis SMS, Hotelsuche, Seminare, Chat

[Feedback]  [Privatsphäre]  [Über Inhalte]  [Nutzungsbedingungen]  [AGB]  [Werbung]

(C) by Raber Information Management GmbH, Search & Portal Technology (C) by Relog AG, Daten (C) by Smartphone, Design by zeitgeist.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 01-6215-CR-JORDAN(s)/BANDSTRA

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
v.                                   )
                                     )
WILLIAM P. TRAINOR,                  )
                                     )
                    Defendant.       )
_____)

## **DECLARATION OF JACK B. PATRICK**

I, Jack B. Patrick, do hereby declare that I am a Senior Trial Attorney in the Fraud Section,

Criminal Division, of the United States Department of Justice.  I am one of the counsel of record in this

case representing the United States.

On March 29, 2001, I signed a motion styled "In Re Sealed Matter (Grand Jury Investigation

of Novatek International, et al)," applying for an order suspending the running of the statute of

limitations pursuant to 18 U.S.C. Section 3292, for offenses under investigation in the matter.  I

enclosed a Memorandum of Points and Authorities and a copy of the October 17, 2000 <u>Request to</u>

<u>Switzerland for Assistance in the Prosecution of William Trainor, et al</u>.  I further enclosed with the

motion a proposed "Sealed Order" and a "Motion to Seal," both with the same caption as styled in the

motion.  The proposed signature line for the "Sealed Order" was for the signature of a Magistrate

1



Judge.   I provided that motion to an employee in the United States Attorney's Office in Fort Lauderdale, Florida for filing, and the motion was submitted to the Clerk's Office.

On or about April 6, 2001, I was informed by an employee in the Clerk's Office in Fort Lauderdale that the caption on the motion was improper because pleadings in grand jury matters could not state the name of a company in the caption.  I was also informed that the proposed order could not be signed by a Magistrate Judge, and that only a United States District Court Judge could review the motion and execute the order.  I was further informed that the motion would be returned to me.

On April 9, 2001, believing that the motion was defective and that it had been rejected for filing by the Clerk's Office, I signed a new motion applying for an order suspending the running of the statute of limitations, styling this motion "In Re Sealed Matter (Grand Jury 00-01)," with the signature line in the proposed Order being for a United States District Judge.  I then caused the motion to be filed at the Clerk's Office on April 10, 2001.   See Attachment 1.

I was advised on May 10, 2001 that United States District Judge Jose Gonzalez had signed the Order which I had filed with the motion on April 10, 2001.  I later received a signed copy of the Order dated May 10, 2001.  See Attachment 2.  I also later received a copy of the defective motion with a date-stamp indicating it had been filed on April 6, 2001.  See Attachment 3.

JACK B. PATRICK

I declare under penalty of perjury, pursuant to 28 U.S.C. Section 1746, that the foregoing is true and correct.  Executed on _April 19, 2003_

JACK B. PATRICK

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. _____

IN RE SEALED MATTER                )
(Grand Jury 00-01)                 )
                                   )
_____ )

FILED BY _____ B.B.
INTAKE
APR 1 0 2001
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

## MOTION FOR SUSPENSION OF STATUTE OF LIMITATIONS

The United States of America, by and through its undersigned counsel, hereby applies and

moves this Court, ex parte and under seal, pursuant to 18 U.S.C. § 3292, for an order suspending

the running of the statute of limitations for the offenses under investigation in the above-

captioned matter, pending receipt of testimony and evidence from Switzerland. The offenses

under investigation in the above-captioned matter concern the making of false statements, the

concealment of material facts, and other acts of fraud or deception relating to Novatek

International, Inc. and related entities, including Health Care Limited, Universal HealthWatch,

Inc., Medical Products, Inc. and New England Diagnostics. Such offenses may include, but are

not limited to, violations of 18 U.S.C. §§ 1341, 1343, 1956 and 1957.

The proposed order of suspension will cover the period beginning October 17, 2000, the

date on which an official request for evidence in connection with the above-referenced

investigation was submitted to Switzerland by the Criminal Division of the United States

Department of Justice and ending on the date on which Switzerland takes final action on the

EXH 1

## MEMORANDUM OF POINTS AND AUTHORITIES

A.      Grand Jury Investigation.

A grand jury convened in the Southern District of Florida has been conducting an

investigation concerning investments in Novatek International, Inc. and related entities.  The

investigation has focused on allegations that from in or about June 1994 through in or about

December 1996 William P. Trainor and Vincent D. Celentano fraudulently induced investments

in entities which they controlled and that they fraudulently gained control of Novatek

International, Inc. ("Novatek"), a publicly-traded company, and, thereafter, used Novatek to

engage in a pump and dump securities fraud scheme.

In or about 1994, William Trainor and Vincent Celentano began to create entities that

purported to distribute medical diagnostic devices in countries outside of the United States.   The

first entity was Health Care Limited, organized in Russia.  Health Care Limited, and subsequent

entities controlled by Trainor and Celentano, obtained licenses to distribute the devices from

Universal HealthWatch, Inc., which was another entity controlled by Trainor and Celentano and

which was headquartered in Columbia, Maryland.   Universal HealthWatch, Inc. was supposed to

develop the devices or buy them from other companies.   By selling the licenses between entities

which they controlled, essentially "flipping" the licenses at increasing prices mostly paid for with

promissory notes, Trainor and Celentano were able to create the illusion of value.

In or about January 1995, Trainor and Celentano began to sell stock in Health Care

Limited, based on their false claims regarding Health Care Limited, including claims that they

had a $216 million annual contract with a Russian government entity and claims that Celentano

had put over $50 million into their company.

In or about November 1995, Trainor and Celentano began looking for a publicly-traded

company which they could acquire and through which they could market medical diagnostic devices, reaching a broader range of investor-victims. In or about December 1995, they focused on Novatek.

Novatek was a manufacturer of steel, hurricane-proof buildings, headquartered in Boynton Beach, Florida. At that time, Novatek was not a very profitable operation. Novatek officials engaged in discussions with Celentano and with others on behalf of Trainor and Celentano concerning a possible merger between Novatek and Medical Products, Inc. ("MPI"), a company which Trainor and Celentano formed in November 1995. MPI was owned by the Pickeral Cove Trust and The Celentano Group, entities made up of the family members of Trainor and Celentano. The same entities owned Universal HealthWatch, Inc. The ownership structure allowed Trainor and Celentano to control both MPI and Universal HealthWatch, Inc.

MPI's sole asset was a license to distribute in South America and the Bahamas the medical diagnostic devices of Universal HealthWatch, Inc. MPI had acquired the license by an agreement, dated November 30, 1995, from an entity called New England Diagnostics, Inc. ("NED"), purportedly for $30 million, given by MPI as a promissory note. NED had purportedly acquired its license from Universal HealthWatch, Inc., covering many more countries, for $250,000 and certain other promises. Hence, the license flowed from Universal HealthWatch, Inc. to NED to MPI and the price purportedly paid for the license increased from $250,000 to $30 million in no more than a few months time.

Accountants who audited the financial statements of MPI and Novatek prior to the merger raised certain concerns during the merger negotiations, including whether or not the value being suggested for MPI in a proposed swap for Novatek stock was legitimate or falsely inflated and

2

whether or not the license transactions being used to support MPI's value were between unrelated parties. Since the ownership of Universal HealthWatch, Inc. and MPI was essentially the same, the focus was on the ownership and control of NED.

Celentano made false representations and provided false documents to the accountants involved in the merger, creating the impression that the license held by MPI was valuable and that the license agreements were legitimate, arms-length transactions. Celentano represented that NED was not related to Universal HealthWatch, Inc. or MPI and that neither Celentano or Trainor controlled NED. Subsequently, Trainor and Celentano alleged that NED was owned by Andreas Schweitzer, a Swiss businessman. The grand jury investigation, however, has revealed that NED was operated out of the home of Trainor's daughter, Karen Losordo, in Hingham, Massachusetts and that Trainor and Celentano provided instructions to her as to NED's operations, including where to send money from NED. Losordo, who claims only to be the agent of NED, is identified in various documents as the president, sole director and authorized agent of NED.

Based on false and misleading representations made and caused to be made by Trainor and Celentano, Novatek officials agreed to the merger. In or about March 1996, Novatek merged with MPI, mistakenly believing that it was obtaining a license worth more than $55 million in the acquisition, the bump up from $30 million to $55 million being based on other license and revenue figures. The $55 million value was then used in Novatek financial statements submitted to the SEC, resulting in Novatek appearing to have assets of about $55 million value.

As part of the merger, MPI acquired about 4 million shares of Novatek stock. NED also received about 3.4 million shares of Novatek and $1.3 million in cash as payment on the

3

promissory note given to NED by MPI for the license. The $1.3 million ended up being used to buy a house on the Hillsboro mile for the Trainor family.

After the merger, Trainor and Celentano effectively controlled Novatek and caused Novatek to make additional multi-million dollar agreements with NED for licenses to distribute UHW medical diagnostic devices in Mexico and Central America. Trainor and Celentano also caused Novatek to issue press releases from March 1996 through September 1996 which falsely gave the appearance that Novatek had binding multi-million dollar contracts to distribute the medical diagnostic devices in South America and that Novatek was receiving revenue from the contracts. Novatek also submitted period reports to the SEC which repeated the false claims in the press releases and reflected Novatek's ownership of the $55 million license.

The false claims induced investors to buy Novatek stock and induced investors to pay about $7 million for Novatek convertible debentures. The efforts of Trainor and Celentano to fraudulently inflate the value of Novatek's stock price were successful. During the relevant period, Novatek's stock price more than doubled in value, rising from a mere $5 per share in March 1996 to over $13 per share in September 1996 before settling back to $9 per share. The stock price totally collapsed following suspension of trading in October 1996. Novatek subsequently went into bankruptcy. Trainor then fraudulently induced a Las Vegas businessman to provide millions of dollars to continue the operations of Universal HealthWatch, Inc., with substantial amounts of that funding ending up in the hands of the Trainor family.

Tracing of the money paid to Novatek for the convertible debentures has revealed that about $7 million went from Novatek to NED, purportedly as payments on licenses sold by NED to Novatek and on loans made by NED to Novatek. Other money from the sale of stock also

4

went through NED.   After the money reached NED, Karen Losordo moved the money to other

accounts or wired the money back to Florida and elsewhere to buy expensive homes and cars for

the Trainor family.  Over $1 million of the money was used to buy back stock from disgruntled

family and friends who had bought stock based on Celentano's promise to repay them if their

stock value did not increase.   At least $250,000 went back to Novatek from NED to create the

appearance that money was being received under a contract in South America as had been

announced in a press release.

B.      Foreign Evidence and Treaty Requests.

On October 17, 2000, a request for assistance in the prosecution of William Trainor, et al

was submitted by the Central Authority of the United States to the government of Switzerland

pursuant to the Treaty on Mutual Assistance in Criminal Matters entered into force on January

23, 1977, and to the Diplomatic Notes exchanged on November 3, 1993 in connection with a

civil action by the United States Securities and Exchange Commission ("SEC") and a criminal

investigation being conducted by the United States Department of Justice, Criminal Division,

Fraud Section ("DOJ").   The request identified a civil lawsuit filed by the SEC and discussed the

SEC interest.  The request also stated that DOJ was investigating whether Trainor and other

persons and entities violated United States law by engaging in mail and wire fraud and money

laundering in connection with misrepresentations made to investors.  The request set forth the

statutory offenses of 18 U.S.C. § 1341 (mail fraud), 1343 (wire fraud), 1956 (laundering of

monetary instruments), and 1957 (engaging in monetary transactions in property derived from

specified unlawful activity).

The request sought was to obtain bank records and other documents in the possession of

5

Andreas Schweitzer concerning Novatek, HealthCare Limited, Universal HealthWatch, Inc. and

NED and concerning Trainor, Celentano and Losordo and to obtain business record certifications

for the documents. The request also sought to have a Swiss magistrate arrange recorded

testimony from Schweitzer and to have the Swiss magistrate invite Schweitzer to appear to

testify before a grand jury (at that time identified as being in Washington, DC) and/or at trial.

The documents in the possession of Schweitzer are necessary to the grand jury

investigation being conducted in the Southern District of Florida in order to determine

Schweitzer's knowledge of and involvement in the license transactions and the transfer of money

and to identify the true ownership and control of NED, the true purpose for NED's involvement

in the license transactions, and the true value of the licenses.

The issue of the ownership and control of NED is of critical importance to the

government's investigation of the aforementioned fraud and money laundering offenses. The

purported $30 million license owned by MPI enabled Celentano and Trainor to gain control of

Novatek. Moreover, the grossly inflated value of the MPI license shown on Novatek's financial

statements after the Novatek/MPI merger, in part, induced people to invest million of dollars in

Novatek during the relevant period. If NED was owned or controlled by Trainor or Celentano (or

their nominees), then it is clear that the license value was created through a series of related party

transactions resembling classic land flips rather than through legitimate arms-length transactions

as Celentano and Trainor represented to the auditors of MPI and Novatek. Thus, evidence

related to the control or ownership of NED bears directly on whether Celentano, Trainor and

others committed the fraud offenses outlined earlier. Because NED was the primary vehicle

used to launder the proceeds of the fraud, evidence concerning the ownership and control of NED

6

is equally important to the investigation of the money laundering offenses described above.

Celentano, Trainor and Losordo have at various times claimed that NED was owned by Andreas

Schweitzer. Accordingly, testimony and documentary evidence from Schweitzer concerning

NED is critical to the government's fraud and money laundering investigation.

C.    Legal Authority for Suspension of the Statute of Limitations

Title 18, United States Code, Section 3292, permits a court to suspend the running of the

statute of limitations for a period of up to the three years when an official request has been mde

for evidence in a foreign country. Section 3292 provides in pertinent part as follows:

> (a)(1)   Upon application of the United States, filed before return of an
> indictment, indicating that evidence of an offense is in a foreign country, the
> district court before which a grand jury is impaneled to investigate the offense
> shall suspend the running of the statute of limitations for the offense if the court
> finds by a preponderance of the evidence that an official request has been made
> for such evidence and that it reasonably appears, or reasonably appeared at the
> time the request was made, that such evidence is, or was, in such foreign country.
>            *    *    *
> (d)    As used in this section, the term "official request" means a letter
> rogatory, a request under a treaty or convention, or any other request for evidence
> made by a court of the United States or an authority of the United States having
> criminal law enforcement responsibility, to a court or other authority of a foreign
> country.

Upon receipt of an application that outlines the government's reasons to believe that

evidence of an offense lies outside the jurisdiction of the United States, the Court must determine

by a preponderance of the evidence  (1) that "an official request" has been made and (2)  that "it

reasonably appears or reasonably appeared at the time the request was made, that such evidence

is or was, in such foreign country. Exhibit A is the request for assistance by the United States

Department of Justice. The issuance of the request satisfies the first prerequisite of the statute - -

that an "official request" has been made to the foreign government by "an authority of the United

7

States having criminal law enforcement responsibility."

The final prerequisite to stay the running of the statute of limitations is whether it reasonably appears that the evidence sought under the request for foreign assistance is, or was, in the foreign country. Documents obtained by the grand jury have identified Schweitzer as the holder of bearer stock of NED, as a Swiss resident, and have identified his business address as being in Switzerland. Agreements pertinent to NED and Schweitzer have identified Schweitzer's address in Switzerland. Witnesses interviewed by the Federal Bureau of Investigation have also stated that Trainor and Celentano represented to them that Schweitzer was the owner of NED and have identified Schweitzer as a Swiss resident.

The date for the tolling of the limitations period is the date of the official request for evidence, not the date that the § 3292 motion is made. United States v. Bischel, 61 F.3d 1429, 1434 (9th Cir. 1995). Although the request was signed by Thomas Snow, Deputy Director, Office of International Affairs, Criminal Division, on January 2, 2000, it was not submitted by the DOJ Criminal Division to the Central Authority of Switzerland until October 17, 2000. Accordingly, the United States takes the position for purposes of this motion only that the date of the request is October 17, 2000.

The statute is tolled until final action is taken by the Swiss Authorities. The Swiss authorities have requested additional information regarding Schweitzer, the matters being investigated, and the damages suffered by investors, and final action has not been taken by the Swiss authorities. See United States v. Bischel, 61 F.3d 1429, 1434 (9th Cir. 1995)("final action" for purposes of § 3292 means a dispositive response by the foreign sovereign t both the request for records and for a certificate of authenticity of those records as identified in the official

8

request).

      D.    <u>Conclusion</u>.

For the foregoing reasons, the government respectfully requests that the court enter an

order suspending the running of the statute of limitations herein as of October 17, 2000 until the

appropriate authorities in Switzerland take final action on the official request.

Dated: April ___9___, 2001

                            Respectfully submitted,

                            GUY A. LEWIS
                            United States Attorney

          By:

                            JACK B. PATRICK
                            VA Bar No. 32645
                            Senior Trial Attorney
                            Fraud Section, Criminal Division
                            U.S. Department of Justice
                            1400 New York Avenue
                            Washington, DC 20005
                            Tel: (202) 514-9842
                            Fax: (202) 514-0152
                            E-MAIL: Jack.Patrick2@USDOJ.GOV

9



Exhibit A

**U.S. Department of Justice**

*Criminal Division*

JEH:RT:JF:JTjt
182-6767 (please repeat when responding)

Washington, DC 20530

OCT 17 2000

BY AIRMAIL

Giorgio Bomio, Esquire
Central Authority for U.S. Requests
Division of International Legal Assistance
Federal Office of Justice
Bundesrain 20
3003 Bern
Switzerland

Dear Mr. Bomio:

    Re:  Request to Switzerland for Assistance in the
         Prosecution of William TRAINOR, et al.

    Enclosed is a request for assistance on behalf of the U.S.
Securities and Exchange Commission pursuant to the Treaty between
the United States of America and the Swiss Confederation on
Mutual Assistance in Criminal Matters (entered into force January
23, 1977). A German translation of the request is also provided.
In addition, we apologize for the delay in the transmittal of
this request.

    If you have any questions concerning this matter, please
contact me at (202) 514-0951 or Julie Thirolf, the paralegal
assigned, at (202) 616-0549. Thank you for your assistance in
this matter.

                       Sincerely,

                       John E. Harris, III
                       Acting Director
                       Office of International Affairs
                       Criminal Division

                       By:

                       Judith Friedman
                       Senior Trial Attorney
                       P.O. Box 27330
                       Washington, D.C. 20038-7330

Enclosures
Records
Chron
File
Attorney

cc w/ enclosures:

Elizabeth Jacobs
United States Securities and Exchange Commission
Office of International Affairs
450 Fifth Street, NW
Washington, D.C.  20549-1104

**2**



U.S. Department of Justice

Criminal Division

Washington, D.C.   20530

TO:   The Central Authority Of Switzerland

SUBJECT:   Request For Assistance in SEC v. Trainor, et al.

The Central Authority of the United States requests the
assistance of the appropriate authorities in Switzerland pursuant
to the Treaty on Mutual Assistance in Criminal Matters entered
into force on January 23, 1977, and to the Diplomatic Notes
exchanged on November 3, 1993, which replace the Diplomatic Notes
of November 10, 1987, in connection with a civil action being
prosecuted by the United States Securities and Exchange
Commission ("SEC"), and a criminal investigation being conducted
by the United States Department of Justice, Criminal Division,
Fraud Section ("DOJ").

On August 18, 1998, the SEC filed a civil lawsuit in the
United States District Court for the District of Columbia
against, William P. Trainor, Trainor's daughter, Karen Losordo,
Vincent D. Celentano, Novatek International, Inc. ("Novatek"),
New England Diagnostics, Inc. ("NED"), a private company
controlled by Trainor and Celentano, and several other Trainor
and Celentano family members.  The SEC is investigating whether
these persons and entities violated U.S. federal securities laws
by making false and misleading public statements in press

releases and reports filed with the SEC in connection with the offer and sale of securities to the U.S. public. DOJ is investigating whether Trainor and other persons and entities have violated United States law by engaging in mail and wire fraud and money laundering in connection with misrepresentations made to investors.

The SEC needs bank records and other documents, as well as testimony, from Andreas Schweitzer, a Swiss citizen who was listed as NED's owner, to determine what information Schweitzer has relating to the allegations contained in the SEC's complaint. This information will be shared with DOJ in connection with its investigation.

## FACTS

During the period from early 1995, through the end of 1996, Novatek, a small Columbia, Maryland-based company, claimed to have an exclusive license to distribute ("Distribution License") rapid medical diagnostic test kits in South America, Latin America, and the Bahamas, which were designed to detect infectious diseases such as HIV and cholera. The devices were purportedly manufactured by Universal HealthWatch, Inc. ("Universal"), a private company controlled by Trainor (who served time in prison on a fraud conviction), and Celentano. Novatek acquired the Distribution License through a series of sham transactions among several entities either owned or controlled by Trainor and/or Celentano, including Medical Products, Inc. ("MPI"), a shell company formed for the sole

2

purpose of transferring the Distribution License.   Various
documents identify Andreas Schweitzer as NED's owner at the time
of these transactions.

The fraudulent activities involved in this matter began in
1995, when Celentano, a Florida-based businessman, Losordo, and
NED offered securities in a company named HealthCare, Ltd.
("HealthCare") to the U.S. public.  HealthCare was purportedly a
Russian public company that sold medical devices similar to those
allegedly sold by Novatek.  HealthCare investors were told, among
other things, that the company's securities were traded on a
Russian stock exchange and that the company had entered into
agreements to supply medical diagnostic devices to Russian
entities.  There is no evidence, however, that either of these
assertions was true.  The HealthCare stock offered and sold was,
in fact, owned by NED.

On March 3, 1996, Novatek and MPI entered into a Plan of
Merger Agreement whereby Novatek would acquire MPI for $72
million worth of Novatek securities. Shortly after the merger,
Novatek began filing a series of reports with the SEC that
contained misrepresentations relating to Novatek's financial
status and business contacts.  For example, on April 2, 1996,
Novatek filed a Form 8-K/A, a report that companies are required
to file when there is a material change in its operations.   This
report included pro forma financial information reflecting
Novatek's acquisition of MPI and ownership of the Distribution
License.  The financial statements included in this filing listed
Novatek's assets in excess of $57 million.  In reality, however,

3

Novatek's assets were only approximately $2 million.  The $55 million difference resulted from a false valuation of the Distribution License.

At about this same time, in early 1996, Celentano offered HealthCare investors the option of converting their  shares of HealthCare into Novatek.  Prior to its merger with MPI, Novatek had been a Florida-based construction firm whose securities traded on the National Association of Securities Dealers' ("NASD") SmallCap Market.  Subsequent to the merger, Novatek's securities continued to trade on the SmallCap Market until trading was suspended by the SEC and the NASD in October 1996. In the course of offering investors this opportunity, Celentano made false and misleading representations concerning the existence of multi-million dollar contracts with Brazilian and Mexican entities, and the value of Novatek's assets.  Further, at no time were Celentano, Losordo, or NED registered as brokers or dealers, or associated with a broker or dealer, as required by the U.S. securities laws.

On April 11, 1996, Novatek issued the first in a series of false and misleading press releases.  This press release announced a purported five-year agreement between Novatek and Importadora y Exportadora Accmed., Ltd., ("Importadora"), based in Santiago, Chile, for the sale of cholera tests.  According to the press release, the agreement called for the "guaranteed purchase (by Importadora) of five million dollars ($5,000,000) of QUIX (™) Rapid Cholera Strip Tests per year for five (5) years totaling twenty-five million dollars ($25,000,000 U.S.)."  In

4

fact, the Importadora contract, as stated in the press release, did not exist, and no devices were ever shipped to Chile.

On May 20, 1996, Novatek filed with the SEC a Form 10-QSB, a required periodic report setting forth, among other things, a company's financial condition, for the quarter that ended March 31, 1996.  This filing repeated the false information contained in the earlier April 2 filing and reported Novatek's assets at $57 million, with the Distribution License accounting for $52 million.  Further, in the Management Discussion and Analysis ("MD&A") section of the filing, Novatek falsely stated that it was acting as a co-broker in an agreement to ship HIV test devices to Mexico, and that the first shipment had been made on May 14, 1996.  In fact, no shipment was ever made pursuant to any agreement.

On June 14, 1996, NASD advised Novatek that its previously filed application for listing on the National Market System (which lists companies with assets of at least $4 million) was being denied.  Not only did NASD deny Novatek's application, but it advised Novatek that its accounting for the March merger was incorrect.  As a result, Novatek was advised that it would have to submit a new application for continued listing on the SmallCap Market and that failure to do so might lead to delisting of Novatek's securities.

On August 13, 1996, Novatek filed a Form 10-QSB with the SEC for the period that ended June 30, 1999.  This report also contained false financial statements, listing Novatek's assets at $59 million and shareholders' equity at $55 million.  Without the improper $54 million valuation of the Distribution License, the

5

shareholders' equity would have been approximately $1.3 million. Novatek also failed to disclose the circumstances giving rise to NASD's possible delisting of its stock and falsely stated in the MD&A section of this report that Novatek had executed an agreement in Chile worth more than $15 million.

On August 16, 1996, Novatek issued a press release claiming that Novatek and the Oswaldo Cruz Foundation had entered into a ten year joint agreement to manufacture and distribute medical diagnostic kits throughout Brazil. The press release projected that revenues from the purported agreement would exceed $35 million in the first year and expand thereafter. These representations were false.

A short time later, Novatek issued the first of two press releases concerning health ministries in Argentina. On August 26, 1996, Novatek issued a press release concerning a purported contract with the Ministry of Health of the Province of Corrientes that would garner revenues of $3 million per year. Less than two weeks later, on September 3, Novatek issued a press release announcing an agreement worth $15 million with the Ministry of Health of the Province of Mendoza. In fact, neither of these contracts existed.

On August 12, 1996, the SEC filed its First Amended Complaint in this matter, alleging that Novatek and the other defendants violated U.S. securities laws by 1) disseminating a series of false and misleading press releases, 2) making false and misleading statements concerning Novatek's financial status in financial statements included in reports filed with the SEC, and 3) acting as unlicensed brokers or dealers.

6

## THE OFFENSES

15 U.S.C. §§77e and 77q(a). Fraudulent interstate transactions

    (a) It shall be unlawful for any person in the offer or sale of any securities . . .
(1) to employ any device, scheme or artifice to defraud or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. . . .

15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5.
Regulation of the use of manipulative and deceptive devices

    It shall be unlawful for any person, directly or indirectly, by use of . . . the mails, or any facility of any national securities exchange . . .
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest for the protection of investors.

15 U.S.C. §§77e (a) & (c). Prohibitions relating to interstate commerce and the mails

    (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly,
(1) to make use of any means or instruments of transportation or communication . . . to sell such security  through the use or medium of any prospectus or otherwise; or . . .
    (c) . . . to offer to sell or offer to through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security. . . .

15 U.S.C. §78ff(a). Penalties

    (a) Any person who willfully violates any provision . . . or any rule or regulation . . . the violation of which is made unlawful or the observance of which is required under the terms of this title, or any  person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this title . . . shall . . . be fined not more than $1,000,000, or imprisoned not more than 10 years, or both. . . .

7

18 U.S.C. §1341. Frauds and swindles

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . . for the purpose of executing such scheme or artifice or attempting so to do . . . [uses the mails] shall be fined not more than [$250,000] or imprisoned for not more than five years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. §1343. Fraud by wire, radio or television

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises by means of wire, radio or television communication . . . . for the purpose of executing such scheme or artifice, shall be fined not more than [$250,000] or imprisoned not more than five years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. §1956. Laundering of monetary instruments

    (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of specified unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of the specified unlawful activity--
(A)(i) with the intent to promote the carrying on of specified unlawful  activity .  .  . shall be fined not more than $500,000 or twice the value of the property (or monetary instrument or funds) involved in the transaction, whichever is greater, or imprisoned for not more than 20 years, or both.

18 U.S.C. §1957. Engaging in monetary transactions in property derived from specified unlawful activity

    (a) Whoever, .  .  . knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished by [a fine of not more than $250,000, or imprisoned for not more than ten years, or both].

8

## PERSONS AND ENTITIES INVOLVED

1.   WILLIAM P. TRAINOR

|  |  |
|---|---|
| Date of Birth: | November 30, 1936 |
| Place of Birth: | United States |
| Citizenship: | United States |
| Race: | Caucasian |
| Sex: | Male |
| Height: | Unknown |
| Weight: | Unknown |
| Eye Color: | Unknown |
| Hair Color: | Unknown |
| Passport Number: | (U.S.) 200822511 |
| Social Security Number: | Unknown |

2.   VINCENT D. CELENTANO

|  |  |
|---|---|
| Date of Birth: | Unknown |
| Place of Birth: | Unknown |
| Citizenship: | United States |
| Race: | Caucasian |
| Sex: | Male |
| Height: | Unknown |
| Weight: | Unknown |
| Eye Color: | Unknown |
| Hair Color: | Unknown |
| Passport Number: | Unknown |
| Social Security Number: | Unknown |

3.   KAREN P. LOSORDO

|  |  |
|---|---|
| Date of Birth: | January 13, 1959 |
| Place of Birth: | United States |

9

| | |
|---|---|
| Citizenship: | United States |
| Race: | Caucasian |
| Sex: | Female |
| Height: | Unknown |
| Weight: | Unknown |
| Eye Color: | Unknown |
| Hair Color: | Unknown |
| Passport Number: | (U.S.) 100461696 |
| Social Security Number: | Unknown |

4. NOVATEK INTERNATIONAL, INC.
(now known as Medical Diagnostic Products, Inc.)

| | |
|---|---|
| Place of Incorporation: | Colorado, U.S.A. |
| Address: | 8990-H<br>Route 108<br>Columbia, Maryland |

5. NEW ENGLAND DIAGNOSTICS, INC.

| | |
|---|---|
| Place of Incorporation: | Cayman Islands |
| Address: | 4 Butternut Lane<br>Hingham,<br>Massachusetts |

## PERSON AFFECTED

ANDREAS SCHWEITZER

| | |
|---|---|
| Date of Birth | Unknown |
| Place of Birth: | Unknown |
| Citizenship: | Believed to be Swiss |
| Race: | Caucasian |
| Sex: | Male |
| Social Security Number: | Unknown |
| Address: | Seestrosso No. 1<br>Cham 6330<br>Switzerland |

10

## NEED FOR ASSISTANCE

### DOCUMENTS NEEDED

Please provide all documents or other materials in the possession of Andreas Schweitzer concerning:

1) Novatek International, Inc.;

2) Novatek International Holding, Inc.;

3) HealthCare, Ltd.;

4) Universal HealthWatch, Inc.;

5) New England Diagnostics, Inc.;

6) William P. Trainor;

7) Vincent D. Celentano; and

8) Karen Losordo.

### TESTIMONY NEEDED

Please take the sworn testimony of Andreas Schweitzer, with the participation of attorneys from the SEC, attorneys from DOJ, agents from the Federal Bureau of Investigation, and attorneys representing the defendants, concerning his involvement with the above-mentioned persons and entities and his knowledge of all matters pertaining to the subject of this request for assistance. The SEC and DOJ are prepared to provide questions that they would like posed to Schweitzer in advance of the testimony.

### PROCEDURES TO BE FOLLOWED

Please ask the cantonal magistrate to do the following:

1.   arrange for Schweitzer's interview to take place no less than a week after the requested documents have been produced to the SEC, with representatives of DOJ, FBI and the defendants present, and provide a proces-verbal pursuant to articles 1(4)(b), 10 and 12;

11

2.    arrange to have Schweitzer's testimony recorded verbatim by sound and visual means, have Schweitzer sign the verbatim transcript or other record of responses to the questions, and provide the verbatim transcript or other record to all counsel who request copies;

3.    require production of original or true copies of the requested documents pursuant to articles 1(4)(c) and 18(1);

4.    attach to the documents a Certificate of Authenticity of Business Records completed and signed by Andreas Schweitzer pursuant to articles 1(4)(e) and 18(2);

5.    affix his or her seal (or stamp) upon the certificate pursuant to article 18(3) if satisfied that, under the procedure followed, a false statement on the certificate would subject the person who completed and signed it to criminal penalty under Swiss law; and

6.    invite Andreas Schweitzer to appear at some future date in Washington, D.C., at the expense of the United States Government, to testify before a grand jury and/or at trial pursuant to article 23(2).

_____
Date

_____
Thomas G. Snow
Deputy Director
Office of International Affairs
Criminal Division

12

US-Justizministerium [U.S. Department of Justice]
Kriminalabteilung [Criminal Division]
Washington, DC 20530, USA

An: Die Zentralbehörde der Schweiz

REF: Ersuchen um Unterstützung im Fall <u>SEC gegen Trainor, u.a.</u>

Die Zentralbehörde der Vereinigten Staaten ersucht um die Unterstützung durch die entsprechenden Behörden in der Schweiz gemäß dem Abkommen zur gegenseitigen Unterstützung bei strafrechtlichen Verfahren vom 23. Januar 1977 und gemäß der am 3. November 1993 ausgetauschten diplomatischen Mitteilungen, die die diplomatischen Mitteilungen vom 10. November 1987 ersetzen, im Zusammenhang mit einem von der US-Börsenaufsichtsbehörde [United States Securities and Exchange Commission – „SEC"] angestrengten Zivilprozess und einer Untersuchung in einem Strafverfahren durch das US-Justizministerium [U.S. Department of Justice], Kriminalabteilung [Criminal Division], Abteilung Betrug [Fraud Section] („DOJ").

Am 18 . August 1998 reichte die SEC beim US-Bezirksgericht [United States District Court] für den District of Columbia eine Zivilklage gegen William P. Trainor, Trainors Tochter, Karen Losordo, Vincent D. Celentano, Novatek International, Inc. („Novatek"), New England Diagnostics, Inc. („NED"), ein Privatunternehmen unter dem beherrschenden Einfluss von Trainor und Celentano, und weitere Mitglieder der Familien Trainor und Celentano ein. Die SEC untersucht, ob diese Personen und Unternehmen durch Bekanntgabe falscher und irreführender Veröffentlichungen in Pressemitteilungen und in bei der SEC eingereichten Berichten gegen US-Wertpapiergesetze verstoßen haben. Diese Veröffentlichungen und Berichte erfolgten im Zusammenhang mit dem Angebot und Verkauf von Wertpapieren an die US-amerikanische Öffentlichkeit. DOJ untersucht, ob Trainor und andere Personen und Unternehmen durch Begehen von Betrug unter Zuhilfenahme des Post- und Telegrafendienstes und Geldwäscherei im Zusammenhang mit irreführenden Darstellungen gegenüber Anlegern gegen die Gesetze der USA verstoßen haben.

Die SEC benötigt Schweizer Bankunterlagen und andere Dokumente sowie die Zeugenaussage von Herrn Andreas Schweitzer, einem Schweizer Bürger, der als Eigentümer von NED registriert war, um festzustellen, welche Informationen Herr Schweitzer in Bezug auf die Behauptungen in der Klageschrift der SEC hat. Diese Informationen werden im Rahmen seiner Untersuchung an das DOJ weitergeleitet.

## DIE TATBESTÄNDE

In der Zeit von Anfang 1995 bis Ende 1996 behauptete Novatek, ein kleines Unternehmen mit Sitz in Columbia im US-Bundesstaat Maryland, in Besitz einer Exklusivlizenz zum Vertrieb („Vertriebslizenz") von schnell wirkenden medizinischen Diagnosetestsätzen in Südamerika, Lateinamerika und auf den Bahamas zu sein, mit denen Infektionskrankheiten, wie zum Beispiel HIV und Cholera, erkannt werden können. Angeblich wurden die Testsätze von Universal Healthwatch, Inc. („Universal") hergestellt, einem Privatunternehmen unter dem beherrschenden Einfluss von Trainor, der eine Gefängnisstrafe wegen Betrugs absaß, und Celentano. Novatek erwarb die Vertriebslizenz mittels einer Reihe von betrügerischen Transaktionen zwischen verschiedenen Unternehmen, die entweder unter dem beherrschenden Einfluss von Trainor und/oder Celentano standen, einschließlich Medical Products, Inc. („MPI"), einem Firmenmantel, der für den alleinigen Zweck der Übertragung der Vertriebslizenz gegründet wurde. Verschiedene Dokumente nennen Andreas Schweitzer als Eigentümer von NED zum Zeitpunkt dieser Transaktionen.

Die betrügerischen Aktivitäten in dieser Angelegenheit begannen 1995, als Celentano, ein in Florida ansässiger Geschäftsmann, Losordo und NED der US-amerikanischen Öffentlichkeit Aktien eines Unternehmens mit dem Namen HealthCare, Ltd. („HealthCare") anboten. HealthCare war angeblich ein russisches, an der Börse gehandeltes Unternehmen, das ähnliche medizinische Geräte, wie angeblich von Novatek verkauft, verkaufte. Den Anlegern von HealthCare wurde mitgeteilt, dass die Aktien des Unternehmens an einer russischen Börse gehandelt wurden und dass das Unternehmen Verträge zum Verkauf von medizinischen Diagnosegeräten an russische Unternehmen eingegangen war. Allerdings liegen keine Beweise vor, dass eine dieser Behauptungen wahr ist. Vielmehr befanden sich die angebotenen und verkauften HealthCare Aktien im Besitz von NED.

Am 3. März 1996 gingen Novatek und MPI einen Vertrag zur Planung einer Fusion ein, wonach Novatek MPI für Aktien im Wert von 72 Millionen Novatek Aktien erwerben würde. Kurz nach der Fusion begann Novatek, eine Reihe von Berichten bei der SEC einzureichen, die irreführende Darstellungen hinsichtlich Novateks finanzieller Lage und Geschäftsverträgen enthielt. Zum Beispiel reichte Novatek am 2. April 1996 ein Formular 8-K/A ein. Diesen Bericht müssen Unternehmen einreichen, wenn eine wesentliche Änderungen ihres Geschäftsbetriebs vorliegt. Dieser Bericht enthielt Proforma-Finanzinformationen hinsichtlich Novateks Übernahme von MPI und Eigentum an der Vertriebslizenz. Die Finanzausweise bei dieser Einreichung gaben Novateks Vermögenswerte mit einer Höhe von 57 Millionen US-Dollar an. In Wahrheit jedoch betrug der Wert von Novateks Vermögenswerten nur ca. 2 Millionen US-Dollar. Die Differenz in Höhe von 55 Millionen US-Dollar war ein Ergebnis der falschen Bewertung der Vertriebslizenz.

Ungefähr zum gleichen Zeitpunkt zu Beginn des Jahres 1996 bot Celentano HealthCare Anlegern die Option, ihre Aktien von HealthCare in Novatek Aktien umzuwandeln. Vor seiner Fusion mit MPI war Novatek eine Baufirma mit Sitz in Florida, deren Aktien auf dem SmallCap-Markt der National Association of Securities Dealers („NASDAQ") gehandelt wurden. Bei dem

Angebot dieser Gelegenheit an die Anleger machte Celentano falsche und irreführende Angaben hinsichtlich des Bestehens eines mehrere Millionen Dollar umfassenden Vertrages mit brasilianischen und mexikanischen Unternehmen und des Werts der Vermögenswerte von Novatek. Gleichzeitig waren weder Celentano, Losordo noch NED zu keinem Zeitpunkt als Broker oder Wertpapierhändler registriert bzw. arbeiteten mit einem Broker oder Wertpapierhändler zusammen, wie dies laut US-Wertpapiergesetzen vorgesehen ist.

Am 11. April 1996 veröffentliche Novatek die erste Pressemitteilung einer Reihe von falschen und irreführenden Pressemitteilungen. In dieser Pressemitteilung wurde ein angeblicher fünf Jahre laufender Vertrag zwischen Novatek und Importadora y Exportadora Accmed., Inc. („Importadora") mit Sitz in Santiago, Chile, über den Verkauf von Cholera-Tests angekündigt. Laut Pressemitteilung sah der Vertrag den „garantierten Kauf [durch Importadora] in Höhe von fünf Millionen Dollar (5.000.000 US-Dollar) von QUIX™ Rapid Cholera Strip Tests über fünf (5) Jahre für insgesamt fünfundzwanzigmillionen Dollar (25.000.000 US-Dollar)" vor. Tatsächlich jedoch gab es den in der Pressemitteilung beschriebenen Importadora Vertrag überhaupt nicht, und es wurden niemals irgendwelche Vorrichtungen nach Chile versandt.

Am 20. Mai 1996 reichte Novatek bei der SEC ein Formular 10-QSB bei. Dieser erforderliche in regelmäßigen Abständen eingereichte Bericht beschreibt u.a. die finanzielle Lage des Unternehmens in dem Quartal, das am 31. März 1996 endete. In diesem Bericht wurden die falschen Informationen in dem früheren Bericht vom 2. April wiederhum und Novateks Vermögenswerte wurden mit einem Wert von 57 Millionen US-Dollar angegeben, wobei die Vertriebslizenz mit 52 Millionen US-Dollar veranschlagt wurde. Außerdem gab Novatek in dem Abschnitt „Management Discussion und Analysis" („MD&A") des Berichts fälschlicherweise an, dass es als Co-Broker mit einem Vertrag zum Versand von HIV-Testvorrichtungen nach Mexiko auftrat und dass der erste Versand am 14. Mai 1996 erfolgte. Tatsächlich erfolgte jedoch zu keinem Zeitpunkt ein Versand aufgrund irgendeines Vertrages.

Im Juni 1994 teilte NASDAQ Novatek mit, dass sein zuvor eingereichter Antrag zur Zulassung beim National Market System ( das Unternehmen mit Vermögenswerten in Höhe von mindestens 4 Millionen US-Dollar aufführt) abgelehnt wurde. NASDAQ lehnte nicht nur den Antrag von Novatek ab, sondern wies Novatek darauf hin, dass seine Rechnungslegung für die Fusion im März unrichtig war. Dies führte dazu, dass Novatek darauf hingewiesen wurde, dass es für die weitere Zulassung auf dem SmallCap-Markt einen neuen Antrag stellen müsste. Ohne diesen neuen Antrag würden unter Umständen die Aktien von Novatek nicht länger zulassen werden.

Am 13. August 1996 reichte Novatek für den Zeitraum bis zum 30. Juni 1999 ein Formular 10-QSB bei der SEC ein. Dieser Bericht enthielt ebenfalls falsche Finanzausweise und gab Novateks Vermögenswerte mit 59 Millionen US-Dollar und ein Eigenkapital in Höhe von 55 Millionen US-Dollar an. Ohne die falsche Bewertung der Vertriebslizenz mit 54 Millionen US-Dollar hätte das Eigenkapital ca. 1,3 Millionen betragen. Außerdem versäumte es Novatek, die

Umstände offenzulegen, die möglicherweise zur Nichtzulassung seiner Aktien führen könnten, und es gab fälschlicherweise im MD&A-Abschnitt dieses Berichts an, dass Novatek in Chile einen Vertrag eingegangen ist, der über 15 Millionen US-Dollar wert war.

Am 16. August 1996 gab Novatek eine Pressemitteilung heraus, in der behauptet wurde, dass Novatek und die Oswaldo Cruz Foundation gemeinsam einen über 10 Jahre laufenden Vertrag zur Herstellung und zum Vertrieb von medizinischen Diagnosesätzen in ganz Brasilien eingegangen sind. Der Pressebericht prognostizierte, dass die Erlöse aus dem angeblichen Vertrag im ersten Jahr 35 Millionen US-Dollar übersteigen und dann noch höher sein würden. Diese Darstellungen waren falsch.

Kurz darauf veröffentlichte Novatek die erste von zwei Pressemitteilungen in Bezug auf die Gesundheitsministerien in Argentinien. Am 26. August 1996 gab Novatek eine Pressemitteilung in Bezug auf einen angeblichen Vertrag mit dem Gesundheitsministerium der Provinz von Corrientes in einem Umfang von jährlich 3 Millionen US-Dollar heraus. Weniger als zwei Wochen später am 3. September später veröffentlichte Novatek eine Pressemitteilung, um einen Vertrag im Wert von 15 Millionen US-Dollar mit dem Gesundheitsministerium der Provinz von Mendoza bekanntzugeben. Tatsächlich jedoch existierte keiner dieser Verträge.

Am 12. August 1998 reichte die SEC ihre erste abgeänderte Klage [First Amended Complaint] in dieser Angelegenheit ein, in der dargelegt wurde, dass Novatek und die anderen Beklagten folgendermaßen gegen die US-Wertpapiergesetze verstoßen hätten: 1) durch Verbreitung einer Reihe von falschen und irreführenden Pressemitteilungen, 2) durch falsche und irreführende Angaben in Bezug auf die finanzielle Lage von Novatek in den Finanzausweisen, die den bei der SEC eingereichten Berichten beigelegt wurden und 3) durch Auftreten als nicht zugelassene Broker oder Wertpapierhändler.

## DIE STRAFTATEN

15 U.S.C. §§77 e und 77 q (a). Betrügerische Transaktionen zwischen Bundesstaaten

(a) Keiner Person ist es erlaubt, beim Verkauf oder Kauf von Wertpapieren ...

(1) Methoden, Machenschaften oder Täuschungsmanöver für betrügerische Zwecke einzusetzen.

(2) Geld oder Vermögensgegenstände durch unwahre Angaben zu einer wesentlichen Tatsache oder durch Nichtangabe einer wesentlichen Tatsache an sich zu bringen, die notwendig ist, um sicherstellen, dass die Angaben unter den Umständen, unter denen sie gemacht wurden, nicht irreführend sind.

15 U.S.C. §§78 j (b) und 17 C.F.R. § 240.10b-5 Vorschriften gegen den Einsatz von manipulativen und täuschenden Methoden

Es ist keiner Person erlaubt, sich direkt oder indirekt mit Hilfe ... der Postdienste oder einer Einrichtung einer nationalen Börse ...
(b) im Zusammenhang mit dem Kauf oder Verkauf von Wertpapieren, die an einer nationalen Börse registriert sind, manipulativer oder täuschender Mittel oder Vorrichtungen in Zuwiderhandlung in Bezug auf solche Regeln und Vorschriften zu bedienen, die die SEC als erforderlich oder angemessen betrachtet und im Interesse der Öffentlichkeit oder zum Schutz der Anleger vorschreibt.

15 U.S.C. §§77 e (a) & (c ) Verbote in Bezug auf den zwischenstaatlichen Handel und Postdienste

(a) Es sei denn, eine Anlage zum Antrag auf Börsenzulassung von Wertpapieren bei der SEC ist für das Wertpapier wirksam, ist es keiner Person erlaubt, direkt oder indirekt

(1) Transport- oder Kommunikationsmittel bzw. –instrumente einzusetzen ..., um solche Wertpapiere mittels Emissionsprospekt etc. zu verkaufen oder

(c) ... mittels Emissionsprospekt etc. ein Wertpapier nur dann anzubieten oder zu verkaufen, wenn eine Anlage zum Antrag auf Börsenzulassung von Wertpapieren bei der SEC wurde für das Wertpapier eingereicht wurde.

15 U.S.C. § 78 ff (a) Strafen

(a) Jede Person, die vorsätzlich gegen irgendeine Vorschrift oder eine Vorschrift oder Regel, deren Verletzung ungesetzlich ist oder deren Beachtung gemäß den Bedingungen dieses Titels erforderlich ist, oder jede Person, die vorsätzlich und wissentlich Angaben in einem Antrag, Bericht oder Dokument macht oder veranlasst, der gemäß diesem Titel veröffentlicht werden muss, verstößt, ...wird bei Verurteilung mit einer Geldstrafe von bis zu 1.000.000 US-Dollar oder mit einer Gefängnisstrafe von bis zu 10 Jahren oder beidem bestraft.

18 U.S.C. §1341 Betrug und Schwindel

Jede Person, die sich Machenschaften oder Täuschungsmanöver für einen Betrug oder zum Erhalt von Geldern oder Eigentum mit Hilfe irreführender oder betrügerischen Vorgaben, Darstellungen oder Versprechen mittels telegrafischer, Funk- oder TV-Kommunikation ausdenkt oder beabsichtigt oder die diese plant oder verspricht, ... zum Zweck der Durchführung solcher Machenschaften oder Täuschungsmanöver, .... bzw. dieses versucht, wird mit einer Geldstrafe

von bis zu 250.000 US-Dollar oder Gefängnisstrafe von bis zu 5 Jahren oder beidem bestraft. Wenn der Verstoß ein Finanzinstitut betrifft, wird eine solche Person mit einer Geldstrafe von bis zu 1.000.000 US-Dollar oder mit einer Gefängnisstrafe von bis zu 30 Jahren oder beidem bestraft.

## 18 U.S.C. §1956 Geldwäsche

(a) (1) Jede Person, die weiß, dass die in einer finanziellen Transaktion verwendeten Vermögensgegenstände die Erlöse aus einer bestimmten unerlaubten Handlung sind, und die eine finanzielle Transaktion durchführt oder versucht durchzuführen, bei der die Erlöse aus der unerlaubten Tätigkeit verwendet werden ...

(A) (i) mit der Absicht, die bestimmte unerlaubte Handlung weiterhin ausführen zu können, wird mit einer Geldstrafe von bis zu 500.000 US-Dollar bzw. dem doppelten Wert des Vermögensgegenstandes (oder der Geldinstrumente oder Gelder), die bei der Transaktion eingesetzt wurden, wobei der jeweils höhere Betrag gilt, oder einer Gefängnisstrafe von bis zu 20 Jahren oder beidem bestraft.

## 18 U.S.C. §1957 Beteiligung an Geldtransaktionen mit Vermögensgegenständen, die aus einer bestimmten unerlaubten Handlung stammen

(a) Jede Person, die sich wissentlich an Geldtransaktionen beteiligt oder dieses versucht, die mit Vermögensgegenständen durchgeführt werden, die aus kriminellen Handlungen stammen, die einen Wert von 10.000 US-Dollar übersteigen und aus einer bestimmten unerlaubten Handlung stammen, wird mit [einer Geldstrafe von bis zu 250.000 US-Dollar bzw. einer Gefängnisstrafe von bis zu 10 Jahren oder beidem bestraft].

## BETEILIGTE PERSONEN UND UNTERNEHMEN

### 1. WILLIAM P. TRAINOR

| | |
|---|---|
| Geburtsdatum: | 30. November 1936 |
| Geburtsort: | USA |
| Staatsbürgerschaft: | USA |
| Rasse: | Kaukasisch |
| Geschlecht: | Männlich |
| Körpergröße: | Unbekannt |
| Gewicht: | Unbekannt |

| | |
|---|---|
| Augenfarbe: | Unbekannt |
| Haarfarbe: | Unbekannt |
| Passnummer: | (U.S.) 200822511 |
| US-Sozialversicherungsnummer: | Unbekannt |

## 2. VINCENT D. CELENTANO

| | |
|---|---|
| Geburtsdatum: | Unbekannt |
| Geburtsort: | Unbekannt |
| Staatsbürgerschaft: | USA |
| Rasse: | Kaukasisch |
| Geschlecht: | Männlich |
| Körpergröße: | Unbekannt |
| Gewicht: | Unbekannt |
| Augenfarbe: | Unbekannt |
| Haarfarbe: | Unbekannt |
| Passnummer: | Unbekannt |
| US-Sozialversicherungsnummer: | Unbekannt |

## 3. KAREN P. LOSORDO

| | |
|---|---|
| Geburtsdatum: | 13. Januar 1959 |
| Geburtsort: | USA |
| Staatsbürgerschaft: | USA |
| Rasse: | Kaukasisch |
| Geschlecht: | Weiblich |
| Körpergröße: | Unbekannt |
| Gewicht: | Unbekannt |
| Augenfarbe: | Unbekannt |
| Haarfarbe: | Unbekannt |
| Passnummer: | (U.S.) 100461696 |
| US-Sozialversicherungsnummer: | Unbekannt |

## 4. NOVATEK INTERNATIONAL, INC.
(läuft jetzt unter dem Namen Medical Diagnostics Products, Inc.)

| | |
|---|---|
| Eingetragener Geschäftssitz: | Colorado, USA |
| Adresse: | 8990-H |
| | Route 108 |
| | Columbia, Maryland, USA |

## 5. NEW ENGLAND DIAGNOSTICS, INC.

| | |
|---|---|
| Eingetragener Geschäftssitz: | Cayman-Inseln |
| Adresse: | 4 Butternut Lane |

Hingham
Massachussetts, USA

BETROFFENE PERSON

ANDREAS SCHWEITZER

| | |
|---|---|
| Geburtsdatum: | Unbekannt |
| Geburtsort: | Unbekannt |
| Staatsbürgerschaft: | Anscheinend Schweiz |
| Rasse: | Kaukasisch |
| Geschlecht: | Männlich |
| Sozialversicherungsnummer: | Unbekannt |
| Adresse: | Seestrosso No. 1 |
| | Cham 6330 |
| | Schweiz |

## ERFORDERLICHE UNTERSTÜTZUNG
### Erforderliche Dokumente

Bitte stellen Sie alle Unterlagen oder andere Materialien im Besitz von Herrn
Andreas Schweitzer hinsichtlich folgender Unternehmen und Personen zur
Verfügung:

1) Novatek International, Inc.,
2) Novatek International Holding, Inc.,
3) HealthCare, Ltd.,
4) Universal Health Watch, Inc.,
5) New England Diagnostics, Inc.,
6) William P. Trainor,
7) Vincent D. Celentano und
.8) Karen Losordo.

## ERFORDERLICHE ZEUGENAUSSAGEN

Bitte nehmen Sie die Zeugenaussage des vereidigten Zeugen Andreas
Schweitzer unter Beteiligung der SEC-Rechtsanwälte, der DOJ-Rechtsanwälte,
der Vertreter des Federal Bureaus of Investigation und Rechtsanwälte der
Beklagten hinsichtlich seiner Beziehungen zu den oben genannten Personen
und Unternehmen und seines Wissens in allen Angelegenheiten, die sich auf die
Angelegenheit dieses Unterstützungsgesuchs beziehen. Die SEC und DOJ
haben Fragen vorbereitet, die sie Herrn Schweitzer vor der Zeugenaussage
stellen möchten.

## ZU BEACHTENDE VERFAHRENSWEISEN

Bitte bitten Sie den Kantonalrichter um Folgendes:

1. Dafür zu sorgen, dass das Interview mit Herrn Schweitzer innerhalb einer Woche nach Vorlage der erforderlichen Dokumente bei der SEC, wobei Vertreter des DOJ, FBI und der Beklagten anwesend sein müssen, durchgeführt wird und Vorlage eines Protokolls gemäß Artikel 1(4) (b), 10 und 12.

2. Dafür zu sorgen, dass Herrn Schweitzers Zeugenaussage wortwörtlich in Ton und Bild aufgezeichnet wird, dass Herrn Schweitzer das wortwörtliche Protokoll oder andere Medien, die zur Aufzeichnung der Antworten auf die Fragen verwendet wurden, unterzeichnet, und dass das wortwörtliche Protokoll oder die anderen Aufzeichnungen allen Rechtsanwälten zur Verfügung gestellt werden, die dies wünschen.

3. Anforderungen von Originaldokumenten oder gleichlautenden Abschriften der Dokumente von der Bank gemäß Artikel 1(4) (c) und 18(1),

4. Das Ergänzen der Dokumente um eine Echtheitsbescheinigung der Geschäftsunterlagen ausgefüllt und unterschrieben von der Person, die diese Dokumente vorlegt, gemäß Artikel 1(4) (e) und 18(2) und

5. Das Versehen der Bescheinigung mit ihrem oder seinem Siegel (oder Stempel) gemäß Artikel 18(3), wenn gewährleistet wird, das eine Falschaussage auf der Bescheinigung die Person, die diese ausfüllte und unterschrieb, der Strafverfolgung nach Schweizer Recht aussetzt.

6. Einladung an Herrn Schweitzer zum Erscheinen in Washington D.C. zur Zeugenaussage vor dem Geschworenengericht und/oder im Rahmen der Gerichtsverhandlung gemäß Artikel 23 (2) zu einem zukünftigen Zeitpunkt auf Kosten der Regierung der Vereinigten Staaten.


21. Januar 2000          {Unterschrift}
Datum                    Thomas G. Snow
                         Stellvertretender Direktor
                         Büro für Internationale Angelegenheiten
                         [Office of International Affairs]
                         Kriminalabteilung [Criminal Division]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. _____


IN RE SEALED MATTER                    )
(Grand Jury 00-01)                     )
                                       )
_____ )

## SEALED ORDER

Upon application ex parte and under seal of the United States of America, pursuant to 18

U.S.C. § 3292, the Court finds by a preponderance of the evidence that an official request was

submitted to the appropriate Switzerland authorities on October 17, 2000 for evidence relating to

the offenses of (1) mail fraud, 18 U.S.C. §§ 1341, (2) wire fraud, 18 U.S.C. § 1343, (3)

laundering of monetary instruments, 18 U.S.C. § 1956, and (4) engaging in monetary transactions

in property derived from specified unlawful activity, 18 U.S.C. § 1957, and that it reasonably

appears that such evidence is in Switzerland.

Therefore, in view of the findings, it is hereby

ORDERED that the application of the United States is granted, and it is further

ORDERED that the running of the statute of limitations for the offenses set forth above

and further described in the Motion of the United States for Suspension of the Statute of

Limitations is hereby suspended beginning on October 17, 2000 until the date on which the

authorities of Switzerland take final action on such request by delivering a complete response to

the United States, provided that this period of suspension may not exceed three years.

IT IS FURTHER ORDERED that, within ten (10) days of being advised that final action

has been taken by Switzerland on the government's request, government counsel assigned to this

investigation shall notify the Court of such final action.

Dated: This _____ day of _____, 2001.


_____

UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. _____

IN RE SEALED MATTER                    )
(Grand Jury 00-01)                     )
                                       )
_____        )

## ORDER TO SEAL

Upon Motion of the United States, this Court having been apprised in the premises, for good cause shown, does hereby enter an ORDER sealing the Motion for Suspension of the Statute of Limitations, the Order granting the Motion for Suspension of the Statute of Limitations, the Motion to Seal, and this Order, until such time as the indictment of any of the defendants in the above-styled matter or until further Order of the Court.

Dated: This _____ day of _____, 2001.

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. _____

IN RE SEALED MATTER                )
(Grand Jury 00-01)                 )
                                   )
_____  )

## MOTION TO SEAL

The United States of America, by and through its undersigned counsel, hereby applies and

moves this Court, for an Order sealing the Motion for Suspension of the Statute of Limitations in

the above-captioned matter, sealing the Order granting that motion, and sealing this Motion to

Seal, until such time as the indictment of any of the defendants in this investigation or until

further Order of the Court.

In furtherance of this motion, the United States submits that the matters contained in the

motion and Order are of a sensitive nature pertaining to an on-going grand jury investigation

involving a number of victims and subject to the general rule of secrecy contained in Rule 6(e) .

WHEREFORE, pursuant to Rule 6(e)(6) of the Federal Rules of Criminal Procedure, the

United States respectfully requests that the Motion for Suspension of the Statute of Limitations,

the Order granting that motion, and this Motion to Seal, be **SEALED** until such time as the

indictment of any defendant in this investigation or until further Order of the Court.

Dated: April ___9___, 2001.

Respectfully submitted,

GUY A. LEWIS
United States Attorney

By: _____

JACK B. PATRICK
VA Bar No. 32645
Senior Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue
Washington, DC 20005
Tel: (202) 514-9842
Fax: (202) 514-0152
E-MAIL: Jack.Patrick2@USDOJ.GOV

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. $GJ$ -00 -01



IN RE SEALED MATTER          )
(Grand Jury 00-01)           )
                             )
_____    )

## SEALED ORDER

Upon application <u>ex parte</u> and under seal of the United States of America, pursuant to 18

U.S.C. § 3292, the Court finds by a preponderance of the evidence that an official request was

submitted to the appropriate Switzerland authorities on October 17, 2000 for evidence relating to

the offenses of (1) mail fraud, 18 U.S.C. §§ 1341, (2) wire fraud, 18 U.S.C. § 1343, (3)

laundering of monetary instruments, 18 U.S.C. § 1956, and (4) engaging in monetary transactions

in property derived from specified unlawful activity, 18 U.S.C. § 1957, and that it reasonably

appears that such evidence is in Switzerland.

Therefore, in view of the findings, it is hereby

ORDERED that the application of the United States is granted, and it is further

ORDERED that the running of the statute of limitations for the offenses set forth above

and further described in the Motion of the United States for Suspension of the Statute of

Limitations is hereby suspended beginning on October 17, 2000 until the date on which the

authorities of Switzerland take final action on such request by delivering a complete response to

EXH. 2

the United States, provided that this period of suspension may not exceed three years.

IT IS FURTHER ORDERED that, within ten (10) days of being advised that final action

has been taken by Switzerland on the government's request, government counsel assigned to this

investigation shall notify the Court of such final action.

Dated: This ___10ᵀᴴ___ day of ___May___, 2001.

UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. _OO-O1_

FILED by ____ D.C.
INTAKE

APR -6 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

IN RE SEALED MATTER                    )
(Grand Jury Investigation of           )
Novatek International, Inc. et al)      )
_____ )

## SEALED MOTION FOR SUSPENSION OF STATUTE OF LIMITATIONS

The United States of America, by and through its undersigned counsel, hereby applies and

moves this Court, ex parte and under seal, pursuant to 18 U.S.C. § 3292, for an order suspending

the running of the statute of limitations for the offenses under investigation in the above-

captioned matter, pending receipt of testimony and evidence from Switzerland. The offenses

under investigation in the above-captioned matter concern the making of false statements, the

concealment of material facts, and other acts of fraud or deception relating to Novatek

International, Inc. and related entities, including Health Care Limited, Universal HealthWatch,

Inc., Medical Products, Inc. and New England Diagnostics. Such offenses may include, but are

not limited to, violations of 18 U.S.C. §§ 1341, 1343, 1956 and 1957.

The proposed order of suspension will cover the period beginning October 17, 2000, the

date on which an official request for evidence in connection with the above-referenced

investigation was submitted to Switzerland by the Criminal Division of the United States

Department of Justice and ending on the date on which Switzerland takes final action on the

request.

EXH. 3

As this is an on-going grand jury matter that is subject to the general rule of secrecy contained in Rule 6(e) of the Federal Rules of Criminal Procedure, a separate motion requests filing under seal of this application and the Order until indictment of any defendant in this investigation or until further order of the Court.

This application is based on the attached Memorandum of Points and Authorities and attached exhibits.

Dated: March _29_, 2001.

Respectfully submitted,

GUY A. LEWIS
United States Attorney

By:        _Jack B Patrick_

JACK B. PATRICK
Senior Trial Attorney
VA Bar No. 32645
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue
Washington, DC 20005
Tel: (202) 514-9842
Fax: (202) 514-0152
E-MAIL: Jack.Patrick2@USDOJ.GOV

2

## MEMORANDUM OF POINTS AND AUTHORITIES

A.    Grand Jury Investigation.

A grand jury convened in the Southern District of Florida has been conducting an investigation concerning investments in Novatek International, Inc. and related entities. The investigation has focused on allegations that from in or about June 1994 through in or about December 1996 William P. Trainor and Vincent D. Celentano fraudulently induced investments in entities which they controlled and that they fraudulently gained control of Novatek International, Inc. ("Novatek"), a publicly-traded company, and, thereafter, used Novatek to engage in a pump and dump securities fraud scheme.

In or about 1994, William Trainor and Vincent Celentano began to create entities that purported to distribute medical diagnostic devices in countries outside of the United States. The first entity was Health Care Limited, organized in Russia. Health Care Limited, and subsequent entities controlled by Trainor and Celentano, obtained licenses to distribute the devices from Universal HealthWatch, Inc., which was another entity controlled by Trainor and Celentano and which was headquartered in Columbia, Maryland. Universal HealthWatch, Inc. was supposed to develop the devices or buy them from other companies. By selling the licenses between entities which they controlled, essentially "flipping" the licenses at increasing prices mostly paid for with promissory notes, Trainor and Celentano were able to create the illusion of value.

In or about January 1995, Trainor and Celentano began to sell stock in Health Care Limited, based on their false claims regarding Health Care Limited, including claims that they had a $216 million annual contract with a Russian government entity and claims that Celentano had put over $50 million into their company.

In or about November 1995, Trainor and Celentano began looking for a publicly-traded company which they could acquire and through which they could market medical diagnostic devices, reaching a broader range of investor-victims. In or about December 1995, they focused on Novatek.

Novatek was a manufacturer of steel, hurricane-proof buildings, headquartered in Boynton Beach, Florida. At that time, Novatek was not a very profitable operation. Novatek officials engaged in discussions with Celentano and with others on behalf of Trainor and Celentano concerning a possible merger between Novatek and Medical Products, Inc. ("MPI"), a company which Trainor and Celentano formed in November 1995. MPI was owned by the Pickeral Cove Trust and The Celentano Group, entities made up of the family members of Trainor and Celentano. The same entities owned Universal HealthWatch, Inc. The ownership structure allowed Trainor and Celentano to control both MPI and Universal HealthWatch, Inc.

MPI's sole asset was a license to distribute in South America and the Bahamas the medical diagnostic devices of Universal HealthWatch, Inc. MPI had acquired the license by an agreement, dated November 30, 1995, from an entity called New England Diagnostics, Inc. ("NED"), purportedly for $30 million, given by MPI as a promissory note. NED had purportedly acquired its license from Universal HealthWatch, Inc., covering many more countries, for $250,000 and certain other promises. Hence, the license flowed from Universal HealthWatch, Inc. to NED to MPI and the price purportedly paid for the license increased from $250,000 to $30 million in no more than a few months time.

2

Accountants who audited the financial statements of MPI and Novatek prior to the merger raised certain concerns during the merger negotiations, including whether or not the value being suggested for MPI in a proposed swap for Novatek stock was legitimate or falsely inflated and whether or not the license transactions being used to support MPI's value were between unrelated parties. Since the ownership of Universal HealthWatch, Inc. and MPI was essentially the same, the focus was on the ownership and control of NED.

Celentano made false representations and provided false documents to the accountants involved in the merger, creating the impression that the license held by MPI was valuable and that the license agreements were legitimate, arms-length transactions. Celentano represented that NED was not related to Universal HealthWatch, Inc. or MPI and that neither Celentano or Trainor controlled NED. Subsequently, Trainor and Celentano alleged that NED was owned by Andreas Schweitzer, a Swiss businessman. The grand jury investigation, however, has revealed that NED was operated out of the home of Trainor's daughter, Karen Losordo, in Hingham, Massachusetts and that Trainor and Celentano provided instructions to her as to NED's operations, including where to send money from NED. Losordo, who claims only to be the agent of NED, is identified in various documents as the president, sole director and authorized agent of NED.

Based on false and misleading representations made and caused to be made by Trainor and Celentano, Novatek officials agreed to the merger. In or about March 1996, Novatek merged with MPI, mistakenly believing that it was obtaining a license worth more than $55 million in the acquisition, the bump up from $30 million to $55 million being based on other license and

3

revenue figures. The $55 million value was then used in Novatek financial statements submitted to the SEC, resulting in Novatek appearing to have assets of about $55 million value.

As part of the merger, MPI acquired about 4 million shares of Novatek stock. NED also received about 3.4 million shares of Novatek and $1.3 million in cash as payment on the promissory note given to NED by MPI for the license. The $1.3 million ended up being used to buy a house on the Hillsboro mile for the Trainor family.

After the merger, Trainor and Celentano effectively controlled Novatek and caused Novatek to make additional multi-million dollar agreements with NED for licenses to distribute UHW medical diagnostic devices in Mexico and Central America. Trainor and Celentano also caused Novatek to issue press releases from March 1996 through September 1996 which falsely gave the appearance that Novatek had binding multi-million dollar contracts to distribute the medical diagnostic devices in South America and that Novatek was receiving revenue from the contracts. Novatek also submitted period reports to the SEC which repeated the false claims in the press releases and reflected Novatek's ownership of the $55 million license.

The false claims induced investors to buy Novatek stock and induced investors to pay about $7 million for Novatek convertible debentures. The efforts of Trainor and Celentano to fraudulently inflate the value of Novatek's stock price were successful. During the relevant period, Novatek's stock price more than doubled in value, rising from a mere $5 per share in March 1996 to over $13 per share in September 1996 before settling back to $9 per share. The stock price totally collapsed following suspension of trading in October 1996. Novatek subsequently went into bankruptcy. Trainor then fraudulently induced a Las Vegas businessman

4

to provide millions of dollars to continue the operations of Universal HealthWatch, Inc., with

substantial amounts of that funding ending up in the hands of the Trainor family.

Tracing of the money paid to Novatek for the convertible debentures has revealed that

about $7 million went from Novatek to NED, purportedly as payments on licenses sold by NED

to Novatek and on loans made by NED to Novatek. Other money from the sale of stock also

went through NED. After the money reached NED, Karen Losordo moved the money to other

accounts or wired the money back to Florida and elsewhere to buy expensive homes and cars for

the Trainor family. Over $1 million of the money was used to buy back stock from disgruntled

family and friends who had bought stock based on Celentano's promise to repay them if their

stock value did not increase. At least $250,000 went back to Novatek from NED to create the

appearance that money was being received under a contract in South America as had been

announced in a press release.

B.    Foreign Evidence and Treaty Requests.

On October 17, 2000, a request for assistance in the prosecution of William Trainor, et al

was submitted by the Central Authority of the United States to the government of Switzerland

pursuant to the Treaty on Mutual Assistance in Criminal Matters entered into force on January

23, 1977, and to the Diplomatic Notes exchanged on November 3, 1993 in connection with a

civil action by the United States Securities and Exchange Commission ("SEC") and a criminal

investigation being conducted by the United States Department of Justice, Criminal Division,

Fraud Section ("DOJ"). The request identified a civil lawsuit filed by the SEC and discussed the

SEC interest. The request also stated that DOJ was investigating whether Trainor and other

5

persons and entities violated United States law by engaging in mail and wire fraud and money laundering in connection with misrepresentations made to investors. The request set forth the statutory offenses of 18 U.S.C. § 1341 (mail fraud), 1343 (wire fraud), 1956 (laundering of monetary instruments), and 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

The request sought was to obtain bank records and other documents in the possession of Andreas Schweitzer concerning Novatek, HealthCare Limited, Universal HealthWatch, Inc. and NED and concerning Trainor, Celentano and Losordo and to obtain business record certifications for the documents. The request also sought to have a Swiss magistrate arrange recorded testimony from Schweitzer and to have the Swiss magistrate invite Schweitzer to appear to testify before a grand jury (at that time identified as being in Washington, DC) and/or at trial.

The documents in the possession of Schweitzer are necessary to the grand jury investigation being conducted in the Southern District of Florida in order to determine Schweitzer's knowledge of and involvement in the license transactions and the transfer of money and to identify the true ownership and control of NED, the true purpose for NED's involvement in the license transactions, and the true value of the licenses.

The issue of the ownership and control of NED is of critical importance to the government's investigation of the aforementioned fraud and money laundering offenses. The purported $30 million license owned by MPI enabled Celentano and Trainor to gain control of Novatek. Moreover, the grossly inflated value of the MPI license shown on Novatek's financial statements after the Novatek/MPI merger, in part, induced people to invest million of dollars in

6

Novatek during the relevant period. If NED was owned or controlled by Trainor or Celentano (or

their nominees), then it is clear that the license value was created through a series of related party

transactions resembling classic land flips rather than through legitimate arms-length transactions

as Celentano and Trainor represented to the auditors of MPI and Novatek. Thus, evidence

related to the control or ownership of NED bears directly on whether Celentano, Trainor and

others committed the fraud offenses outlined earlier. Because NED was the primary vehicle

used to launder the proceeds of the fraud, evidence concerning the ownership and control of NED

is equally important to the investigation of the money laundering offenses described above.

Celentano, Trainor and Losordo have at various times claimed that NED was owned by Andreas

Schweitzer. Accordingly, testimony and documentary evidence from Schweitzer concerning

NED is critical to the government's fraud and money laundering investigation.

    C.    <u>Legal Authority for Suspension of the Statute of Limitations</u>

    Title 18, United States Code, Section 3292, permits a court to suspend the running of the

statute of limitations for a period of up to the three years when an official request has been mde

for evidence in a foreign country. Section 3292 provides in pertinent part as follows:

> (a) (1)   Upon application of the United States, filed before return of an
> indictment, indicating that evidence of an offense is in a foreign country, the
> district court before which a grand jury is impaneled to investigate the offense
> shall suspend the running of the statute of limitations for the offense if the court
> finds by a preponderance of the evidence that an official request has been made
> for such evidence and that it reasonably appears, or reasonably appeared at the
> time the request was made, that such evidence is, or was, in such foreign country.
>           *   *   *
> (d)    As used in this section, the term "official request" means a letter
> rogatory, a request under a treaty or convention, or any other request for evidence
> made by a court of the United States or an authority of the United States having

criminal law enforcement responsibility, to a court or other authority of a foreign country.

Upon receipt of an application that outlines the government's reasons to believe that evidence of an offense lies outside the jurisdiction of the United States, the Court must determine by a preponderance of the evidence  (1) that "an official request" has been made and (2) that "it reasonably appears or reasonably appeared at the time the request was made, that such evidence is or was, in such foreign country.  Exhibit A is the request for assistance by the United States Department of Justice.  The issuance of the request satisfies the first prerequisite of the statute - - that an "official request" has been made to the foreign government by "an authority of the United States having criminal law enforcement responsibility."

The final prerequisite to stay the running of the statute of limitations is whether it reasonably appears that the evidence sought under the request for foreign assistance is, or was, in the foreign country.  Documents obtained by the grand jury have identified Schweitzer as the holder of bearer stock of NED, as a Swiss resident, and have identified his business address as being in Switzerland.  Agreements pertinent to NED and Schweitzer have identified Schweitzer's address in Switzerland.  Witnesses interviewed by the Federal Bureau of Investigation have also stated that Trainor and Celentano represented to them that Schweitzer was the owner of NED and have identified Schweitzer as a Swiss resident.

The date for the tolling of the limitations period is the date of the official request for evidence, not the date that the § 3292 motion is made.  United States v. Bischel, 61 F.3d 1429, 1434 (9th Cir.1995).  Although the request was signed by Thomas Snow, Deputy Director, Office

8

of International Affairs, Criminal Division, on January 2, 2000, it was not submitted by the DOJ

Criminal Division to the Central Authority of Switzerland until October 17, 2000. Accordingly,

the United States takes the position for purposes of this motion only that the date of the request is

October 17, 2000.

The statute is tolled until final action is taken by the Swiss Authorities. The Swiss

authorities have requested additional information regarding Schweitzer, the matters being

investigated, and the damages suffered by investors, and final action has not been taken by the

Swiss authorities. See United States v. Bischel, 61 F.3d 1429, 1434 (9th Cir.1995)("final action"

for purposes of § 3292 means a dispositive response by the foreign sovereign t both the request

for records and for a certificate of authenticity of those records as identified in the official

request).

D.    Conclusion.

For the foregoing reasons, the government respectfully requests that the court enter an

order suspending the running of the statute of limitations herein as of October 17, 2000 until the

appropriate authorities in Switzerland take final action on the official request.

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MISC. NO. *OD-OI ftl* ·

IN RE SEALED MATTER                          )
(Grand Jury Investigation of                 )
Novatek International, Inc. et al)            )
_____        )

FILED by _____ D.C.
INTAKE

APR - 6 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. • FT. LAUD.

## MOTION TO SEAL

The United States of America, by and through its undersigned counsel, hereby applies and moves this Court, for an Order sealing the Motion for Suspension of the Statute of Limitations in the above-captioned matter, sealing the Order granting that motion, and sealing this Motion to Seal, until such time as the indictment of any of the defendants in this investigation or until further Order of the Court.

In furtherance of this motion, the United States submits that the matters contained in the motion and Order are of a sensitive nature pertaining to an on-going grand jury investigation involving a number of victims and subject to the general rule of secrecy contained in Rule 6(e) .

WHEREFORE, pursuant to Rule 6(e)(6) of the Federal Rules of Criminal Procedure, the

United States respectfully requests that the Motion for Suspension of the Statute of Limitations,

the Order granting that motion, and this Motion to Seal, be **SEALED** until such time as the

indictment of any defendant in this investigation or until further Order of the Court.

Dated: March 2 9 , 2001.

                        Respectfully submitted,

                        GUY A. LEWIS
                        United States Attorney

By: _____
                        JACK B. PATRICK
                        Senior Trial Attorney
                        VA Bar No. 32645
                        Fraud Section, Criminal Division
                        U.S. Department of Justice
                        1400 New York Avenue
                        Washington, DC 20005
                        Tel:  (202) 514-9842
                        Fax: (202) 514-0152
                        E-MAIL: Jack.Patrick2@USDOJ.GOV

[vdkttext]

```
                              Case Selection
Dkt type: cr   Case Number: 01-6215      Division: 0   FtLauderdale

Transaction: kseal doc -/-/- - -
                              History Record
Occurrence date:     04/16/03      Service date :            ID#  5692556
                              Document Record
Document number:    117     -1   Document type :doc        -
Date filed : 04/16/03            Date disposed :       Term # :
Date req :                       Time req :            Flag .
Requested Amt :
+----------------------------------------------------------+
 SEALED DOCUMENT with attachments as to William P. Trainor



+editing docket text-----------------------------------------+


 Command mode (? for commands)
```